## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **DEBRA JULIAN & STEPHANIE MCKINNEY**, *on behalf of themselves and others similarly situated,* | ) ) ) | |
| | ) | **Case No.: 1:17-cv-00957-AJN** |
| *Plaintiffs,* | ) ) | |
| **v.** | ) ) | *Electronically Filed* |
| **METROPOLITAN LIFE INSURANCE COMPANY,** | ) ) ) | |
| *Defendant.* | ) ) | |

---

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DECERTIFY PLAINTIFFS' CONDITIONAL COLLECTIVE

---

**MORGAN, LEWIS & BOCKIUS LLP**

Melissa C. Rodriguez
Ashley Hale
Christopher A. Parlo

101 Park Avenue
New York, New York 10178
212.309.6000

*Attorneys for Defendant Metropolitan Life Insurance Company*

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT .................................................................. 1

II.  RELEVANT PROCEDURAL BACKGROUND .......................................... 3

III.  WHETHER A PLAINTIFF OR OPT-IN IS EXEMPT MUST  BE DETERMINED ON A CASE-BY-CASE BASIS. ........................................... 4

    A.  The Administrative Exemption ................................................... 4

    B.  DOL Guidance Confirms That Adjusters Like Plaintiffs May Be Exempt .......... 5

    C.  Whether a Claims Specialist is Exempt Must Be Decided on an Individual Basis ........................................................................... 5

IV.  RELEVANT FACTUAL BACKGROUND ................................................ 5

    A.  MetLife's Expectations for the LTDCS Role and the LTDCS Job Description ...................................................................... 6

    B.  The Plaintiffs and Opt-ins Cannot Even Agree on their Primary Duty ................ 8

    C.  The Plaintiffs And Opt-ins Cannot Agree on the Scope of Their Discretion and Independent Judgment ...................................... 11

        1.  Plaintiffs and Opt-ins had Different Authority Levels and Differed in How and How Often They applied that Authority ............................. 12

        2.  Plaintiffs and Opt-ins Differ in How They Evaluated Claims ................. 13

        3.  Plaintiffs and Opt-ins Disagree on the Use of Resources and CDMs...... 14

        4.  Plaintiffs and Opt-in Practices Differed as to Conducting Interviews................................................................... 16

        5.  Plaintiff and Opt-in Practices Differed as to Determining the Extent of Liability and Total Value of a Claim ....................... 17

        6.  Plaintiff and Opt-in Practices Differed as to Other Exempt Duties......... 19

    D.  The Plaintiffs Disavow That Any Common Job Description or Policy  or Procedure Was Accurate or Applied to Them .................................... 20

V.  ARGUMENT ................................................................................... 21

    A.  Plaintiffs Have the Burden of Proving That They and The Opt-ins are Similarly Situated on the Controlling Issue of Whether They Are Exempt From Overtime ............................................................ 22

    B.  The Plaintiffs and Opt-ins Are Not Similarly Situated ...................... 24

        1.  Because At Least Some Plaintiffs And Opt-ins Are Exempt The Collective Should Be Decertified .......................................... 24

        2.  No Common Unlawful Company Policy or Practice Exists.................... 24

        3.  The Plaintiffs Have Failed to Show That They and The Opt-ins Are Similarly Situated on the Controlling Issue of Whether or Not They Are Exempt.......................................................... 26

        4.  The Plaintiffs Have Also Failed to Show That They and The Opt-ins Are Similarly Situated With Respect to MetLife's Defenses. .......... 28

VI.  CONCLUSION................................................................................. 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,
    772 F. Supp. 2d 1111 (N.D. Cal. 2011), *abrogated on other grounds by
    Campbell v. City of Los Angeles,* 903 F.3d 1090 (9th Cir. 2018)...........................................28

*Brown v. Barnes & Noble, Inc.*,
    252 F. Supp. 3d 255 (S.D.N.Y. 2017)........................................................................................24

*DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*,
    27 F. Supp. 3d 313 (E.D.N.Y. 2014) .........................................................................................28

*Espenscheid v. DirectSat USA, LLC*,
    705 F.3d 770 (7th Cir. 2013) .....................................................................................................32

*Glatt v. Fox Searchlight Pictures, Inc.*,
    811 F.3d 528 (2d Cir. 2016)...........................................................................................25, 26, 27

*Green v. Harbor Freight Tools USA, Inc.*,
    888 F. Supp. 2d 1088 (D. Kan. 2012) .......................................................................................30

*Guillen v. Marshalls of MA, Inc.*,
    750 F. Supp. 2d 469 (S.D.N.Y. 2010) .......................................................................................24

*Guillen v. Marshalls of MA, Inc.*,
    No. 09-9575, 2012 WL 2588771 (S.D.N.Y. Jul. 2, 2012).........................................................24

*Harper v. Gov't Emps. Ins. Co.*,
    No. CV 09-2254, 2015 WL 9673810 (E.D.N.Y. Nov. 16, 2015)......................................22, 32

*Hernandez v. Fresh Diet, Inc.*,
    No. 12-4339, 2014 WL 5039431 (S.D.N.Y. Sept. 29, 2014) ....................................................27

*Hernandez v. United Auto Credit Corp.*,
    No. 08-03404, 2010 WL 1337702 (N.D. Cal. Apr. 2, 2010).....................................................22

*Hoffman-LaRoche Inc. v. Sperling*,
    493 U.S. 165 (1989)....................................................................................................................22

*Holick v. Cellular Sales of N.Y., LLC*,
    No. 1:12-cv-584, 2019 WL 1877176 (N.D.N.Y. Apr. 26, 2019), *appeal filed*,
    No. 20-2037 (2d Cir. Jun 29, 2020)...................................................................................17, 28

*In re Family Dollar FLSA Litig.*,
    637 F.3d 508 (4th Cir. 2011) .....................................................................................................24

*Jenkins v. TJX Cos. Inc.*,
    853 F. Supp. 2d 317 (E.D.N.Y. 2012) .......................................................................................24

*Johnson v. Big Lots Stores, Inc.*,
   561 F. Supp. 2d 567 (E.D. La. 2008) ..........................................................................30, 31, 32

*Krupinski v. Laborers E. Region Org. Fund*,
   No. 15-982, 2016 WL 5800473 (S.D.N.Y. Sept. 30, 2016) .......................................10

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010).....................................................................................23

*Roe-Midgett v. CC Servs., Inc.*,
   512 F.3d 865 (7th Cir. 2008) .................................................................................5, 28

*Scott v. Chipotle Mexican Grill, Inc.*,
   954 F.3d 502 (2d Cir. 2020), *petition for cert. docketed*, No. 20-257 (U.S.
   Sept. 1, 2020) ..................................................................................................22, 23, 26

*Scott v. SSP Am., Inc.*,
   No. 09-4399, 2011 WL 1204406 (E.D.N.Y. 2011) ...................................3, 4, 23, 28

*Stevens v. Hmshost Corp.*,
   2014 WL 4261410, (E.D.N.Y. Aug. 26, 2014)............................................... *passim*

*Thind v. Healthfirst Mgmt. Servs., LLC*,
   No. 14-9539, 2016 WL 7187627 (S.D.N.Y. Dec. 9, 2016) .......................................23

*Vecchio v. Quest Diagnostics Inc.*,
   No. 16-5165, 2020 WL 5604080 (S.D.N.Y. Sept. 18, 2020) ............................23, 26

*White v. Baptist Mem'l Health Care Corp.*,
   699 F.3d 869 (6th Cir. 2012) ...................................................................................24

*Withrow v. Sedgwick Claims Mgmt. Serv., Inc.*,
   841 F. Supp. 2d 972 (S.D. W. Va. 2012).................................................................13

*Zivali v. AT&T Mobility, LLC*,
   784 F. Supp. 2d 456 (S.D.N.Y. 2011).....................................................23, 25, 28

**STATUTES**

29 U.S.C. § 213(a)(1)...................................................................................................4

ERISA .........................................................................................................................7

Fair Labor Standard Act.................................................................................... *passim*

Portal-to-Portal Act, Pub. L. No. 80-49, § 5(a), 61 Stat. 84, 87 (1947)........................22

**RULES**

29 C.F.R. § 541.200(a)...................................................................................................4

29 C.F.R. § 541.200(c)(3)...............................................................................................21

29 C.F.R. § 541.201(a) ................................................................................................4

29 C.F.R. § 541.202(a) ............................................................................................4, 21

29 C.F.R. § 541.202(b) ..............................................................................................19

29 C.F.R. § 541.202(c) ...........................................................................................4, 10

29 C.F.R. § 541.203(a) .......................................................................................5, 13, 22

69 Fed. Reg. 22122, at 22144 (Apr. 23, 2004) ..........................................................5

## I.   **PRELIMINARY STATEMENT**

In March 2018, the Court permitted plaintiffs Debra Julian ("Julian") and Stephanie McKinney ("McKinney") (with Kimberly Harris, "Plaintiffs") to send notice of this action to hundreds of current and former Long Term Disability Claims Specialists ("LTDCSs") employed by MetLife.  Dkt. No. 65 (the "Order").  Noting the "low standard of proof" and "minimal" burden for conditional certification at *that stage*, the Court deferred MetLife's arguments against certification to another day.  *Id.* at 4.  That day has arrived.  The test now is whether Plaintiffs and others who joined the collective (the "Opt-ins") are *actually* similarly situated in how they performed their jobs.  They are not, and under the higher bar applicable at *this stage* the collective must be decertified.

Plaintiff must now show that a jury could decide in one proceeding, based on representative proof, whether the FLSA's administrative exemption applies to all remaining 80 Plaintiffs and Opt-ins.  That showing cannot be made.  According to their own testimony and written statements, the experiences of the Plaintiffs span to opposite ends of the spectrum on the administrative exemption's critical inquiry: did they exercise discretion and independent judgment in making decisions.  Whereas Julian cast herself as a "peon" who made *no* decisions, Opt-in Dubois "had to make an approval or denial on every claim."  *See* Julian Tr. 59; Dubois Tr. 135.[1]  The Court should stop right there and decertify the collective.

As this Court predicted, determining the primary job duty for each Plaintiff and Opt-in

---

[1] The record in this case includes the deposition testimony ("Tr.") of Debra Julian ("Julian"), Stephanie McKinney ("McKinney"), Kimberly Harris ("K. Harris"), Jennifer Dubois ("Dubois"),  Michael Hensel ("Hensel"), Lisa Mocny ("Mocny"), Tonya Gill ("Gill"), Pamela Wolber ("Wolber"), Tamitra Harris ("T. Harris"), Claudette Leveille ("Leveille"), Krystal Hrobowski ("Hrobowski"), Sandhya Patel ("Patel"), Keith Wicklund ("Wicklund"), Sharon DeForge ("DeForge"), Shawn Stephenson ("Stephenson"), Theresa Jones ("Jones"), and Jacklin Roberts ("Roberts").  Cited pages and exhibits from these depositions are attached to the Declaration of Christopher Parlo ("Parlo Decl.") at Exs. A-Q.

must be done on a case-by-case basis.  Order at 9.[2]   Julian and other Opt-ins have now said so

themselves:

> Q. If I wanted to know what any other LTD claims specialist did on a day-to-day basis and how they performed their functions, how would I go about finding that out? A. You would have to call. Q. Call them? A. Yeah.

Julian Tr. 291.[3]

Julian and the Opt-ins are correct that the claims of each Plaintiff and Opt-in turn on proof

<u>unique</u> <u>to</u> <u>each</u> <u>individual</u>.  Some Opt-ins testified that *they* made the decisions to approve or deny,

or to terminate or modify, claims for long-term disability ("LTD") benefits totaling millions of

dollars each year.  These and other admissions by McKinney, and Opt-ins Wolber, Dubois,

Hrobowski, Patel and others, confirm they are exempt as a matter of law.   But Julian and other

Opt-ins reject that testimony.   Julian states that she did not make *any* decisions at all, about *any*

aspects of her claims.   This is not hyperbole—she denies making one decision.  Julian Tr. 59-

62, 72.  Plaintiff K. Harris, too, disclaimed responsibility for making decisions about her claims,

and others claim that nurses made the decisions for them.  K. Harris Tr. 108-10; Roberts Tr. 124-

25.

If that stark difference on this dispositive issue was not enough, other LTDCSs claim they

fall somewhere in an undefined middle.  They did not go as far as Julian and K. Harris in rejecting

all discretion and judgment, yet downplayed or flat-out disowned statements *in their own resumes,*

*job description and self-assessments* conceding that they regularly exercised discretion to make

important decisions.   Since many LTDCSs' current self-serving denials conflict with their own

prior admissions, it is impossible to decide even their single claims based on representative proof.

---

[2] While the Court granted conditional certification under the low, first-stage standard, it noted that "determining whether all LTDCSs exercised a similar amount of discretion—and whether the exercise of that discretion rendered LTDCSs exempt from the FLSA's overtime provision—*is a fact-intensive question* that will require significant discovery and an assessment" of the claims of each Plaintiff and Opt-in.  Order at 9 (emphasis added).
[3] *See also* Hrobowski Tr. 78-79, 256-57, 319 (you would have to ask each LTDCS); Mocny Tr. 57-59, 250-51 (same); Hensel Tr. 64-66 (same).

For any LTDCS whose claim is not dismissed, a jury would have to decide *which* version of *which* story to believe.  For each, the jury would also have to weigh the testimony of multiple co-workers who observed first-hand the exempt duties each performed.  There is nothing efficient or fair about holding a single trial to decide 80 individual claims that rise and fall based on <u>un</u>common evidence and testimony from <u>un</u>common witnesses.

If just the 21 LTDCSs deposed so far cannot agree on the fundamental question of what their job was or is, how could a jury decide the claims of all 80 Plaintiffs and Opt-ins together? It couldn't.  Because answering the question at the heart of this case "must be made on a case-by-case basis in light of the totality of the circumstances," the collective cannot stand.  *Scott v. SSP Am., Inc.*, No. 09-4399, 2011 WL 1204406, at *6 (E.D.N.Y. 2011).

## II.    RELEVANT PROCEDURAL BACKGROUND

In February 2018, notice of this action was sent to 470 LTDCSs across the country.  Only 87 (18.51%) filed consents to join.[4]  Since then, Plaintiffs have demanded sprawling discovery. MetLife has produced over **170,000** pages of documents, including emails from 13 separate custodians, in response to more than 100 separate document requests.  Parlo Decl. ¶ 2.  In addition, MetLife has produced dozens of surveys completed by LTDCSs (including some Opt-ins), about their work functions.[5]

Plaintiffs have also deposed multiple MetLife witnesses, including about **25** separate 30(b)(6) topics, and different types of electronic information, data and systems, **over a nine-year period**.  Dkt. No. 107, Ex. B.  In seeking to compel *even more* discovery beyond that already

---

[4]  *See* Dkt. Nos. 85, 87, 90, 93.  Eight individuals subsequently withdrew their consents to join and are no longer Opt-ins in this action.  *See* Dkt. Nos. 94, 105, 109, 111, 153, 204, 208, 210.  The Court dismissed the claims of one Opt-in without prejudice.  *See* Dkt. No. 168.  Thus, there are now 77 members of the collective, plus the three Plaintiffs.

[5] Among others, those surveys ("Sur.") were completed by Opt-ins Sharon Deforge ("DeForge"), Courtney Carlo ("Carlo"), Tammy Crego ("Crego"), Kim Kolupa ("Kolupa"), Joquetta Randolph ("Randolph"), Sheba Stephen ("Stephen"), Shawn Stephenson ("Stephenson"), and Ana E. Starowicz ("Starowicz").  *See* Parlo Decl. Ex. U.

produced, Plaintiffs represented to the Court that **"*significant disputes about Claim Specialists'*** ***job duties"*** relevant to the "administrative exemption to the FLSA" cannot be resolved without, at a minimum, discovery of multiple "claims processing programs" that "track and record Claim Specialists' work[.]" *Id.* at 2 (emphasis added). The scope of Plaintiffs' demands betrays any argument that their claims and the claims of 77 Opt-ins can be lumped together easily, fairly and efficiently in a collective action.

## III.   WHETHER A PLAINTIFF OR OPT-IN IS EXEMPT MUST BE DETERMINED ON A CASE-BY-CASE BASIS.

### A.   The Administrative Exemption

The FLSA exempts from its overtime requirements employees employed in an administrative capacity. 29 U.S.C. § 213(a)(1). The U.S. Department of Labor ("DOL") has defined "an employee employed in a bona fide administrative capacity" as an employee: (1) who is compensated at no less than $455 a week (and $684 per week after January 1, 2020); (2) whose "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) whose "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

An employee's work bears on the "general business operations" of her employer *or its customers* if she "perform[s] work directly related to assisting with the running or servicing of the business." *Id.* § 541.201(a). An employee exercises discretion and independent judgment if, "[i]n general," her work "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* § 541.202(a). Administrative employees may have "their decisions and recommendations . . . reviewed at a higher level," so long as they generally retain authority to make choices "free from immediate direction or supervision." *Id.* § 541.202(c).

### B.     DOL Guidance Confirms That Adjusters Like Plaintiffs May Be Exempt

DOL regulations specifically address the exempt status of insurance claims adjusters like the Plaintiffs and Opt-ins.  Under those regulations, an LTDCS will "generally meet the duties requirements for the administrative exemption" if her "duties include activities such" as: (1) "evaluating and making recommendations regarding coverage of claims"; (2) "interviewing insureds, witnesses and physicians"; and (3) "determining liability and total value of a claim."  29 C.F.R. § 541.203(a).  This list of tasks that are presumptively "administrative" does not distinguish between duties related to "general business operations" and those related to exercising "discretion and independent judgment."  Rather, insurance claims adjusters who perform the listed tasks satisfy *both* of "the duties requirements for the administrative exemption." *Id.*

### C.     Whether a Claims Specialist is Exempt Must Be Decided on an Individual Basis

Speaking in generalities, § 541.203(a) does not answer whether *every* claims adjuster is exempt.  Courts must still perform "a case-by-case assessment to determine whether [a given adjuster's] duties meet the requirement for exemption." 69 Fed. Reg. 22122, at 22144 (Apr. 23, 2004); *see also Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 874 (7th Cir. 2008) (holding claims adjusters exempt after recognizing need for case-by-case analysis); Order at 9 ("determining whether all LTD Claim Specialists exercised a similar amount of discretion . . . will require significant discovery and an assessment" of the claims of each Plaintiff and Opt-in).

## IV.     RELEVANT FACTUAL BACKGROUND

The Plaintiffs and Opt-ins testified that they had significantly different experiences with respect to whether, how often, and how they performed the exempt job duties in 29 C.F.R. § 541.203(a), which are at the core of the administrative exemption.

### A.     MetLife's Expectations for the LTDCS Role and the LTDCS Job Description

It is MetLife's position, and several Opt-ins confirmed, that LTDCSs are responsible for evaluating and managing claims arising under employer customers' LTD plans.  *See* Dubois Tr.

58-59; Wolber Tr. 50-51, 94-95; Hrobowki Tr. 129-30, 173-74, 312-13; Patel Tr. 109; DeForge Sur., Carlo Sur., Crego Sur., Stephen Sur. (Questions #36, 39); *see also* Dieppa Decl. ¶¶ 11, 14 (summarizing MetLife's LTD business and expectations for the LTDCS role).  LTDCSs decide whether to approve or deny the payment of disability benefits to employee customers (the "claimants") and, depending on that initial claims decision, whether to continue, terminate or modify that payment.  Wolber Tr. 50-51; 94-95.  LTDCSs are expected to, and do, make decisions resulting in the payment of millions of dollars in benefits every year.  *See* Gill Tr. 246-47; Gill Dep. Ex. 4; Julian Tr. 240-41, 260-62; Julian Dep. Ex. 2; *see also* T. Harris Tr. 165-66.

Given that no two disability claims are alike, whether or not an LTDCS approves or denies the payment of benefits depends on the facts and circumstances of *each* particular claim. Specifically, each employer customer has its own LTD plan (and sometimes multiple plans).  *See* Julian Tr. 265-68 ("every plan would be different"); Dubois Tr. 61-62, 106-07, 227-28; 106-07, 112; Leveille Tr. 100-01; K. Harris Tr. 167; Hrobowski Tr. 68-70, 81-82; Patel Tr. 62-64, 117-19, 151-52; Hensel Tr. 109-11; Mocny Tr. 62-64. Each plan could have a different definition of "disability" and exclusions from coverage that must be analyzed based on the medical/clinical, occupational and other facts presented by *each* claimant.   Hrobowski Tr. 68-70; 81-82. Determining whether a claimant meets the definition of disabled or is excluded under each employer's plan—decisions that can themselves require consulting with multiple resources—is just one step.  Dubois Tr. 106-07; Leveille Tr. 100-01; Wolber Tr. 63-65, 95-96; Gill Tr. 26-28; K. Harris Tr. 239-41.  As Opt-in Dubois explained, "you have to make sure there's no pre-existing [condition], you have to make sure there's no offsets, you have to make sure they're eligible." Dubois Tr. 107.

To determine whether to approve or deny a claim, an LTDCS may review, among other things, the claimant's medical records, information provided by the claimant and their medical

providers, the claimant's medical condition and related restrictions, and the claimant's occupation and work environment. *See* Dubois Tr. 58-59, 71-75, 156; Stephenson Tr. 37-39; Gill Tr. 36-38; Parlo Decl. Ex. R. LTDCSs are also expected to determine for how long a claimant may receive benefit payments and the value or amount of those benefits. *See* Dubois Tr. 61. And those steps are just for the initial claims decision! If a claim is approved, LTDCSs are expected to continue to reassess new information about the claimant's medical condition, treatment plan, possible workplace accommodations, potential fraud and other factors to decide whether to continue, terminate, or modify the claim. *See* Leveille Tr. 270-71; Wolber Tr. 106-07; Dubois Tr. 158; Smith Decl. ¶¶ 14, 16. While numerous LTDCS have confirmed they make these decisions, *others deny doing so*. *Compare, e.g.*, Hensel Tr. 101-02; Dubois Tr. 58; Leveille Tr. 108-17, *with* Mocny Tr. 72, 104-07; Roberts Tr. 19-20.

Depending on the facts and circumstances, still more exempt tasks may be required over the lifespan of the claim, as many Claims Specialists have confirmed:

- Determining whether additional medical information is necessary and evaluating whether the claimant's medical records are consistent with the medical diagnosis;
- Determining whether a claim requires additional investigation, including by the Special Investigation Unit ("SIU") for possible fraud (*e.g.*, home visits, surveillance, social media searches);
- Determining the amount of any offsets or other amounts (such as social security, state disability benefits, workers' compensation, settlement money for lost wages) that may impact the value of the claimant's LTD benefits;
- Deciding whether to interview claimants and deciding what questions to ask;
- Deciding whether to interview the claimant's employer and/or health care providers to obtain information relevant to the claim;
- Evaluating whether the claimant's current activities are consistent with the claimant's medical diagnosis and restrictions;
- Determining the claimant's motivation and expectations for returning to work with or without accommodations;
- Identifying and investigating discrepancies between the claimant's subjective complaints and the objective clinical findings in the claimant's medical records as well as any discrepancies in medical documentation;
- Determining and/or formulating opinions about the claimant's actual level of functionality, considering all sources of information;

- Determining whether to extend ERISA deadlines;
- Determining whether and when to involve a clinician, vocational rehabilitation expert or other internal resources, including whether to hold claim discussion meetings ("CDMs");
- Evaluating whether the claimant is actually following the treatment plan recommended by his/her health care professional;
- Assessing whether an injured employee can return to work and what, if any, workplace accommodations need to be made to facilitate the employee's return
- Assessing the claimant's education, skills, work experience, training, and functionality to determine whether they can return to work in any occupation.[6]

The job description for the LTDCS position reflects these exempt tasks. Parlo Decl. Ex. S. However, several Plaintiffs and Opt-ins testified that the job description is not accurate *and* ***cannot*** *be relied upon* to determine the job duties they performed. *See* Mocny Tr. 76-78; Roberts Tr. 19-20. Others go further and now deny (for the first time) performing their work in line with MetLife's expectations for the LTDCS position. *See* p. 9, *infra*. So the claims in this case will turn on the individual testimony of the Plaintiffs and Opt-ins, ***and they cannot even agree on what they did, who did what, or how it was done***. Some LTDCSs swear they performed the exempt job they were hired and expected to do. Others, like Julian and K. Harris, now claim in retrospect they did not. That disagreement on basic duties precludes certification.

### B. <u>The Plaintiffs and Opt-ins Cannot Even Agree on their Primary Duty.</u>

**"I rendered the decisions, I reviewed the work[.]" – Dubois Tr. 102.**

**"[R]endering decisions was something that I did not do." – Julian Tr. 248.**

MetLife expected, and put in writing, that LTDCSs' primary duty is to decide whether or not to approve claims for LTD benefits. *See* Parlo Decl. Ex. S. Multiple other Opt-ins confirmed this. *See, e.g.,* Dubois Tr. 134-35; DeForge Tr. 47; Patel Tr. 68-69, 131-32. However, Plaintiffs

---

[6] *See* Leveille Tr. 112, 125-27, 165, 178-79, 183, 255, 259-61; Dubois Tr. 75, 106-09, 116, 127; Gill Tr. 38, 40-41, 67-69, 71, 121-24, 152-53, 195-97; McKinney Tr. 89-91, 150-51, 317, 324, 331; Wolber Tr. 79, 95, 106-07; Roberts Tr. 87, 108, 113-14, 135-36; Hensel Tr. 137-41, 145-48, 153-57; Hrobowski Tr. 249-52, 296-97, 312-13; Patel Tr. 98-99, 107-08. *See also, e.g.,* DeForge Sur., Carlo Sur., Crego Sur., Sheba Sur., Wolber Sur., Randolph Sur. Questions #4, 5, 8, 11, 12, 13, 14, 21, 22, 23, 24, 29, 30, 31.

Julian and Kimberly Harris, as well as Opt-in Mocny, testified to holding a completely different job. And these are not mere differences of semantics or degree. Julian's description of her primary duty is unrecognizable from the one she was hired and expected to perform, and from the discretion and independent judgment other LTDCSs swear they regularly exercised.

Julian testified that she was a "trained monkey," a "peon," and a "gofer," whose sole job was to collect information, at the direction of her immediate supervisor (a "Unit Leader" or "UL"), to hand over to nurses, doctors, and vocational consultants employed by MetLife. Julian Tr. 58-59, 61-62, 68, 71-72, 227-29; Julian Dep. Ex. 4. Those individuals, Julian claims, and not her, would then decide whether to approve or deny the claim. *Id.* Julian testified that she did not make a single decision or recommendation, or offer any opinion, throughout the entire LTD claim process. *Id*. 168-71, 175, 286. K. Harris, Jones and Mocny also testified that claim decisions are made by *others* involved in the claims process, and that they used, in K. Harris's words, "really no thought" during the course of their claims. K. Harris Tr. 153-54, 160, 266-80; Mocny Tr. 109, 141-44, 152, 310-13; Jones Tr. 80-84, 125-28.

Julian, K. Harris, and Mocny's alleged primary duty—the mindless retrieval of information, devoid of analysis or thought—is nothing like the job other LTDCSs performed. Dubois, Hrobowski, Patel and DeForge testified that *they* decided whether someone was disabled, and whether a claim would be approved or denied, and that they regularly exercised discretion in doing so:

> Q. And if somebody asked you at a party what you did at MetLife from 2013 on as a claims specialist, what would you say as a broad strokes description?
> A. I would tell them that I get medical records from doctors on claimants who are disabled or claiming they're disabled, and I would review the medical records **to _determine_ if they were disabled**, with the nurses and the resources. And I would use, you know, the policies and procedures that MetLife provided to us through the CMG and through the training **to _determine_ if they were disabled or not disabled _and I would make a decision_**.
> Q. And then what happens after you make the decision?

A. The claim would either be approved or denied.

Dubois Tr. 58-59 (emphasis added); s*ee also id.* 83-84, 135 ("Well, I had to make an approval or denial on every claim."); Patel Tr. 68-69, 131-32, 173-82; Gill Tr. 122, 125-28, 129-31, 145-49, 152-54, 222-23;  Wolber Tr. 48-51, 66, 107; T. Harris Tr. 257-61; Hensel Tr. 104-05, 113-25; Hrobowski Tr. 173-74, 312-13; DeForge Tr. 47-48.  Gill admitted that her "primary" and "very important" responsibility was to recommend approving, denying or terminating LTD benefits claims based upon her analysis of all information relevant to the claim.  Gill Tr. 127-28, 291-92; Gill Dep. Ex. 4.  Wolber evaluated and decided whether to approve, deny, and terminate hundreds of LTD claims during her employment with MetLife.  *See* Wolber Tr. 49-51, 66-68, 86.

Even named Plaintiff McKinney rejected the position taken by Julian and K. Harris— although she added her own different spin.  Specifically, while McKinney refused to say that she "approved" claims, she testified repeatedly that *she made the decision to recommend* approval, and that her recommendations were rarely not accepted.  McKinney Tr. 175-83, 239-40, 247-51. As a matter of law, the distinction McKinney tried to draw is irrelevant.  "Approving" and "recommending" are both exempt functions.  *See* 29 CFR § 541.202(c); *see also Krupinski v. Laborers E. Region Org. Fund*, No. 15-982, 2016 WL 5800473, at *9 (S.D.N.Y. Sept. 30, 2016) (applying administrative exemption to employee who made "recommendations to supervisors" concerning "matters of significance").  But her explanation of her job puts her squarely at odds with her peers.  McKinney Tr. 178-79, 183; *see* also Dkt. No. 48 at 6-8.

Further complicating the question of *whether* individual LTDCSs do or do not decide if a claim should be approved, Julian, Roberts and others who deny making those decisions cannot even agree on who does.  Roberts testified that nurses make the decision.  Roberts Tr. 19-20, 120-25.  Leveille testified that Unit Leaders make the decision. Leveille Tr. 312-13. Julian testified that Unit Leaders, nurses, and medical specialists make the decisions.  Julian Tr. 61-62.  And they

advance these alternative theories even though other LTDCSs, including several other Opt-ins, are adamant that Unit Leaders, nurses, and other resources do *not* and *cannot* make those claims decisions.   *See* Hensel Tr. 102-04, 206-08 (testifying that nurses, doctors and vocational consultants cannot make a claim decision); Stephenson Tr. 69; Hrobowski  Tr. 311-13 (nurses, vocs and other resources never do that); Patel Tr. 140-41; Smith Decl. ¶ 12 ("Even if my Unit Leader disagrees with my decision, it is still ultimately my decision to make."); Page Decl. ¶ 5; *see also* Cesario Decl. ¶¶ 4, 10; Miscione Decl. ¶ 4; Bellot Decl. ¶¶ 4-5 ; Ayotte Decl. ¶¶ 4-5; Hall Decl. ¶¶ 4, 6

Since Julian, K. Harris and others on the one hand, and Dubois, Wolber and others on the other hand, claim *exactly opposite primary duties*, this case cannot continue to be certified.[7]

### C.      The Plaintiffs And Opt-ins Cannot Agree on the Scope of Their Discretion and Independent Judgment.

In  addition  to  there  being  no  common  answer  as  to  whether  LTDCSs  make  the decision/recommendation to approve or deny a claim, the LTDCSs also disagree about whether they performed the other exempt duties that may be required before and after the initial claims decision.  In fact, some Plaintiffs and Opt-ins gave the *opposite* answer to the *same* question about their duties/decisions.  As Julian, Hrobowski and other Plaintiffs and Opt-ins confirmed, the only way to determine what job duties each Plaintiff and Opt-in performed, as well as how (and how often) they performed those duties, *is to ask each of them*.  Julian Tr. 291; Mocny Tr. 57-59, 250-51; Hensel Tr. 64-66; McKinney Tr. 94-95; Hrobowski Tr. 78-79, 319.  But when asked about those duties, the Plaintiffs and Opt-ins gave very different, and conflicting, answers.

---

[7] The position taken by Julian and Harris—that nurses and vocational consultants made the claims decisions—is directly at odds with: (1) the job description for the LTDCS position; (2) training and other materials upon which several plaintiffs say they relied; and (3) directives given to those nurses and vocational consultants that they can*not* make those decisions.  *See* Parlo Decl. Exs. S, T; Miscione Decl. ¶ 4; Thibado-Conley Decl. ¶¶ 5-6; Ayotte Decl. ¶¶ 4-5. Thus, any continued collective would, inappropriately, have to be made up of individuals whose alleged experience stands at odds with, and cannot be determined by, any MetLife policies.

### 1. *Plaintiffs and Opt-ins had Different Authority Levels and Differed in How and How Often They applied that Authority*

The Plaintiffs and Opt-ins claim different experiences on how much authority and discretion they had to approve claims. Gill, for instance, says she could approve claims with an annual value only up to $30,000, which she testified occurred relatively infrequently because her claimants made more than $30,000 a year. Gill Tr. 239-40. Wolber, on the other hand, admitted she has authority to approve claims with an annual value of up to $90,000 ($7,500 per month), which make up the majority of her claim portfolio. *See* Wolber Tr. 67-68; *see also* Smith Decl. ¶ 12 (authority up to $7,500 per claim, per month, which was on 90% of her claims); Lambert Decl. ¶ 8 (authority of up to $10,000, per claim, per month).

Dubois testified that she was responsible for approving claims, **without any financial limits**, for "six months to a year" while working with one Unit Leader, Erica Hartline. *See* Dubois Tr. 91-92. Dubois' next Unit Leader, Ta-Nisha Rose, reviewed Dubois' recommendations on claims for the first three to six months that they worked together. *Id.* After that, while still working with Rose, Dubois had the discretion and authority to herself approve claims up to $36,000 — which represented over half of her portfolio. *Id.* at 92. These differences were not tied to any MetLife policy or practice—"[j]ust manager discretion." *Id.* at 91.

McKinney, despite working with the same Unit Leaders (Rose and Hartline), testified she had a totally different experience than Dubois. *See* McKinney Tr. 59, 127. According to McKinney she, unlike Gill, Wolber, and Dubois, did <u>not</u> have complete discretion to approve claims on her own up to a certain dollar amount. Instead, McKinney could only *recommend* the amount of benefits to be paid. McKinney Tr. 178-79, 183, 247-50.

### 2. *Plaintiffs and Opt-ins Differ in How They Evaluated Claims.*

Approving or denying the payment of benefits is just one in a series of important decisions made by LTDCSs during the lifecycle of each claim. As one Opt-in testified: "[Y]ou couldn't

make a decision if you didn't have all the information you needed." Dubois Tr. 102.  The Plaintiffs and Opt-ins, however, cannot agree on how they sought out, collected, and used the information, or whether they even did so at all.  As a result, there is <u>no</u> similar approach.

Some LTDCSs confirmed that they exercised their judgment by: *interpreting* the provisions of the different LTD plans used by different employers; reviewing and *analyzing* claimants' medical records; *evaluating* claimant's pre-existing conditions; and *assessing* the claimant's functionality.  *See* Hrobowski Tr. 297-98*; Patel Tr. 145-47*, 176-77, 179-80; Kolupa Sur., Crego Sur., Carlo Sur. (Questions #2, 18, 30, 31); Smith Decl. ¶ 7.  These are all exempt functions.  *See* 29 C.F.R. § 541.203(a).  Other LTDCSs denied making any evaluative decisions and claimed they relied solely on other MetLife employees to perform these duties.  *See* Julian Tr. 52-53, 264-68, 287-88; K. Harris Tr. 288-93.

The Plaintiffs and Opt-ins also claim different experiences assessing whether a particular claimant has submitted a fraudulent claim—another clearly exempt function.  *See Withrow v. Sedgwick Claims Mgmt. Serv., Inc.*, 841 F. Supp. 2d 972, 985 (S.D. W. Va. 2012) (claims examiners exercised discretion and independent judgment where they "assessed claims for possible fraud").  Some testified that they evaluated investigation materials received from SIU, an anti-fraud unit, made decisions to conduct social media research to investigate potential fraud, or conducted social media and other searches on their own (all clearly exempt duties).  *See* Leveille Tr. 240-46; Patel Tr. 83-86, 138-39; McKinney Tr. 167-80; T. Harris Tr. 323 (asked for social media searches); Hrobowski Tr. 328, 330; *see also* Carlo Sur. (Question #25, "**Yes**"); Wicklund Tr. 323-25 (confirming that LTDCS can do the searches); Hensel Tr. 155-56 (LTDCSs review reports from SIU).  Others, however, said that they did not or could not ask for or perform *those exact same tasks*.  *See* Roberts Tr. 135 (never asked for social media search); Julian Tr. 295 (did not review reports from SIU); Randolph Sur. (Question #25, "**No**"); Mocny Tr. 262-65.  And Julian

rightly admitted that her lack of involvement in evaluating investigation materials made her different from her peers.  Julian Tr. 295 ("Q. If any [LTDCS] were to establish that they did so, they would be different from you? A. Yes.").

### 3.   *Plaintiffs and Opt-ins Disagree on the Use of Resources and CDMs.*

LTDCSs have "resources" they can choose to use to help them make the best claims decision, including ULs or Claim Support Specialists ("CSSs"), nurses, doctors and vocational consultants.  K. Harris Tr. 104-05; Hensel Tr. 80-82, 101-02; Dubois Tr. 76; Wolber Tr. 75-77; Miscione Decl. ¶¶ 2, 6-7; Cesario Decl. ¶¶ 5-7;  Johnston Decl. ¶¶ 9-10; Wilcox Decl. ¶¶ 19-20. They can also convene a Claim Discussion Meeting ("CDM") with those resources to get additional input.  *See, e.g.*, Miscione Decl. ¶¶ 6-7; Cesario Decl. ¶ 6; Sulley Decl. ¶¶ 14-15.  But the Plaintiffs and Opt-ins could not even agree on whether or how these resources were used.

McKinney and several Opt-ins testified that they had the discretion and complete authority to determine, depending on the circumstances of the claim, whether to conduct a CDM.  McKinney Tr. 220-23; Gill Tr. 76-79; Hensel Tr. 84-85, 100, 187-95; Roberts Tr. 23-24 (entirely up to the LTDCS); Stephenson Tr. 19-20 (same); Hrobowski Tr. 132, 199, 304-05; K. Harris Tr. 283. Wolber confirmed: "I did not need to request one for every claim, no. There were claims that were obvious the person couldn't be working so I wouldn't waste clinical and vocational resources' time doing that." Wolber Tr. 92; *see also* Hensel Tr. 100 ("I would not set up a CDM if I thought we didn't need a CDM. If I'm doing a CDM it's because I think we need it."), 187-92; DeForge, Carlo, Crego, Stephenson Surs. (Question #29).  In exercising this discretion, McKinney testified that she chose to hold CDMs on only 10% of her claims.  McKinney Tr. 220-23.  In direct contrast, Julian and Mocny testified they were *required* to hold CDMs, and to consult with the same resources, for every single claim (100%!).  Julian Tr. 38-39, 190-91, 255, 281-83, 289-90; Mocny Tr. 176, 181-82, 219-21; *but see* Hrobowski Tr. 98, 199 (there was no such policy); Patel Tr. 110

14

(no such rule).  Leveille testified that for *most* claims she determined whether or not to conduct CDMs, but in limited circumstances she was required to conduct one.  Leveille Tr. 198-200.

These were not the only two variants.  Whether Hensel used particular resources (like nurses or vocational resources), or conducted a CDM, changed depending on his UL at the time. Hensel Tr. 82-84, 187-92.  Finally, others decided whether or not to engage nurses or vocational consultants depending on the particular facts of the claimant's condition and employment. Stephenson Tr. 40; K. Harris Tr. 108-11; Wolber Tr. 62-64.  As Hrobowski admitted, "… it really depends on each situation as to if I take it to a CDM or not . . ." (Hrobowski Tr. 285), and to find out what other LTDCSs did you would have to ask each one.  *Id*. 98, 199, 285.

Plaintiffs also differed in how they engaged these different resources.  Leveille stated she would review a claimant's medical records and reach out to a nurse *only* if she did not understand the information in the claimant's medical file.  Leveille Tr. 113.  Hrobowski testified that she would go to a resource only if she had a question, and that she would specifically formulate her question and purpose for the CDM in advance.  Hrobowski Tr. 204, 218, 220-21, 313-14.  *See also* Smith Decl. ¶ 15 ("If I submit a request to a nurse, for example, he or she will review the request and submit what is called a Clinical Response ('Response')."  Opt-in Mocny, however, claimed that she was limited to reciting the facts regarding a claim, and that a UL or other resource ran the entire CDM. Mocny Tr. 154-55, 236-39, 261-62.  Plaintiffs also could not agree on who would attend a CDM.  Mocny testified that her UL, CSS, a nurse and a voc ALL had to attend every single CDM.  Mocny Tr. 257-62.  Others testified that *they* determined who would attend and the composition would differ from claim to claim.  Hrobowski Tr. 106-07; Patel Tr. 113-14, 137-38; DeForge Tr. 65-67.

####     4.      ***Plaintiffs and Opt-in Practices Differed as to Conducting Interviews.***

There is also no uniform experience among the Plaintiffs and Opt-ins with respect to interviewing claimants, employers, and health care providers (another exempt duty).  Whereas Julian and Gill claim that they were *required* to interview the claimant *in every case*, McKinney and multiple Opt-ins had the *discretion* to, and did, make decisions (or for McKinney "recommendations") *without* interviewing the claimant.  *Compare* Julian Tr. 276-77; Gill Tr. 40-41, *with* McKinney Tr. 317; Arroyo Sur., Stephen Sur., Randolph Sur., Carlo Cr., Crego Sur. (Question #8).  Julian claims she **never** conducted a follow-up interview with any claimant, and that these interviews were conducted instead by nurses or psychologists employed by MetLife. Julian Tr. 243-44.  Dubois, Wolber and others, however, regularly conducted follow-up interviews themselves with claimants, to determine whether or not claims should be terminated or modified depending on any changes to the claimant's medical condition, and to determine whether the claimant was adhering to back-to-work plans.  Dubois Tr. 72-73, 87-88; Wolber Tr. 106-07; Hrobowski Tr. 328-30.

The Plaintiffs and Opt-ins also cannot agree on *how* they conducted interviews (*i.e.*, whether they used discretion).  Some testified that *they tailored* their questions to the specific claim and the claimant's responses.  *See* Roberts Tr. 67-69; Hensel Tr. 151-53.  This makes sense given that "not one claim is the same, so every time you get a disability claim something is different[.]" Hensel Tr. 218-23.  Despite these differences, others remarkably testified that they followed the same template, without deviation, for every interview, and did not ask any follow-up questions. K. Harris Tr. 248-52; Mocny Tr. 186-96.

The Plaintiffs and Opt-ins also differ with respect to *who* they interviewed.  Some personally interviewed the claimant's health care providers; others say they chose to rely on other resources for medical information.  *Compare* Wolber Tr. 79-80; McKinney Tr. 89-91 ("I spoke

with doctors obviously."); Hrobowski Tr. 318, *with* Dubois Tr. 110-11 ("I would never talk to doctors."); K. Harris Tr. 265.  Whereas some Plaintiffs and Opt-ins *did* interview employers—ranging from "occasionally" to "all the time" - others bizarrely testified that *they were not allowed to. Compare* Julian Tr. 34, 64-65; K. Harris Tr. 264-65; Patel Tr. 58, 98-102; Leveille Tr. 125-27; Roberts Tr. 60-63, 87-90 ("A. Did I ever reach out to claimant's employers? All the time."), *with* McKinney Tr. 90 ("Q. Did you interview employers to determine pertinent claim information? A. That was not allowed, no.").[8]

> 5.    ***Plaintiff and Opt-in Practices Differed as to Determining the Extent of Liability and Total Value of a Claim.***

Decisions to approve or deny (or continue or terminate) LTD claims, as well as deciding when payment on those claims stops and starts, have a substantial impact on the businesses of both MetLife and its customers.  T. Harris Tr. 182-86; Patel Tr. 135-36; DeForge Tr. 100-02.  Yet, the Plaintiffs and Opt-ins cannot agree on how or if they determined liability and the value of claims. Most LTDCSs acknowledge that because no two claimants have precisely the same medical condition or restrictions, and because each condition may affect a claimant's ability to work in different ways, *there is no formulaic method to decide whether to terminate or modify claims for LTD benefits*.  Leveille Tr. 172, 240-47, 250-52, 259-61, 265-66; Wolber Tr. 94-95; Gill Tr. 138-42, 159-61; Dubois Tr. 90-93; McKinney Tr. 209-12, 309-10; Patel Tr. 124-26.  Numerous factors must be considered.  *Id.*  Wolber explained this point when she testified about the difficulties of deciding whether or not to terminate benefits based on evidence of potential fraud:

> If it's something that shows the person is out working doing something that they haven't told us about, **then I would actually have to make another decision on**

---

[8] Plaintiffs may say these and other discrepancies in their job duties are not self-serving denials, but rather the result of overbearing managers, or LTDCSs who simply were not good at their job and needed extra supervision or assistance.  Even so, that is yet another reason why this case cannot remain certified.  *See Holick v. Cellular Sales of N.Y., LLC*, No. 1:12-cv-584 (NAM/DJS), 2019 WL 1877176, at *7 (N.D.N.Y. Apr. 26, 2019) (decertifying collective after stating "evidence showing notable differences among Plaintiffs with regard to . . . the level of supervision and discipline exerted by [Defendant] over Plaintiffs . . . is highly relevant" to the decertification analysis), *appeal filed*, No. 20-2037 (2d Cir. Jun 29, 2020).

**that claim** according to what the plan requires and the guidelines are that we have, and **it could potentially end the claim or they might have to pay MetLife money back if they were working and hadn't told us**. * * * So it really depends on the information that's found. **It's not a cut and dry**. It's whatever that person is doing that we didn't know about or aren't they doing anything and it all fits[.] **There isn't a yes or no answer for that**.

Wolber Tr. 94-95.

Wolber and other LTDCSs could also *decide or recommend* whether to conduct surveillance on claimants in cases of suspected fraud. *See* Wolber Tr. 71-74; Smith Decl. ¶ 10 ("I have the authority to request enhanced investigation techniques."); K. Harris Tr. 212-13, 220-21(I refer claims to SIU); Dubois Tr. 119-24, 140 (same); McKinney Tr. 170, 231-33 (same); K. Harris Dep. Ex. 6; Gill Tr. 61, 156-60 (I request "Direct observation"). However, other LTDCSs denied even having the ability to make those exact same decisions and recommendations. *See* Roberts Tr. 82 ("Q. Did you ever refer a claimant's file to a special investigations unit? A. Not me."); Julian Tr. 185-87; Arroyo Sur. (Question #28, "No"); Mocny Tr. 203-04 (if I saw a "red flag" all I could do was tell my UL). Some Plaintiffs and Opt-ins then decided or recommended whether or not to terminate claims based on the information uncovered in those investigations. Others claim they did not. *Compare* McKinney Tr. 170-80; Dubois Tr. 119-24, *with* Julian Tr. 185-87, 301-02. Looking for evidence of fraud and acting on it are clearly exempt tasks, and Plaintiffs cannot even agree if they did that. *See, e.g*, Hrobowski Tr. 126-27 (to find out whether other LTDCSs did searches you would have to ask them); Patel Tr. 85 (same).

As to the value/payout of LTD claims, while some LTDCSs admitted that *they* determined the date when benefits would start to be paid, others claim they did not, and that a "system" did so. *Compare* Dubois Tr. 227-28 ("Even after I left, [other Claim Specialists] would reach out to me to ask me how to get the benefit start dates."), *with* Gill Tr. 344-45 ("Q. [D]id you decide payment period as an LTD claim specialist? A. No, not alone. The system will calculate the start

date."). While some LTDCSs testified that *they decided* how long a claimant would receive benefits, others claimed that only MetLife medical staff did so. *Compare* Julian Tr. 68, *with* Dubois Tr. 60-61; T. Harris Tr. 182-86.

Depending on the particular plan at issue, the value of a claim—and the financial obligation to pay it—could also decrease dramatically based on the availability of "offsets." Offsets are other sources of income available to the claimant, such as social security benefits. McKinney Tr. 149-51. Plaintiffs also cannot agree on what they did in this area. Many testified that they routinely identified and applied offsets, and that these decisions had a significant financial impact on MetLife and its clients. Gill Tr. 195-97; Leveille Tr. 225-30; Roberts Tr. 114-15; Hensel Tr. 205-06; Hrobowski Tr. 85-86, 152-53, 189, 330-31; *see also* Arroyo Sur., Carlo Sur., Crego Sur., Randolph Sur. (Question #12). McKinney analyzed potential offsets for *all* of her claims. McKinney Tr. 150-51. In direct contrast, Julian claims she had no responsibility for determining what offsets might apply. Julian Tr. 328-29.

6.    *Plaintiff and Opt-in Practices Differed as to Other Exempt Duties.*

Many Plaintiffs and Opt-ins admitted performing other clearly exempt duties (*see* 29 C.F.R. § 541.202(b)), such as waiving established policies and procedures without prior approval and formulating and implementing operating practices. Others, however, claim they did *not* do those things. The differences are as varied as the claims they investigated, with LTDCSs again repeatedly giving the diametrically opposed responses of "Yes" and "No" *to the same question*. By way of example only:

- **Had the discretion and authority to extend or toll claim deadlines** without approval from their UL. *Compare* Julian Tr. 293, *with* Gill Tr. 121-24, 152-53; *see also* Arroyo Sur. (Question #21, **"Yes"**); DeForge Sur. (Question #21, **"No"**); Hrobowki Tr. 331-32 (**Neither** - sometimes I could sometimes I coudn't).

- **Developed protocols and best practices** for use by other MetLife employees when evaluating claims. *Compare* T. Harris Tr. 195-219; K. Harris Tr. 193-95; K. Harris Dep. Ex. 4; Dubois Tr. 221-25; Hensel Tr. 87-89, 145-48; Wolber Tr. 135-37;

Wolber Dep. Ex. 4 ("I recently developed a tip sheet on preexisting conditions aimed at ensuring all pertinent plan provisions which may come into play are being reviewed . . . ."), *with* Mocny Tr. 96 ("Everybody followed the same procedures and guidelines").

- **Mentored and coached less experienced LTDCSs**. *Compare* McKinney Tr. 327; Gill Tr. 257 ("Q. Did you mentor or coach any less-experienced LTD claim specialists? A. **No.**"), *with* Dubois Tr. 158 ("Q. Did you mentor and coach less experienced LTD claims specialists? A. **Yes.**"); T. Harris Tr. 188-89, 192-93.

- **Assessed the claimant's education, skills, alternate work experience, training, functionality and geographic area** to determine whether he or she can return to work in any occupation. *Compare* Carlo Sur., Arroyo Sur., Starowicz Sur., (Question #31, **"Yes"**), *with* Randolph Sur., DeForge Sur. (Question #31, **"No"**).

- **In cases involving multiple diagnoses, determined which of the claimant's conditions was the disabling condition and/or what was causing or contributing to the claimant's impairment.** *Compare* DeForge Sur. (Question #19, "Yes"), *with* Arroyo Sur. (Question #19, "No").

- **Identified any discrepancies between the claimant's subjective complaints versus the objective findings in the medical records**. *Compare* Leveille Tr. 178-79 (**"Yes**, using our tools that we have."); Hrobowski Tr. 295-96, 299-300, *with* Roberts Tr. 115 ("A. **No**, not my decision.").

### D.     The Plaintiffs Disavow That Any Common Job Description or Policy or Procedure Was Accurate or Applied to Them

As no two claims are the same, each step and decision in the path for each claim leads to a new series of decisions, and *there is no single roadmap for those twists and turns*.[9]   MetLife expects that, contrary to this testimony, Plaintiffs will point to job descriptions, the Claims Management Guidelines ("CMG") and the availability of "resources" for LTDCSs as evidence that they are similarly situated.   That argument is both *irrelevant* and *wrong*.   Plaintiffs' rote reference to MetLife training materials and job descriptions at the conditional certification stage is *irrelevant* to the Court's more searching second stage inquiry that now examines what each Plaintiff and Opt-in **actually did**.   *See* pp. 22-24, *infra*.   The argument is *wrong* because, in doing

---

[9] *See, e.g.*, Leveille Tr. 172, 240-47, 250-51, 259-61, 265-66; Wolber Tr. 94; T. Harris Tr. 323-25; Gill Tr. 138-41, 159-61; Dubois Tr. 90-91; McKinney Tr. 197-200, 209-10, 219-20, 309-10; K. Harris Tr. 103-12, 149-51, 156-57; Hensel Tr. 145-48; Smith Decl. ¶ 14 ("The process always varies based upon the nature of the impairment and particular facts of the claim."); Patel Tr. 124; Hrobowski Tr. 80-81, 316 (every claim is different and the claims management process differs from claim to claim).

all they could to reject job descriptions and other documents that describe *exempt* positions, Plaintiffs testified that these documents are **not** reliable indicators of their job duties.  Julian testified:

> Q.  Did you ever see any document, policy, rule, guidelines, regulation, standard, anything of the sort that said you, as an LTD claims specialist, cannot make decisions on claims? A. No, because basically a lot of this stuff is false that is in here.  **This is false information that we were given**. Julian Tr. 177 (emphasis added).
>
> \*        \*        \*
>
> Q. As to the job description, looking at that, without asking you yourself personally what of these things did you do or not do, **I can't know whether that job description is accurate, right? A. Correct**. McKinney Tr. 89-95 (emphasis added).

*See also* Mocny Tr. 104-09, 114-17; K. Harris Tr. 263-64; Hensel  Tr. 223-26.  As to the CMG, while one LTDCS described it as the "bible" that had to be followed, she excepted from that requirement all of the portions of the CMG that confirmed the *exempt* duties of LTDCSs.  Mocny Tr. 97-98, 104-117.  And while some LTDCSs reviewed the CMG regularly, others testified that they did not use or look at it at all.  Patel Tr. 168-69 (zero).  As to the use of resources, there is simply no similarity at all.  *See* pp. 14-15, *supra*.

## V.   **ARGUMENT**

Despite the efforts of some Plaintiffs and Opt-ins to downplay, disavow and misrepresent the clearly exempt aspects of their job duties, the undisputed testimony of McKinney, Leveille, Wolber, Dubois, Hrobowski and Patel shows that *they* exercised discretion and independent judgment in what *they* did.  Accordingly, MetLife will be seeking summary judgment on their claims. *See* 29 C.F.R. §§ 541.200(c)(3), 202(a).  These individuals cannot possibly be similarly situated to other LTDCSs who the Plaintiffs allege are not exempt.  Continued certification must be denied for that reason alone.

In addition, the record testimony noted above makes clear that there is no representative or common proof that can establish whether all 80 LTDCSs in this action are exempt, including as to

whether they exercise discretion and independent judgment.  In such circumstances, a collective

action should not be allowed to proceed.  As the Court noted in *Stevens v. Hmshost Corp.*:

> [W]ide differences in employment settings and job duties "greatly complicate the use
> of representative proof either to prove the correctness of the executive classification
> or to rebut such a showing." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567,
> 582 (E.D. La. 2008).  Accordingly, the disparate factual and employment settings of
> the opt-in plaintiffs [with respect to the factors relevant to the FLSA exemptions]
> weigh against proceeding as a collective action.

No. 10 CV 3571(ILG)(VVP), 2014 WL 4261410, at *7 (E.D.N.Y. Aug. 26, 2014).  That the "opt-

in plaintiffs' testimony shows conflicting testimony as to whether each plaintiff could be classified

as administratively exempt under 29 C.F.R. § 541.203(a)" makes this case even more inappropriate

for continued certification.  *Harper v. Gov't Emps. Ins. Co.*, No. CV 09-2254, 2015 WL 9673810,

at *6 (E.D.N.Y. Nov. 16, 2015), *report & recommendation adopted by*, No. 2:09–cv–02254, 2016

WL 98516 (E.D.N.Y. Jan. 6, 2016) (decertifying collective of insurance claims adjusters).

Because the nature, type, and amount of the Plaintiffs' and Opt-ins' job duties vary markedly from

person to person, and because no uniform, unlawful policy binds them together, this case cannot

be fairly or efficiently tried as a collective action.

A.     **Plaintiffs Have the Burden of Proving That They and The Opt-ins are Similarly Situated on the Controlling Issue of Whether They Are Exempt From Overtime.**

The FLSA was expressly amended in 1947 to *limit* actions "to employees who assert[ ]

claims in their own right" and to "free[ ] employers of the burden of representative actions."  Portal-

to-Portal Act, Pub. L. No. 80-49, § 5(a), 61 Stat. 84, 87 (1947).  And while collective actions are

permitted, judicial efficiency "can only be achieved to the extent that named plaintiffs and opt-in

plaintiffs" are "similarly situated."  *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 516 (2d

Cir. 2020), *petition for cert. docketed*, No. 20-257 (U.S. Sept. 1, 2020); *see also Hoffman-LaRoche*

*Inc. v. Sperling*, 493 U.S. 165, 170, 173 (1989) (The primary purpose of allowing plaintiffs to

proceed collectively is to promote the "efficient resolution in <u>one</u> <u>proceeding</u>" of employees' claims

only where there are "common issues of law and fact arising from the same alleged [conduct]."); *Hernandez v. United Auto Credit Corp.,* No. 08-03404, 2010 WL 1337702, at *5 (N.D. Cal. Apr. 2, 2010) ("[W]here there appears to be substantially different employment experiences among the various [opt-ins], the procedural advantages of a collective action cannot be realized").   Such similarity does not mean "any similarity," *Scott*, 954 F.3d at 516 n.4, or merely "superficial" ones. *Vecchio v. Quest Diagnostics Inc.*, No. 16-5165, 2020 WL 5604080, at *14 (S.D.N.Y. Sept. 18, 2020).  Rather "the [similarly situated] standard is met" only "when there is similarity with respect to 'an issue of law or fact *material to the disposition of [plaintiffs'] FLSA claim*.'" *Scott*, 954 F.3d at 516 n.4 (emphasis added); *Vecchio*, 2020 WL 5604080, at *13 (applying *Scott* to decertify collective action where plaintiffs-examiners' depositions showed that their experiences "varied widely in how long it took to perform examination procedures, pre-appointment work, post-appointment work, and to travel" and thus "[i]t would be impossible for the Court or a jury to decide in one fell swoop" the claims of "the entire collective").

At the decertification stage, the "lenient" standard applicable to conditional certification falls away.  Now, a more "stringent standard" of proof is applied to determine, on a fuller record, whether the Opt-ins are "in fact" similarly situated to the named Plaintiffs, and whether the case can be fairly and efficiently tried on a collective basis.  *Myers v. Hertz Corp.*, 624 F.3d 537, 548, 555 (2d Cir. 2010) ("[T]he regulations make clear that these questions should be resolved by examining the employees' *actual* job characteristics and duties.") (emphasis added); *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011).  A mere allegation of a common decision, policy, or plan is *not* sufficient to meet this standard.  *See, e.g.*, *Thind v. Healthfirst Mgmt. Servs., LLC*, No. 14-9539, 2016 WL 7187627, at *3 (S.D.N.Y. Dec. 9, 2016) (decertifying collective where employees' *actual* job experiences contradicted plaintiffs' assertion of a common, uniform policy).  Instead, in a misclassification case like this, Plaintiffs have the burden of showing

that they and the Opt-ins were *in fact* "common victims of a *FLSA violation* pursuant to a systematically-applied company policy or practice such that there exist common questions of law and fact that justify representational litigation."   *Scott*, 954 F.3d at 516 (quoting *McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 367 (S.D.N.Y. 2014) (emphasis added)).

Plaintiffs cannot meet this burden.

**B.    The Plaintiffs and Opt-ins Are Not Similarly Situated.**

*1.    Because At Least Some Plaintiffs And Opt-ins Are Exempt The Collective Should Be Decertified.*

Plaintiffs and Opt-ins claiming to be misclassified as exempt cannot be "similarly-situated" if one of more of their claims is dismissed.  *See, e.g.*, *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 878 (6th Cir. 2012) ("[A] lead plaintiff cannot be similarly situated and represent opt-in plaintiffs without a viable claim."); *In re Family Dollar FLSA Litig.*, 637 F.3d 508, 519 (4th Cir. 2011) (same).  As will be set forth in MetLife's forthcoming motion for summary judgment, the claims of at least McKinney, Wolber, Leveille, Hrobowski, Patel and Dubois should be dismissed because they admit performing duties that are clearly exempt.  Thus, they cannot be similarly situated to other members of the collective who claim that their experiences differed on the central factual and legal issues in this case.  For this reason, the collective should be decertified.

*2.    No Common Unlawful Company Policy or Practice Exists.*

That LTDCSs are classified as exempt is not in dispute.  But, as this Court and dozens of others have held, classifying a group of employees as exempt is *not* a proper basis for certification. *See*, *e.g.*, Order at 6 ("[P]laintiffs must demonstrate not only that the proposed employees were classified pursuant to a common policy, but also that the proposed class had similar job duties."); *Brown v. Barnes & Noble, Inc.*, 252 F. Supp. 3d 255, 262 (S.D.N.Y. 2017) ("[M]ere classification of a group of employees . . .  as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members

as 'similarly situated.'") (citation omitted); *see also Jenkins v. TJX Cos. Inc.*, 853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012) (same); *Guillen v. Marshalls of MA, Inc.*, No. 09-9575, 2012 WL 2588771, at *1 (S.D.N.Y. Jul. 2, 2012) (same). **This is particularly true as some Plaintiffs have disavowed their common job description as being inaccurate and inapplicable**.  Julian Tr. 247-58; K. Harris Tr. 135-38; T. Harris Tr. 27-28; *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 476 (S.D.N.Y. 2010) (denying motion for *conditional* certification where plaintiff alleged that "[d]espite [Marshalls'] 'idealized' job descriptions" and facially lawful standardized company policies, Marshalls' [assistant store managers] "in fact spent the majority of their work time performing non-[exempt] duties")

This rule makes sense. "From the face of [MetLife's] corporate policies alone, the Court can discern nothing that violates the FLSA." *Zivali*, 784 F. Supp. 2d at 462.  To conclude otherwise would mean that one plaintiff need only *allege* that a group of employees were misclassified to proceed to a trial on liability for hundreds or thousands of opt-ins.  No court in this Circuit has reached that conclusion.  In truth, it is foreclosed by the Second Circuit's decision in *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016).

In *Glatt*, the plaintiffs alleged that all members of the putative collective were harmed by the same common policy:  defendants' decision to classify them as independent contractors.  *Id.* at 540.  The Second Circuit held that this allegation could *not* sustain certification under even the more lenient conditional certification standard.  *Id.*  While the plaintiffs had presented common proof addressing *some* of the factors for determining employee status, this was not enough.  *Id.* The Court noted that Plaintiffs seeking to maintain a collective action in a misclassification case must show, *at a minimum*, that the court can rely on common proof to decide *all* of the factors relevant to the classification decision, and for every member of the collective:

> The common proof identified by [plaintiff], and relied on by the district court, **addresses only some of the relevant factors outlined above**. If anything, [plaintiff's] proposed collective presents an even wider range of experience than her proposed class because it is nationwide in scope, rather than limited to just New York interns.

*Id.* (emphasis added).  Like Glatt, the Plaintiffs have not and cannot point to any common proof that would answer the question of whether or not they, and every Opt-in nationwide, is exempt. And as in *Glatt*, the Plaintiffs cannot tie their fractured claims together by relying on MetLife's facially lawful policy to classify them as exempt.

"Indeed, the 'common question' requirement of Rule 23(a) and the 'similarly situated' requirement of § 216(b) serve comparable ends: to limit class and collective actions to those cases where there are "shared issues that will collectively *advance* the litigation of multiple claims in a joint proceeding." *Scott*, 954 F.3d at 521 (emphasis added).  Merely asking whether the Plaintiffs' and Opt-ins should have been eligible for overtime does nothing to advance their claims past the starting line.  *Glatt*, 811 F.3d at 540.

### 3. *The Plaintiffs Have Failed to Show That They and The Opt-ins Are Similarly Situated on the Controlling Issue of Whether or Not They Are Exempt.*

The depositions of the Plaintiffs and Opt-ins show there is no common proof that would allow their exemption status to be tried on a collective basis.  *Scott*, 954 F.3d at 516; *Vecchio*, 2020 WL 5604080, at *12 (decertifying class after holding that "varying testimony across the deposed opt-in plaintiffs illustrates that no fact-finder could make a blanket finding" as to all members of the collective).  According to Plaintiffs themselves, the *only* way to determine what job duties any LTDCS actually performed, as well as how (and how often) they performed those duties, *is to ask them*.  *See* Julian Tr. 291; McKinney Tr. 94-95; Patel Tr. 85.  On this point, the Plaintiffs are correct.  Plaintiffs and Opt-ins testified that they are *not* similarly situated in whether and how often they exercised discretion and independent judgment to make important decisions.  *See* pp. 8-

20, *supra*.  The examples below illustrate just some of the critical factual differences that go to the core of Plaintiffs' misclassification claims:

| | |
|---|---|
| **Approve or deny claims totaling millions of dollars.** | "I mean no disrespect by this but we were peons. We were the gofers. We collected the information. **We did not make the decisions**." – Julian Tr. 59. |
| | Q. [D]id you formulate an opinion based on the terms of the plan, based on all of the sources of information that you gathered?  A: Like, did I make a decision? Q. Right.  A. **Well, I had to make an approval or denial on *every* claim**." – Dubois Tr. 134-35. |
| **Terminate or modify benefit payments based on review of medical records.** | Q. Was there a decision at some point in time whether someone's benefits would be continued or terminated? A. Yes.  Q. And what was your role in that? **Did you make a recommendation to someone after collecting further information? A. No** . . . ." – Gill  Tr. 331. |
| | "Q. And did you reassess medical information restrictions and limitations during the life of the claim to determine whether a claim should be continued, modified or terminated?  A. **Yeah, we had to request medical records continuously to make sure that they were still falling under the definition of disability**." – Dubois Tr. 158. |
| **Determine which resources to review to make clams decisions.** | "**A CDM has to be done on every long-term disability claim** before a decision can be made. Those were the [Unit Manager's] words." – Julian Tr. 190-91. |
| | "Q. Are you aware of any LTD claims specialists or claims support specialist or unit leader saying in your presence, you heard it, **you must do a CDM on every single claim?  A. No**." – McKinney Tr. 223. |

At this stage, the Plaintiffs must demonstrate that they and the Opt-ins "are similar in 'relevant respects,' *i.e.*, with respect to the factors relevant to this Court's determination of whether they are" properly classified as exempt.  *See Hernandez v. Fresh Diet, Inc.*, No. 12-4339, 2014 WL 5039431, at *4 (S.D.N.Y. Sept. 29, 2014).  Moreover, it is not enough to show some similarities with respect to some of the factors relevant to the exemption analysis.  *Id.* (granting decertification: "while [p]laintiffs are certainly similarly situated with respect to some factors, application of these factors is inconclusive as to whether [p]laintiffs were employees or independent contractors in this case").  Plaintiffs are entitled to continued certification only if they can establish that common proof exists on each factor relevant to the employer's classification

decision. *Id.*; *see also Glatt*, 811 F.3d at 540. Here, the divergent testimony of only a few LTDCSs shows that the Plaintiffs cannot meet that burden. *Hernandez*, 2014 WL 5039431, at *5 (granting decertification and holding that "a determination of the import of [the employer's control] is not possible on a collective action basis, because it is not susceptible to common proof").

Because the Plaintiffs are not similarly situated to one another or to the Opt-ins on the central issue in this case—whether they are exempt from the FLSA's overtime requirements—MetLife's motion should be granted. *See, e.g.*, *Holick*, 2019 WL 1877176, at *5 (decertifying collective because "central consideration" of plaintiffs' exempt status was "highly personalized as to each plaintiff, and therefore not amendable to common proof"); *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.,* 27 F. Supp. 3d 313, 320 (E.D.N.Y. 2014) ("[A] determination on the merits is not susceptible to generalized proof; it would require individualized inquiries regarding the procedures in place at each department, and the conduct of individual managers and employees.").

    4.    ***The Plaintiffs Have Also Failed to Show That They and The Opt-ins Are Similarly Situated With Respect to MetLife's Defenses.***

When a defendant relies on individualized defenses, a collective action should be decertified. *Zivali,* 784 F. Supp. 2d at 460. MetLife intends to demonstrate that the Plaintiffs and Opt-ins satisfied the requirements of the FLSA's administrative exemption. However, as some individuals deny performing the duties expected of the position (in direct contradiction of their peers), MetLife must build a separate defense for each such member of the collective. That labor-intensive effort requires an individualized review of how each Plaintiff and Opt-in spent their time at work. *See, e.g.*, *Roe-Midgett,* 512 F.3d at 874; *SSP Am., Inc.*, 2011 WL 1204406, at *6.

Sorting fact from fiction will be no easy task for any Plaintiff or Opt-in whose claim is not dismissed. "[F]or every [LTDCS] who says one thing about his or her job duties and responsibilities, another says the opposite." *Beauperthuy v. 24 Hour Fitness USA, Inc.,* 772 F.

Supp. 2d 1111, 1133 (N.D. Cal. 2011), *abrogated on other grounds by  Campbell v. City of Los Angeles,* 903 F.3d 1090, 1113 n.17 (9th Cir. 2018) (modifying decertification standard but affirming decertification, and holding "there is no evidence to suggest that the declarants' vaguely reported experiences are in fact representative of the experiences of the party plaintiffs Department-wide"); *see also Stevens*, 2014 WL 4261410, at *6 (decertifying collective because "the variation and dissimilarity across the deponents' testimony is immediately apparent").

The contradictory testimony of the LTDCS deponents about their job duties guarantees that a jury would have to hear from each Plaintiff and Opt-in to decide whether that testimony is credible.  Julian herself has questioned the credibility of the Plaintiffs and Opt-ins, like Wolber, who testified that their experiences making claims decisions differed from hers, suggesting that those co-plaintiffs are "liars."

| Q.  If other LTD claim specialists were to testify that they could make decisions on claims without having a CDM, would you be different from that person that says that?  A. **I would say they were liars**.  (Julian Tr. 198). | Q. You didn't request a CDM for every claim? A. **I did not need to request one for every claim, no**. (Wolber Tr. 92). |
| --- | --- |

Equally problematic to deciding the Plaintiffs' and Opt-ins' claims in a single trial is the willingness of *some* LTDCSs to contradict documents, such as *their own* resumes and self-assessments, that *they* created *prior* to joining this lawsuit.  Those unvarnished descriptions of their work show that the LTDCSs highlighted their discretion and independence while they were enjoying the flexibility and other benefits of being exempt.  Only after they joined the action did they do a 180-degree change. Here are just a few examples:

> Q. The next very next sentence, "I do, however, feel **I am the driving force behind my claims**." Did you write that? A. **I wrote that**, but it should say I **should** be the driving force  .   .   . That was a mistake.   Q. Not a lie, a mistake? A.  Right, a mistake.

McKinney Tr. 117-18 (emphasis added); *see also id.* 89-91, 94-95 (Q."[T]his is something else untrue on your LinkedIn profile, you're saying you did not speak to employers? A. Correct."); K. Harris Tr. 135 ("Q. Okay. And so why would you choose analyze for the purposes of the document and now you want to say review? A. Because using the word "analyze" doesn't really reflect what I actually did at MetLife. "); *see also id.* 188-90; K. Harris Dep. Ex. 3; Mocny Tr. 310-14, Mocny Dep. Ex. 6. These shifting, inconsistent answers are yet another reason why the claims and defenses in this case cannot be decided using representative proof.  Because "for every instance in which an opt-in plaintiff reported that she [performed exempt work], there is an alternative response to the contrary." *Stevens,* 2014 WL 4261410, at *7 (quoting *Johnson,* 561 F. Supp. at 587); *Green v. Harbor Freight Tools USA, Inc*., 888 F. Supp. 2d 1088, 1104 (D. Kan. 2012) (decertifying class where "deposition testimony shows that it is not possible to develop common testimony from the Store Managers regarding their daily responsibilities and duties.").

The reasoning and result in *Johnson* is directly on point.  There, like here, the named and opt-in plaintiffs gave diverging testimony about the work they performed.  *Johnson*, 561 F. Supp. 2d at 586.  As a result, the defendant could not "prove a common defense to the claims of the class members by calling a handful of witnesses . . . because there are other witnesses who will testify to the contrary."  *Id*.  Instead, MetLife would have to "to pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each of the [p]laintiffs to prove that these [employees] are properly classified as exempt."  *Id*.  "That exercise is tantamount to conducting multiple individual trials on the merits and is the antithesis of a collective action."  *Id.*

The Plaintiffs' own testimony has made it so that their claims must be decided based on evidence specific to their individual employment circumstances.  MetLife will present evidence demonstrating that some of the testimony offered by some Plaintiffs about their job duties is categorically false and contrary to the work they actually performed.  In establishing this defense,

MetLife will have to rely on documents and testimony unique to each Plaintiff, including: their descriptions of their work in documents like performance reviews, resumes and LinkedIn profiles; other documents that the Plaintiffs created reflecting their exempt work, such as their own checklists and interview questions; and testimony from co-workers that contradicts each plaintiff's version of events. *See* McKinney Tr. 44-46; K. Harris Tr. 194-95; Mocny Tr. 57-58; Bellot Decl. ¶¶ 1-7; Ayotte Decl. ¶¶ 1-5. None of this is possible through common proof.

For other Opt-ins, MetLife will challenge their exaggeration of non-exempt work with the Opt-in's contradictory answers in detailed job surveys. *See, e.g.*, Stephenson  Tr. 170-87; Stephenson Sur. For other Opt-ins who have been deposed, MetLife will rely on their testimony to show they were properly classified as exempt. For still other Opt-ins, MetLife has moved to have their claims dismissed because they failed to disclose their claims in bankruptcy proceedings and/or their claims fall outside applicable limitations periods. Dkt. Nos. 142, 170. For each individual, MetLife must take a different approach, call different witnesses (from different parts of the country), and introduce different documentary evidence. MetLife has no choice but to "pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each" of the named Plaintiffs and Opt-ins "to prove that [they] are properly classified as exempt." *Johnson,* 561 F. Supp. 2d at 586.

The same plaintiff-by-plaintiff process would need to be repeated on the issue damages. There is no common evidence of each Plaintiff's and Opt-in's alleged damages (*i.e.*, their alleged hours worked over 40 in a week), and no way to efficiently try the issue of damages in one proceeding. No LTDCS kept and submitted records of their hours worked. DeForge Tr. 157-58 (confirming no records); Dubois Tr. 26 (same); Patel Tr. 187-88 (same). Each LTDCS must instead rely on their own individualized testimony, about their own alleged work hours, to attempt to prove that they worked any overtime hours -- and they could not think of any way to reconstruct

those hours.  DeForge Tr. 158-60; Patel Tr. 196-98, 210-11; Hrobowski Tr. 32-34.  MetLife, in turn, will rebut that evidence with individualized defenses and evidence, such as remote login data and testimony from Unit Leaders, unique to each LTDCS.  *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773 (7th Cir. 2013)(affirming decertification where the damages determination would require "2,341 separate evidentiary hearings" (one for each plaintiff)).

Because MetLife's defenses will not present any similar legal or factual issue, the collective should be decertified.  *See, e.g.*, *Harper*, 2015 WL 9673810, at *6 (decertifying collective of insurance claims adjusters because the opt-in plaintiffs' conflicting testimony precluded GEICO from proving its exemption defense based on "representative proof"); *Stevens*, 2014 WL 4261410, at *7 (finding "individualized defenses weigh[ed] against proceeding as a collective action" where depositions revealed dissimilar "levels of managerial authority and duties" necessitating "individualized, rather than representative, proof" on the question of whether the named plaintiffs and opt-ins were exempt); *Johnson*, 561 F. Supp. 2d at 587 ("[Defendants] cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said to be representative of each other.").

## VI.    <u>CONCLUSION</u>

Because the Plaintiffs are not similarly situated to one another, let alone to the Opt-ins they seek to represent, MetLife's motion should be granted, the collective should be decertified, and the claims of each Opt-in should be dismissed.

Dated:  October 19, 2020                                MORGAN, LEWIS & BOCKIUS LLP

                                                                    By: <u>/s/ *Christopher A. Parlo*          </u>
                                                                          Christopher A. Parlo
                                                                          Melissa C. Rodriguez
                                                                          Ashley Hale
                                                                          101 Park Avenue
                                                                          New York, New York 10178

                                                                          *Attorneys for Defendant*