UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DEBRA JULIAN, STEPHANIE MCKINNEY AND KIMBERLY HARRIS**, *on behalf of themselves and others similarly situated*,<br><br>    *Plaintiffs*,<br><br>**v.**<br><br>**METROPOLITAN LIFE INSURANCE COMPANY**,<br><br>    *Defendant.* | **Case No.: 1:17-cv-00957-AJN**<br><br>*Electronically Filed*<br><br>*Oral Argument Requested* |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

**MORGAN, LEWIS & BOCKIUS LLP**
Christopher A. Parlo
Melissa C. Rodriguez

101 Park Avenue
New York, New York 10178
212.309.6000

*Attorneys for Defendant Metropolitan Life
Insurance Company*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................... 1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 3

III.    ARGUMENT ...................................................................................................... 3

      A.      Summary Judgment is Appropriate on Plaintiffs' Claims Under the FLSA ......... 3

      B.      Plaintiffs Easily Satisfy the FLSA's Administrative Exemption.......................... 4

            1.      MetLife paid Plaintiffs on a salary basis at a rate per week exceeding the FLSA's minimum statutory floor ...................................... 7

            2.      Plaintiffs' primary duty, the administration and determination of LTD claims, directly relates to the management or general business operations of MetLife and its customers.................................... 8

            3.      Plaintiffs' primary duty, the administration and determination of LTD claims, includes the exercise of discretion and independence with respect to matters of significance.................................... 15

                 a.      Plaintiffs exercised discretion and independent judgment.......... 16

                 b.      In making their claims-adjudication decisions, Plaintiffs represent MetLife and its customers and bind both to significant financial decisions and legal consequences ............... 21

      C.      MetLife is Also Entitled to Summary Judgment on McKinney's CMWA Claim, Because She Satisfies the CMWA's Administrative Exemption............. 25

IV.     CONCLUSION.................................................................................................. 27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bucklin v. Am. Zurich Ins. Co.*,
No. 2:11-CV-05519-SVW, 2013 WL 3147019 (C.D. Cal. June 19, 2013),
*aff'd sub nom. Bucklin v. Zurich Am. Ins. Co.*, 619 F. App'x 574 (9th Cir.
2015) ...........................................................................................................................9

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).......................................................................................................4

*Chapotkat v. Cty. of Rockland*,
No. 11-CV-06209 NSR, 2014 WL 1373531, at *4 (S.D.N.Y. Apr. 4, 2014),
*aff'd*, 605 F. App'x 24 (2d Cir. 2015)..........................................................................4

*Cheatham v. Allstate Ins. Co.*,
465 F.3d 578 (5th Cir. 2006) .............................................................................6, 19, 20

*D'Amato v. Five Star Reporting, Inc.*,
80 F. Supp. 3d 395 (E.D.N.Y. 2015) ..........................................................................11

*Donovan v. United Video, Inc.*,
725 F.2d 577 (10th Cir. 1984) .....................................................................................15

*Dymond v. United States Postal Serv.*,
670 F.2d 93 (8th Cir. 1982) .........................................................................................15

*Ellison v. GAB Robins, Inc.*,
No. 02-127, 2005 WL 8163972 (D.N.M. May 16, 2005)..............................................9

*Encino Motorcars, LLC v. Navarro*,
138 S. Ct. 1134 (2018)...................................................................................................4

*Estrada v. Maguire Ins. Agency, Inc.*,
No. 12-604, 2014 WL 795996 (E.D. Pa. Feb. 28, 2014)...............................7, 12, 19

*In re Farmers Ins. Exch., Claims Representatives, Overtime Pay Litig.*,
481 F.3d 1119 (9th Cir. 2007) ............................................................................ *passim*

*Flood v. Just Energy Mktg. Corp.*,
904 F.3d 219 (2d Cir. 2018)...........................................................................................5

*Ford v. Allstate Ins. Co.*,
No. CV020389937, 2005 WL 374995 (Conn. Super. Ct. Jan. 5, 2005) ..............26, 27

*Foster v. Nationwide Mut. Ins. Co.*,
695 F. Supp. 2d 748 (S.D. Ohio 2010), *aff'd*, 710 F.3d 640 (6th Cir. 2013)............14

*Foster v. Nationwide Mut. Ins. Co.*,
  695 F. Supp. 757 (S.D.N.Y. 1988) ......................................................................25

*Gorman v. Continental Can Co.*,
  No. 76 C 908, 1985 WL 5208 (N.D. Ill. Dec. 31, 1985), *modified*, No. 76 C
  908, 1986 WL 335 (N.D. Ill. Mar. 26, 1986).............................................15, 17, 18

*Hendricks v. J.P. Morgan Chase Bank, N.A.*,
  677 F. Supp. 2d 544 (D. Conn. 2009).................................................................26

*Hinely v. Am. Family Mut. Ins. Co.*,
  275 F. Supp. 3d 1229 (D. Colo. 2016)................................................................10

*Icicle Seafoods, Inc. v. Worthington*,
  475 U.S. 709 (1986)............................................................................................4

*Krupinski v. Laborers E. Region Org. Fund*,
  No. 15-982, 2016 WL 5800473 (S.D.N.Y. Oct. 2, 2016)........................................10

*Locke v. Am. Bankers Ins. Co. of Fl.*,
  No. 1:12-cv-01430, 2014 WL 2091346 (E.D. Cal. May 19, 2014) .............................6, 19, 22

*Lopez v. Delta Funding Corp.*,
  No. 98-cv-7204, 2004 WL 7196764 (E.D.N.Y. Aug 9, 2004) ...................................1

*Marting v. Crawford & Co.*,
  No. 00 C 7132, 2006 WL 681060 (N.D. Ill. Mar. 14, 2006) ....................................7

*McAllister v. Transamerica Occidental Life Ins. Co.*,
  325 F.3d 997 (8th Cir. 2003) ...........................................................................6, 21

*Mertes v. Milardo Photography, Inc.*,
  No. PJRCV030101233S, 2003 WL 22205981 (Conn. Super. Ct. Sept. 10,
  2003).............................................................................................................27

*Morales v. Zondo, Inc.*,
  No. 00-3494, 2001 WL 64745 (S.D.N.Y. Jan. 25, 2001) .........................................4

*Napert v. GEICO*,
  36 F. Supp. 3d 237 (D. Mass. 2014) ....................................................................7

*O'Dell v. Alyeska Pipeline Serv. Co.*,
  856 F.2d 1452 (9th Cir. 1988) ...........................................................................15

*Palacio v. Progressive Ins. Co.*,
  244 F. Supp. 2d 1040 (C.D. Cal. 2002) ........................................................7, 13, 25

*Roe-Midgett v. CC Servs., Inc.*,
  512 F.3d 865 (7th Cir. 2008) .....................................................................6, 9, 14, 19

*Smith v. Gov't Emps. Ins. Co.*,
    590 F.3d 886 (D.C. Cir. 2010) ..................................................................................6

*Talbert v. Am. Risk Ins. Co., Inc.*,
    405 F. App'x 848 (5th Cir. 2010) ..........................................................................21

*Talbert v. Am. Risk Ins. Co.*,
    No. CIV.A. H-09-1023, 2010 WL 1960124 (S.D. Tex. May 14, 2010), *aff'd*,
    405 F. App'x 848 (5th Cir. 2010) ..........................................................................22

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000).........................................................................................4

*Wilshin v. Allstate Ins. Co.*,
    212 F. Supp. 2d 1360 (M.D. Ga. 2002) ................................................................15

*Withrow v. Sedgwick Claims Mgmt. Serv., Inc.*,
    841 F. Supp. 2d 972 (S.D. W. Va. 2012)..................................................... *passim*

*Wright v. Aargo Sec. Servs., Inc.*,
    No. 99-9115, 2001 WL 91705 (S.D.N.Y. Feb. 2, 2001)..........................................4

**Statutes**

29 U.S.C. § 213(a)(1) .....................................................................................................4

29 U.S.C. § 541.202(a) ............................................................................................15, 22

Connecticut Minimum Wage Act ............................................................................25, 26, 27

ERISA ..................................................................................................................20, 24, 25

Fair Labor Standard Act........................................................................................... *passim*

**Rules**

29 C.F.R. § 541.0, *et seq.*............................................................................................5

29 C.F.R. § 541.200 ........................................................................................................7

29 C.F.R. § 541.200(a)...............................................................................................5, 8

29 C.F.R. § 541.200(a)(2).............................................................................................12

29 C.F.R. § 541.200(a)(3).............................................................................................15

29 C.F.R. § 541.201 ......................................................................................................11

29 C.F.R. § 541.201(b) .......................................................................................2, 8, 9, 14

29 C.F.R. § 541.201(c)............................................................................................2, 13

29 C.F.R. § 541.202(b) .............................................................................................22, 23

29 C.F.R. § 541.202(c) ................................................................................10, 21, 22, 23

29 C.F.R § 541.203(a) .................................................................................... *passim*

29 C.F.R. § 541.602 ........................................................................................................7

29 C.F.R. § 541.700(a) ...................................................................................................8

29 C.F.R. § 541.704 ......................................................................................................19

69 Fed. Reg. at 22, 142 ................................................................................................15

69 Fed. Reg. 22122-01, 2214545 ................................................................................13

Fed. R. Civ. P. 56(a) ......................................................................................................4

Fed. R. Civ. P. 56(e) ......................................................................................................4

I.    **INTRODUCTION**

MetLife's long-term disability ("LTD") claims adjusters, called LTD Claim Specialists at MetLife,[1] administer the group LTD insurance plans of MetLife, its customers, and claimants, by investigating, evaluating, and rendering decisions on whether to approve or deny claims for LTD benefits.  While the U.S. Department of Labor ("DOL") and courts across the country consistently treat claims-adjuster positions like the LTD Claim Specialist ("LTDCS" or "Claim Specialist") role as exempt from federal overtime requirements, Named Plaintiff Stephanie McKinney, and opt-ins Pamela Wolber, Jennifer Dubois, Claudette Leveille, Michael Hensel, Mia Cornelius, Krystal Hrobowski and Sandhya Patel ("Plaintiffs") assert that they should have been classified as non-exempt and should have been paid overtime.  However, the undisputed facts show that MetLife properly classified them as administrative employees.  Accordingly, MetLife is entitled to summary judgment on Plaintiffs' claims under the FLSA and Plaintiff McKinney's additional individual claim under Connecticut law.[2]

Plaintiffs' claims rise and fall on two questions: (i) is the primary duty of each Plaintiff, of investigating, evaluating, and rendering decisions on LTD claims, directly related to the general business operations of MetLife *or its customers*; and (ii) did the work of each Plaintiff *include* the exercise of discretion and independent judgment as to matters of significance?  As explained below, the answer to each question for these Plaintiffs is easily "yes."

First, these Plaintiffs all had the primary duty of investigating, evaluating, and rendering decisions on LTD claims.  That was their only job.  And it is undisputed that work is directly related to the general business operations of both MetLife and its customers.  Each of MetLife's

---

[1] For purposes of this Motion, use of the term "LTD Claim Specialists" by Defendant Metropolitan Life Insurance Company ("Defendant," "MetLife" or the "Company") includes Senior LTD Claim Specialists.
[2] Given that the Court has not certified Plaintiffs' state-law claims under Rule 23, the "non-representative class members are not full parties to the action," and MetLife reserves all rights to move for summary judgment as to their state claims if any classes are certified.  *Lopez v. Delta Funding Corp.*, No. 98-cv-7204, 2004 WL 7196764, at *5 (E.D.N.Y. Aug 9, 2004).

LTD customers had an LTD benefits plan.  Those plans needed to be administered – claims needed to be reviewed and, if warranted, benefits needed to be paid.  Customers could have used their own employees – who would be exempt administrative employees.  Instead, customers used MetLife's Claims Specialists to handle or manage the "insurance" aspects of their businesses – an expressly exempt functional area under 29 C.F.R §§ 541.201(b) and (c).  Although not necessary to be exempt, Plaintiffs are also exempt as to MetLife as they do not manufacture any MetLife product, and, instead, represent MetLife to the public through their handling of claims and direct impact on MetLife's customer base.

More specifically, it is undisputed that, in administering the customers' LTD claims, each Plaintiff engaged in one or more of the following exempt activities: (i) interviewing claimants or their representatives (including attorneys), employers, and healthcare providers; (ii) reviewing medical records and drafting action plans; (iii) reviewing vocational and return-to-work information; (iv) identifying red flags for potential fraud and/or referral to the Special Investigation Unit ("SIU"); (v) assisting individuals in returning to work; and (vi) most importantly—deciding whether to approve or deny a claim, including subsequent decisions to continue, modify, or terminate benefits as appropriate.  Individuals performing such activities "meet the duties requirements [(plural)] of the administrative exemption" – as confirmed in DOL Regulations, DOL Opinion Letters, and decisions involving claims adjusters like Plaintiffs.  *See, e.g.*, 29 C.F.R § 541.203(a).

Second, it is undisputed that the work of these Plaintiffs in investigating, evaluating, and rendering decisions on LTD claims "included" (which is all that is required) the exercise of discretion and independent judgment, including the decision (or recommendation) whether claims should be approved or denied.  Among numerous other exempt activities, Plaintiffs interviewed claimants, their employers, and their health care providers for information specific to

2

each claim.  Plaintiffs decided whether to seek additional information, including when and how to do so.  Plaintiffs used discretion in determining whether to engage additional nurse, doctor, psychologist and vocational consulting resources, and for what purpose.  Plaintiffs evaluated claims for "red flags" so that potential fraud can be further investigated and only appropriate claims are paid.  And then, assessing all of the information they collected, deciding (or recommending) that a claim be paid or denied, and, where possible, helping individuals return to work.  Moreover, as all claims are unique, there was no single roadmap for all of the twists and turns involved in the management of claims.  What is certain, however, is that the decisions and recommendations *of each LTDCS* would bind MetLife and its customers to paying LTD benefits totaling millions of dollars each year, and significantly impact the lives of claimants.

For these reasons, and for those more fully explained below, summary judgment should be granted and Plaintiffs' claims under the FLSA, and Plaintiff McKinney's claim under Connecticut law, should be dismissed.[3]

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

MetLife incorporates by reference its Statement of Undisputed Material Facts (Dkt. No. 249) and refers to specific paragraphs as ("SOF ¶ __").

## III.    ARGUMENT

### A.     Summary Judgment is Appropriate on Plaintiffs' Claims Under the FLSA.

---

[3] As explained in MetLife's Motion to Decertify Plaintiffs' Conditional Collective (Dkt. Nos. 228,229), the fact-intensive inquiry under the administrative exemption requires the decertification of the conditionally-certified collective, because LTDCSs reported wildly different experiences in performing their primary duty of managing LTD claims -- which prevents this Court from analyzing the administrative exemption's multi-factor test on a collective basis.  As explained in this Motion, however, the experiences of Plaintiffs McKinney, Wolber, Dubois, Hensel, Hrobowski, Cornelius, Patel, and Leveille require summary judgment as a matter of law.  By limiting the instant Motion to these Plaintiffs, Defendant does not concede that any other Named Plaintiff or opt-in is non-exempt and, to the contrary, reserves the right to assert their exempt status, as well as any other applicable defenses, at the appropriate juncture.  Indeed, the only reason this Motion does not include the claims of other named and opt-in plaintiffs is their highly individualized and self-serving testimony that contradicts the testimony of the Plaintiffs addressed in this Motion.

Summary judgment "shall be rendered" if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986). To defeat a motion for summary judgment, the nonmoving party must, by admissible evidence, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Put differently, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor. *See, e.g.*, *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (explaining that summary judgment is essentially "put up or shut up time" for the nonmovant). Conclusory assertions or those that lack specifics are not enough. *Chapotkat v. Cty. of Rockland*, No. 11-CV-06209 NSR, 2014 WL 1373531, at *4 (S.D.N.Y. Apr. 4, 2014), *aff'd*, 605 F. App'x 24 (2d Cir. 2015).

Whether any employee's compensation and duties ultimately fit the administrative exemption is a question of law that can be appropriately decided at the summary-judgment stage. *See, e.g.*, *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) (whether particular activities excluded plaintiffs from "overtime benefits of the FLSA is a question of law"); *Wright v. Aargo Sec. Servs., Inc.*, No. 99-9115, 2001 WL 91705, at *11 (S.D.N.Y. Feb. 2, 2001); *Morales v. Zondo, Inc.*, No. 00-3494, 2001 WL 64745, at *4 (S.D.N.Y. Jan. 25, 2001). Indeed, courts have routinely dismissed overtime claims asserted by claims adjusters, like Plaintiffs, under the administrative exemption. *See* pp. 6-7, *infra*. That result is appropriate here.

### B.    Plaintiffs Easily Satisfy the FLSA's Administrative Exemption.

The FLSA expressly exempts from its overtime requirement any employee who is paid on a salary basis and works in a bona fide administrative capacity. 29 U.S.C. § 213(a)(1); *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (expressly rejecting a narrow

construction of the FLSA's exemptions).[4]  Although those terms are not defined in the FLSA, the

DOL has defined them in implementing regulations pursuant to its regulatory authority as the

federal agency responsible for enforcing the FLSA (the "Regulations").  29 C.F.R. § 541.0, *et*

*seq.*  According to the Regulations, an "administrative" employee is one who: (i) is paid on a

salary basis at least $684 per week; (ii) has a primary duty to perform office or non-manual work

directly related to the management or general business operations of the employer *or its*

*customers*; and (iii) whose primary duty *includes* the exercise of discretion and independent

judgment as to matters of significance.  29 C.F.R. § 541.200(a).

Plaintiffs satisfy each prong.  Indeed, the authority supporting Plaintiffs' classification as

exempt is long-standing and universal.  The DOL's Regulations, the DOL's Opinion Letters, and

decisions from courts across the country all agree that claims adjusters, like Plaintiffs, satisfy the

administrative exemption.  The Regulations explain that claims adjusters typically perform work

that is administrative in nature, and the DOL has specifically identified insurance claims agents

and adjusters as jobs that ordinarily satisfy the test for exempt administrative work.  *See* 29

C.F.R. § 541.203(a) (explaining that insurance claims adjusters generally meet the duties

requirements for the administrative exemption if their duties include certain activities).

In addition to the Regulations identifying Plaintiffs as prototypical administrative

employees, multiple DOL Opinion Letters have confirmed the exempt status of claims adjusters

performing duties similar to those the Plaintiffs admit they performed.  *See, e.g.,* DOL Opinion

Letter, FLSA 2005-25 (Aug. 26, 2005) (opining that insurance claims specialists  performed

administrative work and exercised sufficient discretion on matters of significance when they

---

[4] According to the Supreme Court, "[t]he narrow-construction principle relies on the flawed premise that
the FLSA pursues its remedial purpose at all costs."  *Id.* (internal quotation marks omitted).  Because
exemptions under the FLSA are "as much a part of the FLSA's purpose as the overtime-pay
requirement," the Supreme Court now instructs that courts "have no license to give the exemption
anything but a fair reading."  *Id.*; *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 228 (2d Cir. 2018).

used their own judgment on determining liability, the worth of a claim, and how to handle

negotiations with claimants); DOL Opinion Letter, FLSA 2002-11 (Nov. 19, 2002) (noting that

the "Wage and Hour [Division of the DOL] has long recognized that claims adjusters typically

perform work that is administrative in nature").

Appellate courts across the country agree with the DOL's Regulations and Opinion

Letters.  Since 2003, five federal appellate courts (the D.C., Fifth, Seventh, Eighth, and Ninth

Circuit Courts of Appeal) have concluded that insurance claims adjusters are administrative

employees and exempt from overtime pay.  *See Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 897

(D.C. Cir. 2010) ("we conclude that the primary duty of GEICO's auto damage adjusters

includes the exercise of discretion and independent judgment, and thus they come within the

administrative employee exemption"); *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865 (7th Cir.

2008) (finding that claims adjusters performed administrative duties and exercised sufficient

discretion to be exempt under the FLSA); *In re Farmers Ins. Exch., Claims Representatives,*

*Overtime Pay Litig.*, 481 F.3d 1119 (9th Cir. 2007) (finding that claims adjusters "satisf[ied]

both prongs of the duties test" under the FLSA); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578 (5th

Cir. 2006) (finding that claims adjusters' duties were directly related to company's general

business operations and required the exercise of discretion); *McAllister v. Transamerica*

*Occidental Life Ins. Co.*, 325 F.3d 997 (8th Cir. 2003) (affirming finding that claims adjuster

exercised sufficient discretion to be administratively exempt).

Multiple district courts – at the summary-judgment stage – agree.  *See, e.g.*, *Locke v. Am.*

*Bankers Ins. Co. of Fl.*, No. 1:12-cv-01430, 2014 WL 2091346, at *12 (E.D. Cal. May 19, 2014)

(holding that claims adjusters were administratively exempt because they exercised discretion in

evaluating claims, evaluating and making recommendations on liability and coverage, and

negotiating and communicating with insureds - even when they were provided guidelines for

handling claims from their supervisors); *Estrada v. Maguire Ins. Agency, Inc.*, No. 12-604, 2014 WL 795996, at *9 (E.D. Pa. Feb. 28, 2014) (holding that claims adjuster plaintiff exercised sufficient discretion where duties included interviewing insureds and witnesses, inspecting property damages, reviewing factual information to ensure that estimates were reasonable, evaluating coverage and settling claims, and providing recommendations regarding coverage to a supervisor); *Napert v. GEICO*, 36 F. Supp. 3d 237 (D. Mass. 2014) (holding claims adjuster exempt who performed many of the same duties as Plaintiffs, including reviewing factual information to prepare estimates; checking for fraudulent claims; determining liability and the total value of claims; and negotiating); *Withrow v. Sedgwick Claims Mgmt. Serv., Inc.*, 841 F. Supp. 2d 972 (S.D. W. Va. 2012) (holding that claims adjusters, whose duties included creating action plans and deciding which cases to refer for fraud investigation, satisfied the administrative exemption test); *Marting v. Crawford & Co.*, No. 00 C 7132, 2006 WL 681060, at *12 (N.D. Ill. Mar. 14, 2006) (finding claims adjuster exempt when she negotiated settlements and made liability recommendations); *Palacio v. Progressive Ins. Co.*, 244 F. Supp. 2d 1040 (C.D. Cal. 2002) (finding that claims adjuster satisfied all requirements for the administrative exemption).

As explained below, the duties of Plaintiffs mirror the claim adjuster functions that the DOL and courts have repeatedly found to be exempt administrative functions, and MetLife is therefore entitled to summary judgment as a matter of law.

### 1. MetLife paid Plaintiffs on a salary basis at a rate per week exceeding the FLSA's minimum statutory floor.

Throughout the applicable statute of limitations period, Plaintiffs received a weekly salary exceeding the statutory floor of $684 per week (or $35,568 per year), which did not vary based on the quantity or quality of their work.  SOF ¶ 14.  Accordingly, Plaintiffs meet the salary level and basis tests of the administrative exemption, and Plaintiffs do not allege otherwise.  *See* Third Am. Compl.; *see* 29 C.F.R. § 541.200; 29 C.F.R. § 541.602.

2.      **Plaintiffs' primary duty, the administration and determination of
LTD claims, directly relates to the management or general business
operations of MetLife and its customers.**

The first prong of the duties test for the administrative exemption requires that an

employee's primary duty involve the performance of office or non-manual work directly related

to the management or general business operations of the company *or its customers*.  29 C.F.R. §

541.201(a); (c).  An employee's "primary duty" is "the principal, main, major, or most important

duty that the employee performs."  29 C.F.R. § 541.700(a).  To determine whether an

employee's primary duty is "directly related" to the company's or the company's customers'

general business operations, the analysis focuses on "the type of work performed by the

employee," and in particular whether it is "directly related to assisting with the running or

servicing of the business, as distinguished, for example, from working on a manufacturing

production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).

"Work directly related to management or general business operations includes, but is not limited

to, work in functional areas such as" "**insurance**;" safety and health; personnel management;

human resources; and employee benefits.  29 C.F.R. § 541.201(b) (emphasis added).

Plaintiffs' primary duty was investigating, evaluating, and rendering decisions on LTD

claims.  SOF ¶ 15.  Indeed, that was their only job, and it clearly serviced the business of

MetLife and its customers as LTDCSs alone handled the functional area of insurance for the

customers, including through the administration of claims and efforts to return employees to

work.  SOF ¶ 16; K. Harris Tr. at 168:10-171:19 (explaining that MetLife adjudicated LTD

claims and that no one at the customer did so); T. Harris Tr. at 162:2-11 ("And over the entire

period from 2013 to 2018 when you were performing those services, did you ever run across

someone who was at the customer company itself who was simultaneously providing the claim

specialist services at the same time you were on the same claims? . . . A No."); Patel Tr. 56-58,

65-68 (across hundreds of claims never saw anyone at customer doing what she did for them in handling their claims); Parlo Decl. Ex. T, at 1 (Patel confirming that she analyzed and managed large organization accounts and their long term disability claims).

The functional area of insurance has long been recognized as work directly related to the management and general business operations of employers and their customers. *See* 29 C.F.R. § 541.201(b) (stating that work is "directly related to management or general business operations" if it is "in functional areas such as" "**insurance**") (emphasis added); DOL Opinion Letter, FLSA 2005-25 ("servicing the employer's customer's business through the performance of claims adjusting duties" directly relates to management or general business operations); DOL Opinion Letter, 2002-11 (same); *Ellison v. GAB Robins, Inc.*, No. 02-127, 2005 WL 8163972, at *1, 9-10 (D.N.M. May 16, 2005) (holding that claims reviewers, whose duties were "virtually indistinguishable from the job duties of claims adjusters" as set out in the Regulations, were exempt administrative employees); *Roe-Midgett*, 512 F.3d at 873 (insurance claims adjusters "are service providers, and the service they provide is the administration of insurance claims . . . [w]e have no difficulty concluding [that their duties are administrative]"); *In re Farmers Ins.*, 481 F.3d at 1123 (claims adjusters who "represent [the employer] to the public through their handling of claims and directly impact [the employer's] customer base" perform administrative duties); *Bucklin v. Am. Zurich Ins. Co.*, No. 2:11-CV-05519-SVW, 2013 WL 3147019, at *1 (C.D. Cal. June 19, 2013), *aff'd sub nom. Bucklin v. Zurich Am. Ins. Co.*, 619 F. App'x 574 (9th Cir. 2015) (granting summary judgment for employer on claims of claim adjusters, finding that the following tasks, among others, "were directly related in a qualitative sense to the administrative operations of Defendant's business": planning the processing of their claims; representing the defendant in investigating claims, determining coverage, and making recommendations to supervisors).

Moreover, the DOL has determined that insurance claims adjusters "generally meet the duties [(plural)] requirements for the administrative exemption" if their duties *include*:

- Interviewing claimants and witnesses;
- Inspecting property damage;
- Reviewing factual information to prepare estimates;
- Evaluating and making recommendations regarding coverage;
- Determining liability and the total value of a claim;
- Negotiating settlements; and
- Making recommendations regarding litigation.

29 C.F.R. § 541.203(a).  "The regulation, however, does not require the adjuster to perform each and every activity listed" in order to meet the administrative exemption.  *In re Farmers Ins.*, 481 F.3d at 1129; *Hinely v. Am. Family Mut. Ins. Co.*, 275 F. Supp. 3d 1229, 1235 (D. Colo. 2016).

Plaintiffs admit that they interviewed claimants and others, reviewed factual information, created action plans, evaluated and made decisions (or recommendations[5]) concerning coverage, determined the liability and total value of claims by determining (or recommending) whether to approve or deny, and to continue or terminate, LTD benefits, and worked with claimants and employers (including by negotiating) to return claimants to work. *See generally* SOF. Specifically, to decide an LTD claim, Plaintiffs testified that they each engaged in one or more of the following activities: (i) interviewing claimants or their representatives (such as family members or attorneys), their employers, and their healthcare providers (SOF ¶¶ 62-64); (ii) reviewing insurance policies; (iii) reviewing medical/psychological records; (iv) reviewing vocational and return-to-work information (SOF ¶¶ 81-82); (v) identifying red flags for potential fraud and/or referral to the SIU (SOF ¶¶ 28, 72-74); and (vi) most importantly—deciding

---

[5] While McKinney refused to say that she "approved" claims, she testified repeatedly that she made the decision to recommend approval, and that her recommendations were rarely not accepted.  SOF ¶ 47.  As a matter of law, the distinction McKinney tried to draw is irrelevant.  Approving and recommending are both exempt functions.  *See* 29 CFR § 541.202(c); *see also Krupinski v. Laborers E. Region Org. Fund*, No. 15-982, 2016 WL 5800473, at *9 (S.D.N.Y. Oct. 2, 2016) (applying administrative exemption to employee who exercised independent judgment and discretion where he, *inter alia*, made "recommendations to supervisors" concerning "matters of significance").

whether to approve or deny a claim, including subsequent decisions to continue, modify, or

terminate benefits as appropriate. SOF ¶ 45.  So there can be no dispute that 29 C.F.R. § 541.201

and 541.203(a) apply to them.  The DOL explained:

> Your description of the claims adjusters' duties indicates that they perform
> many duties related to servicing the business.  They are responsible for
> planning the processing of a claim from the beginning to the end, . . .
> [including] gathering the evidence, assessing credibility, reviewing the
> insurance policy, determining whether there is coverage, evaluating
> liability, making a decision on whether and how much to pay on the claim,
> . . . [and ] making a recommendation on claims above their established
> authority . . . Because these duties involve servicing the insurance company
> in the same manner that claims adjusters traditionally have done so, as is
> reflected in the regulatory reference to claims adjusters, we find that their
> duties are administrative in nature."

FLSA 2002-11 at p. 2; *see also* FLSA 2005-25, 2005 WL 3308596 (Aug. 26, 2005) ("[F]or

carriers with whom your client contracts, the . . . Claims Specialists provide claims adjusting

services which are necessary to service the insurance policy sold by the insurance company.");

*see supra* pp. 6-7 (collecting cases where claims specialists performing duties similar to

Plaintiffs were found exempt as a matter of law).

Finally, there is no evidence that Plaintiffs produced or sold insurance policies or any

other product offered by MetLife, or that they were involved in producing the products of any

customer.  SOF ¶ 12.  Nor did Plaintiffs produce anything on a factory floor or production line.

SOF ¶ 13; *see, e.g., D'Amato v. Five Star Reporting, Inc.*, 80 F. Supp. 3d 395, 416 (E.D.N.Y.

2015) (noting the distinction between employees directly producing goods and services and those

performing administrative work applicable to the running of any business); *see also In re

Farmers Ins.,* 481 F.3d at 1123 (noting that because adjusters represent the insurer to the public

through their handling of claims and directly impact the insurer's customer base, the adjusters'

work "affects business operations to a substantial degree, even though their assignments are tasks

related to the operation of a particular segment of the business").

In addition to meeting the administrative exemption through the insurance work they provide, Plaintiffs testified that they guide claimants through the life cycle of the claim by, *inter alia*, explaining the applicable plan provisions and available benefits, answering questions, and helping to complete forms.  SOF ¶ 105.  By conducting interviews and other discussions with claimants and others, and guiding claimants throughout the entire claims process, Plaintiffs serve as the "face" of MetLife with its customers and claimants.  *Id.*  As Plaintiff Hrobowski put it, she acted as the "main contact for both claimants and employers throughout the duration of each claim."  *Id.*  This is clearly exempt work, as a claims adjuster who serves as the company's representative, in speaking with claimants and insureds, obtaining damage estimates and making liability determinations, performs work directly related to the management or general business operations of the company.  *Estrada*, 2014 WL 795996, at *4 (citing *Cheatham*, 465 F.3d at 585); *In re Farmers Ins.*, 481 F. 3d at 1132 (rejecting the plaintiffs' argument that claims adjusters delivered the insurer's product, *i.e.*, insurance coverage, to its customers, and holding, instead, that they represent the insurer to the public through their handling of claims and directly impact the insurer's customer base).

Plaintiffs may attempt to draw a distinction between customers who are fully insured (who fund claims through an insurance policy) and those who are self-insured.  In that argument, Plaintiffs would say that for customers who do not purchase a MetLife insurance policy the only service or product being provided is the claims handling work, which they would claim makes them production workers in MetLife's "claims-handling business."  But that strained analysis is not supportable under the express language of the Regulations, and under multiple DOL and court decisions, that makes clear that claims adjusting is an administrative function *regardless of whether it is for the employer or its customers*.  *See* 29 C.F.R. § 541.200(a)(2) ("or the employer's customers"); § 541.203(a) ("whether they work for the insurance company or other

type of company"); § 541.201(c)("An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers."); FLSA 2002-5 (August 6, 2002) at p. 1 ("Thus, . . .you asked only whether an employee who performs administratively exempt work for his employer's customers would be exempt, notwithstanding the fact that the employee could be viewed as producing the administrative services his employer is in business to provide. . . . pursuant to the regulations, we continue to believe that the administrative exemption applies where an employee is performing work that is directly related to the internal management policies or general business operations of his employer's customers."); K. Harris Dep. at 167:25-168:9 ("[T]he fact that if it was self-insured or fully insured, it didn't have any bearing on how I processed the claims. . . It's just how that account was set up and it didn't impact how I processed the claim, so I don't really recall how it was funded.").  This is consistent with the preamble to the 2004 Overtime Rule, which states: "Claims adjusters are not production employees because the insurance company is in the business of writing and selling automobile insurance, rather than in the business of producing claims."  69 Fed. Reg. 22122-01, 2214545; *Palacio*, 244 F. Supp. 2d at 1047 ("Progressive is not in the business of claims handling.  Rather, it is in the business of writing and selling automobile insurance. . . [c]laims handling occurs . . . as a type of ancillary customer service.").

DOL Opinion Letter, FLSA 2005-25, is directly on point.  There, the claim specialists were employed by a third party administrator that "exists to sell claims adjusting and other services to insurance companies, insurance brokers, and/or self-insured companies," and charges a fee for the adjusting services.  Despite the claims adjusting work being a service, the DOL held that the primary duties were related to servicing the employer's *customer's* business because it involved work in the "functional area[]" of "insurance," and the employees provided claims

13

adjusting services on the insurance products the customer had purchased. *Id*. at 4. Thus, although they were arguably performing a, or the, core service sold by their employer (claims adjusting), they met the second prong by "servicing the employer's customer's business through the performance of claims adjusting duties." *Id*.[6]; *see also* FLSA 2006-23 at pp. 3-4 (finding that even though agents were providing services that the employer existed to provide, they fell on the administrative side of the dichotomy because they performed functional work covered by §§ 541.201(b) and 541.203(a) for the employer's customers); FLSA 2002-5 at p. 1 ("The regulations then provide that the management policies or general business operations on which the employee works: may be those of the employer **or the employer's customers**.") (emphasis in original); *Foster v. Nationwide Mut. Ins. Co.,* 695 F. Supp. 2d 748, 758 (S.D. Ohio 2010), *aff'd*, 710 F.3d 640, 646 (6th Cir. 2013) ("Insurance claims adjusters generally meet the duties requirements [elements two and three] for the administrative exemption, whether they work for an insurance company or other type of company, . . ."); *Roe-Midgett*, 512 F.3d at 872 (holding that claims adjusters were servicing the business of the employer's customers, even though the defendant contracted to provide claims processing services for various insurance policies); *In re Farmers Ins.,* 481 F.3d at 1132 (holding that adjusters who represent the "claims handling arm" do not necessarily fall on the production side of the "administrative/production worker dichotomy," and finding that the "directly related" prong was met because the adjusters' work "directly impact[s] the employer's customer base"); FLSA 2018-8, 2018 WL 5393307 (Jan. 5, 2018) ("because the CSMs serve as insurance advisers and consultants to your clients, they

---

[6] The DOL noted with respect to the work done by the claims adjusters for different entities, "[F]or carriers with whom your client contracts, the . . . Claims Specialists provide claims adjusting services which are necessary to service the insurance policy sold by the insurance company. . . . For the self-insured companies, . . . Claims Specialists adjust claims brought by employees of the self-insured entity in their every day business activities.") FLSA 2005-25 at p. 4. Thus, the claims adjusters were performing exempt claims handling services for both insurance companies themselves and for self-funded entities.

perform office or non-manual work directly related to the management or general business
operations of the employer's customers.").[7]

Thus, Plaintiffs easily meet the first prong of the administrative exemption duties test.

### 3.    Plaintiffs' primary duty, the administration and determination of LTD claims, includes the exercise of discretion and independence with respect to matters of significance.

"[T]he exercise of discretion and independent judgment involves the comparison and the
evaluation of possible courses of conduct, and acting or making a decision after the various
possibilities have been considered."  29 U.S.C. § 541.202(a).  To meet the last prong of the
administrative exemption, the employee's primary duty must simply *include* the exercise of
discretion and independent judgment with respect to matters of significance.  29 C.F.R. §
541.200(a)(3).  "There is no requirement that all or even most of [the employee's] work involve
discretion and independent judgment; the employee's work need only *include* use of discretion
or independent judgment."  *See, e.g.*, *Wilshin v. Allstate Ins. Co.*, 212 F. Supp. 2d 1360, 1378
(M.D. Ga. 2002) (emphasis added); *Dymond v. United States Postal Serv.*, 670 F.2d 93, 95 (8th
Cir. 1982) (explaining that the term "include" simply means "include" and does not require the
"customar[y] and regular[] exercise [of] discretion and independent judgment"); *O'Dell v.
Alyeska Pipeline Serv. Co.*, 856 F.2d 1452, 1454 (9th Cir. 1988) (same); *Donovan v. United
Video, Inc.*, 725 F.2d 577, 581 n. 4 (10th Cir. 1984) (same); *Gorman v. Continental Can Co.*, No.
76 C 908, 1985 WL 5208 (N.D. Ill. Dec. 31, 1985), *modified*, No. 76 C 908, 1986 WL 335 (N.D.
Ill. Mar. 26, 1986) (explaining that, in analyzing this prong, the term "include" requires the
employer to "only demonstrate that the employee sometimes or occasionally exercises discretion

---

[7] *See also* 69 Fed. Reg. at 22, 142 ("'For example, many bona fide administrative employees perform
important functions as advisors and consultants but are employed by a concern engaged in furnishing
such services for a fee . . . .  Such employees, if they meet the other requirements of the regulations,
should qualify for exemption *regardless of whether the management policies or general business
operations to which their work is directly related are those of the employer's clients or customers, or
those of their employer*.") (citing 1949 Weiss Report at 65) (emphasis added).

and independent judgment").

        a.    <u>Plaintiffs exercised discretion and independent judgment.</u>

Discovery for these Plaintiffs confirmed that their primary duty of managing LTD claims involved the use of discretion and independent judgment with regard to matters of significance, and that it is fundamental to performing that job. *See generally* SOF. Indeed, as every claim is unique (SOF ¶ 37) Plaintiffs had to adjust what they would do from claim to claim. SOF ¶¶ 37-39.

In particular, for each claim, Plaintiffs had to make an initial eligibility determination: was the claimant (and injury) covered by the plan at issue? SOF ¶ 53.[8] If a claimant is eligible, these Plaintiffs then developed a separate action plan for every claim, that included different steps they would take to bring each claim to resolution based on the unique facts of each claim, and they determined the level of detail to include in each plan.[9] SOF ¶¶ 56-61. As part of their action plans, these Plaintiffs determined who to interview (or not) and what information was needed. SOF ¶ 63. They decided whether to speak with doctors, other health care providers, and employers. SOF ¶¶ 62-63. Once individuals were selected, they tailored their questions to specific situations and had to listen actively to be able to react on the spot and to follow up on information provided during the calls. SOF ¶ 64. They decided whether it was necessary to seek and obtain additional or follow-up information, including from whom, when and how. SOF ¶¶ 64, 67-68. They resolved discrepancies between what a claimant said their job entailed versus a

---

[8] Eligibility determinations, sometimes called claims verification, can involve: (1) reviewing the definition of disability in each plan; (2) evaluating whether preexisting conditions exist; (3) reviewing claimant earnings; (4) and determining if a claimant has been actively at work. SOF ¶¶ 53-55. At that stage, Claim Specialists also may need to determine if a Limited Disability Benefits situation may apply. SOF ¶ 5.

[9] *Withrow*, 2012 WL 242773, at *6 (concluding that claims adjustors who interviewed workers' compensation claimants, medical providers, and attorneys, and who created "action plans" for how to bring claims to resolution, exercised discretion and independent judgment).

job description obtained from the employer.  SOF ¶¶ 67-68.  They also identified any

discrepancies in medical records, and decided whether to engage a clinical resource to help

resolve them.  *Id.* They used discretion in determining whether to engage additional resources

(SOF ¶¶ 19, 25, 30-31), among nurses, doctors, vocational specialists, unit leaders or claims

support specialists, and, if so, which resource(s) to use and how.  *Id.*  They decided whether a

claim warranted going to a Claims Discussion Meeting ("CDM") (including who to invite to the

CDM).  SOF ¶¶ 69-70.  They determined the purpose for using a resource or conducting a CDM.

SOF ¶ 71.  They evaluated claims for "red flags" and decided whether to engage SIU or a vendor

for further investigation of potential fraud.  SOF ¶ 72-73.  They determined how to use any

report from SIU in their evaluation of the claim.  SOF ¶ 75.  Together with any vocational

specialist they engaged, they determined whether vocational rehabilitation services were needed

and helped to arrange them.  SOF ¶¶ 65-66.  Together with any clinical resource they engaged,

they determined whether medical rehabilitation services were needed and then monitored

whether any treatment plan was being followed.  SOF ¶ 78.  They determined the Likely Claims

Progression ("LCP") for each claim and what was needed for Proof of Disability.  SOF ¶¶ 76-77.

Then, with respect to each claim under their management, *i.e.*, each claim in their

individual book of claims, they would decide whether to commit MetLife or its customers to the

payment of LTD benefits.  SOF ¶ 45.  To do that, Plaintiffs would evaluate and bring together

the multiple elements of a claims decision (whether an initial or subsequent benefits termination

decision), including clinical findings, policy provisions and definitions, the abilities, restrictions

and limitations of the claimant, the claimant's course of treatment, the functional requirements of

the claimant's own job or broader occupation, and sometimes the claimant's ability to perform a

new, alternative occupation.  *See generally* SOF.  This included an assessment of functionality

by comparing the duties of a position with what the claimant could or could not do.  SOF ¶¶ 80-

81.[10]  It also involved a review of the definition of disability contained in each LTD plan against what the restrictions and limitations were for each claimant on their ability to perform gainful work activities in their own occupation or in any occupation.  SOF ¶ 82.  They would also identify and apply any "offsets," which could be used to reduce the amount of the LTD payment by the insurer or employer.  SOF ¶ 84.  Plaintiffs also determined what information was needed for any medical reassessment to be done during the duration of any covered disability.  SOF ¶ 83.

Each Plaintiff was also involved in hundreds of people going back to work.  SOF ¶ 101; Patel 71:9-13 (explaining that "a MetLife goal" is to have individuals return to work); Hrobowski 180:16-20 (describing an individual's return to work as a goal of the process); Dubois 88 (explaining that the "main goal for long-term disability is to try to get the people to return to work, so you're constantly talking to them about returning to work"); Leveille 173-174 (believing that one of her roles was to try to help people go back to work).  They would determine, sometimes in collaboration with resources they engaged, whether an injured employee could return to work and what, if any, accommodations needed to be made at the workplace to facilitate the employee's return.  SOF ¶¶ 103-05.  They would reach out to employers, healthcare practitioners and claimants regarding return to work plans and accommodations.  *Id.*  This could include implementing return to work incentives that Plaintiffs could apply, after discussing them with employers, healthcare practitioners, and claimants.  SOF ¶ 102.  Plaintiffs would speak with the employer customers, including their HR Departments, and with the claimant customers, to modify any accommodations which could be made.  SOF ¶ 103.  Indeed, throughout the entire claims process Plaintiffs served as the face of the Company

---

[10] As Hrobowski explained, Claim Specialists have to look at (1) what each claimant's duties are; (2) what he or she is currently able to do; and (3) what his or her restrictions and limitations are.  SOF ¶ 81.  And, Hrobowski confirmed, those points differ from claim to claim.  *Id.*

and as the liaison between employers, claimants and MetLife. SOF ¶ 104-05.

All of the foregoing activities, which were performed without any day-to-day supervisor or manager input,[11] demonstrate conclusively that Plaintiffs exercised discretion and independent judgment on a daily basis in handling claims.  *See, e.g., Locke*, 2014 WL 2091346 (claims adjusters exercised discretion in evaluating claims, negotiating and communicating with insureds, even when they were provided guidelines for handling claims from their supervisors); *Estrada*, 2014 WL 795996, at *9 (where claims adjuster interviewed insureds and witnesses, inspected property damage, reviewed factual information to ensure that estimates were reasonable, evaluated whether coverage would be extended and provided recommendations regarding coverage, plaintiff exercised sufficient discretion to meet the administrative exemption); *Withrow*, 841 F. Supp. 2d 972 (creating action plans for closing claims and deciding which cases to refer for fraud investigation were discretionary duties).

Plaintiffs may point to the use of templates or guides in an attempt to show an absence of discretion and independent judgment.  However, the Regulations explicitly provide that the use of such tools does not mean that an employee is not exercising discretion in carrying out their duties.  29 C.F.R. § 541.704 (the "use of such reference material ["manuals and procedures"] would not affect an employee's exempt status"); *see also Roe-Midgett*, 512 F.3d at 874 ("independent judgment is not foreclosed by the fact that an employee's work is performed in accordance with strict guidelines"); *Cheatham*, 465 F.3d at 585 ("the requirement that [claims] adjusters must consult with manuals or guidelines does not preclude their exercise of discretion and independent judgment").

---

[11] With the exception of claims denials, which need a review of the LTDCS's recommendation, LTDCSs perform these tasks without any daily supervisor or manager input.  SOF ¶ 84.  Unit Leaders ("UL") did not make the decision to approve or deny claims, nor did they provide daily input to Plaintiffs.  SOF ¶¶ 46, 84.

Moreover, there is no tool or resource that dictated how a Claim Specialist was to decide any specific disability claim, and there is no dispute that Plaintiffs had discretion even in deciding whether and how to use any tools.  SOF ¶ 40.  As Plaintiff Patel confirmed, ***nothing*** in the CMG says how to handle a specific disability claim.  SOF ¶ 36.  All claims are unique, and there is not even an instruction in the CMG that "similar" claims have to be handled in a similar fashion.  SOF ¶ 38.  So no tool dictates whether any claim should be approved or denied, or how many claims in total need to be approved or denied.  SOF ¶ 40.[12]

With respect to whether and how to use any tools, as Plaintiff Leveille testified, "Not every scenario fits that template" and "[s]ome questions you don't ask because it doesn't pertain."  SOF ¶ 64; *id.* ¶ 42 (Plaintiff Patel testifying that she did not look at the CMG for days and weeks); *id.*¶ 64 (Plaintiff Wolber testifying that she adjusts a template for each interview depending on the specifics of the claim and the information needed); *id.* (Plaintiff McKinney testifying that she asked questions that did not come from any template and that she decided which questions to ask); *id.* (Plaintiff Dubois testifying that, as she conducts the interview, she would have to determine what questions to ask next based on what the claimant says); *id.* (Plaintiff Hensel testifying that, although he used a template, he tailored his questions to the unique facts of the claim and the claimant's responses to his questions); *id.* (Plaintiff Hrobowski testifying that, although she used a template, she would ask "different follow-up questions depending on the diagnosis" and that the interview template does not contain every possible follow-up question).

Plaintiffs may also point to the human resources available to them, such as clinicians and

---

[12] As LTD plans are typically covered by ERISA, Plaintiffs' counsel may attempt to say that certain provisions in ERISA, regarding the timelines for claim decisions and appeals, remove or reduce discretion.  However, Plaintiffs themselves made clear that ERISA applies only to some timing questions, and has *nothing* to do with how any claim is decided.  SOF ¶¶ 108-109.

vocational experts.  But Plaintiffs' own testimony disposes of that argument, as Plaintiffs made

clear that they chose whether and how to engage with such resources.  SOF ¶¶ 65-67.  For

example, Plaintiff Wolber testified, "We're not to use clinical or vocational resources if we don't

need them. Otherwise we're wasting their time."  SOF ¶ 66.  Similarly, Plaintiff Hensel testified,

"I would not set up a CDM if I thought we didn't need a CDM. If I'm doing a CDM it's because

I think we need it."  SOF ¶ 69.

Finally, some Plaintiffs may point to their belief that some of their decisions or

recommendations were subject to review.  But this prong "does not require that decisions made

by an employee have a finality that goes with unlimited authority and a complete absence of

review.  29 U.S.C. § 541.202(c).  The "decisions made as a result of the exercise of discretion

and independent judgment may consist of recommendations for action rather than the actual

taking of action."  *Id.*; *see also McAllister*, 325 F.3d at 1001.  And this is true "even if their

decisions or recommendations are reviewed at a higher level."  29 U.S.C. § 541.202(c).  In short,

the fact that an employee's decisions may be subject to review, or are revised or reversed after

review, does not mean that the employee is not exercising discretion and independent judgment.

*Id.* at § 541.202(c); *see also Talbert v. Am. Risk Ins. Co., Inc.*, 405 F. App'x 848, 854 (5th Cir.

2010) (claims adjuster exercised discretion when his job included recommendations regarding

coverage and interviewing policyholders, even if the employee was rarely required to do so).[13]

> b.    In making their claims-adjudication decisions, Plaintiffs represent
>        MetLife and its customers and bind both to significant financial
>        <u>decisions and legal consequences.</u>

Finally, it cannot be disputed that Plaintiffs exercised discretion and independent

judgment with respect to "matters of significance," a term that "refers to the level of importance

---

[13] Moreover, as to these Plaintiffs, their decisions and/or recommendations were always – except in
extremely rare circumstances – accepted.  SOF ¶ 46.

21

or consequence of the work performed." 29 C.F.R. § 541.202(a).  Indeed, no court has ever found that insurance claims adjusters performing duties similar to those of Plaintiffs did not perform work with respect to matters of significance.

Matters of significance include, *inter alia*, matters where the "employee has authority to commit the employer in matters that have significant financial impact," where the "employee has authority to negotiate and bind the company on significant matters," or where the employee "represents the company in handling complaints . . . or resolving grievances." 29 C.F.R. § 541.202(b).  All of those scenarios apply here.

Plaintiffs' determinations – reached as representatives of MetLife and/or its customers – regarding whether a claimant's condition(s) meet the definition of "disability" covered by a particular plan, and their determinations regarding the type and amount of benefits, have significant financial consequences for MetLife and its customers.  SOF ¶¶ 95, 98-99 (explaining that Plaintiffs have varying amounts of financial authority to approve claims, from $1,000 to no limits, and confirming that approval and denial decisions have a financial impact on employers and claimants).  That impact is clearly a matter of significance, as made clear in FLSA 2002-11:

> [D]eterminations by claims adjusters "regarding whether a particular incident is covered by a policy, and their determinations regarding liability and what the damages are, can result in extremely large financial consequences for the firm. Those steps are essential aspects of every claim processed, and they must be done correctly in order to assure that the insurance company pays what it is contractually obligated to pay, whether to a policyholder or a third party claimant.

FLSA 2002-11, at p. 2-3; *see also Locke*, 2014 WL 2091346 (finding that claims adjusters with the authority to settle claims or make recommendations to settle claims are exercising discretion with respect to matters of significance); *Talbert v. Am. Risk Ins. Co.*, No. CIV.A. H-09-1023, 2010 WL 1960124, at *4 (S.D. Tex. May 14, 2010), *aff'd*, 405 F. App'x 848 (5th Cir. 2010) (rejecting the claim-specialist plaintiff's argument that he did not exercise discretion and

independent judgment because he only made recommendations to settle claims, and granting summary judgment to insurer because he exercised discretion and independent judgment as a matter of law); *accord Withrow*, 841 F. Supp. 2d 972; 29 C.F.R. § 541.202(b).

More specifically, each Claim Specialist makes decisions resulting in the payment to claimants of multiple millions of dollars in benefits every year. SOF ¶ 98. The administration of claims (including the amount of benefits) must be done correctly to ensure that MetLife or its client pays what it is contractually obligated to pay, while maintaining adequate funds by not blindly paying every single claim. SOF ¶ 93. As Plaintiff McKinney testified, MetLife cannot pay every LTD claim at the maximum benefit amount, because MetLife's customers would face increased premiums based on the amount of usage of the LTD plan. SOF ¶ 94. In the case of a self-insured plan, MetLife's customers, the employers, are responsible themselves for paying the benefits on claims approved by the Claim Specialists. SOF ¶¶ 8, 95.

Aside from actual dollars and cents, the claims decision, as Plaintiff McKinney testified, directly impacts the claimant, MetLife, and MetLife's employer customers. SOF ¶ 85. Plaintiff McKinney testified that the approval or denial of a claim was a "big deal," and that she would not describe it any other way. SOF ¶¶ 85-86. She further agreed that a claims decision is "impactful," "meaningful," and "can change someone's life." *Id.* That is because a claim that is approved provides income replacement to the claimant, which may be the only form of income while the claimant is disabled. SOF ¶ 88. The claims decision also impacts the lives of claimants by providing other available benefits (*e.g.*, relocation or childcare) that are available to the specific claimant under the specific plan. *Id.* In contrast, a claim that is denied could result in a claimant having to return to work and/or receiving no benefits. SOF ¶ 90. Again, these

impacts are clearly matters of great significance. *See, e.g.*, FLSA 2002-11.[14]

Any decision to deny LTD benefits, regardless of whether it was reached correctly, also exposes MetLife or its customers to litigation by the millions of employees who possess LTD insurance coverage. This exposure is more than theoretical. According to a 2012 article in the ABA's Journal of Labor and Employment Law, 64.5% of all ERISA litigation in federal district courts from 2006 to 2010 involved LTD insurance claims. Sean M. Anderson, ERISA Benefits Litigation: An Empirical Picture, 28 A.B.A. J. Lab. & Emp. L. 1, 5-7 (2012). According to this analysis, there were 44,473 ERISA cases across this four-year period, and 28,685 were LTD insurance benefit disputes (or an average of approximately 7,200 cases per year from 2006 to 2010). *Id.* As the article explains, "The dominance of disability plans in benefits litigation is particularly striking because fewer private employees participate in disability plans than in other types of plans." *Id.* As these statistics make clear, any decision to deny a claim for benefits carries an inherent risk of litigation for MetLife and its customers.

Finally, Plaintiffs also admitted that they would look for "red flags" or other indicia of fraud in connection with claims, and determined whether a claim required additional investigation, including by the SIU, such as home visits, surveillance, and social media searches. SOF ¶ 72. For example, Plaintiff Dubois explained that she would keep an eye out for fraud, such as if a doctor was signing his name a certain way and she then received "an off signature," she could involve SIU or her Unit Leader. SOF ¶¶ 73-74 (also describing how, when, and why Hensel and Hrobowski utilized resources regarding red flags). Similarly, Plaintiff Wolber explained that she looked out for claimants who are receiving LTD benefits but returned to work

---

[14] FLSA 2002-11 at p. 2 ("The decisions made by claims adjusters affect policyholders, because their eligibility for continued coverage may be affected and their premium level may be affected. If an adjuster erroneously recommends that coverage should be denied, even on a claim of relatively low value, the insurance company may be liable for significant extra contractual damages for bad faith denial of the claim.").

anyway without notifying MetLife.  SOF ¶ 74.  After explaining that such a situation is not "cut and dry," Wolber explained that she may terminate the benefits being provided and possibly require repayment of benefits by a claimant to MetLife.  *Id.*

Besides using independence and discretion to identify what constitutes a red flag and what rises to a level necessary to escalate to SIU, Plaintiffs were also responsible for reviewing any reports from SIU in determining their next steps, such as whether to approve, modify, or terminate benefits.  SOF ¶¶ 73-74 (citing Leveille Tr. 240-241 (explaining that she reviews information from SIU and then discusses it with her resources); Dubois Tr. 122 (explaining that she reviews information from SIU and then discusses it with the claimant's medical provider).  If actual fraud exists, state insurance agencies impose mandatory reporting obligations upon insurers—all of which underscore the significance of Plaintiffs' duties.  SOF ¶ 74.

As shown above, there can be no good faith dispute that Plaintiffs' responsibilities require discretion and independence on matters that are significant and important to MetLife and its employer- and claimant-customers.  *See Palacio v. Progressive Insurance Co.*, 244 F. Supp. 2d 1040 (C.D. Cal. 2002); *Foster v. Nationwide Mut. Ins. Co.*, 695 F. Supp. 757, 758 (S.D.N.Y. 1988) (holding that the investigation of potentially fraudulent insurance claims protected the assets of Nationwide and its policyholders).  Thus, Plaintiffs meet the final prong of the administrative exemption test, and MetLife is entitled to summary judgment as a matter of law.

C.   **MetLife is Also Entitled to Summary Judgment on McKinney's CMWA Claim, Because She Satisfies the CMWA's Administrative Exemption.**

The administrative exemption under the Connecticut Minimum Wage Act ("CMWA") mirrors the FLSA's administrative exemption except that the CMWA: (i) sets the salary threshold at $475 per week instead of the federal threshold of $684 per week; (ii) requires an administratively-exempt employee to "perform[] under only general supervision work along specialized or technical lines requiring special training, experience or knowledge"; and (iii) only

allows 20% or less of the hours worked per week on work that is "not directly and closely related to the performance of" the duties in question.  *See Hendricks v. J.P. Morgan Chase Bank, N.A.,* 677 F. Supp. 2d 544, 560 (D. Conn. 2009) (noting that the administrative exemption in the CMWA and the FLSA "parallel" each other); Conn. Agency Regs. § 31–60–15 (defining the administrative exemption).  Similar to the DOL's determinations and caselaw from across the country (*see supra* pp. 5-7), McKinney also qualifies for the administrative exemption under Connecticut law.  *Ford v. Allstate Ins. Co.*, No. CV020389937, 2005 WL 374995, at *2 (Conn. Super. Ct. Jan. 5, 2005) (granting summary judgment to insurer on the plaintiff's challenge to his classification as an exempt employee).

As to the duties test, the Court in *Ford* focused on the plaintiff's deposition testimony that, as a senior claims representative, he was primarily involved with the investigation and evaluation of insurance claims, which included duties such as interviewing insureds, witnesses, and claimants, speaking with doctors and other medical providers, visiting the scene of an accident, inspecting property damage, and settling claims, among other things.  *Id.* at 2.  The Court found that these actions required the plaintiff to use his own discretion and judgment, including decisions regarding whether to interview an insured, conduct an investigation, issue a reservation of rights letter, and settle some claims up to $15,000 and others without getting approval from management. *Id.* at 3.

Given the *Ford* decision and the additional analysis above, summary judgment is warranted on McKinney's claim under Connecticut law.  First, she was paid on a salary basis at a rate per week exceeding the CMWA statutory minimum.  SOF ¶ 14.  Second, as established above, McKinney's primary duty was work directly related to the management or general business operations of MetLife and/or its customers, which required her to use discretion and independent judgment.  *See, supra*, Section III.B.3.a.  She also performed, under only general

26

supervision, work along specialized or technical lines requiring special training, experience or knowledge. *See, id.*; *Ford*, 2005 WL 374995 at *2-3. Finally, McKinney spent no time on anything other than work directly related to her primary duty. McKinney's work consisted entirely of claims administration and adjudication (which is exempt work as set forth in Section III.B.3.a above), and there is no evidence that McKinney performed any work that is **not** "directly and closely related to the performance" of that duty (*i.e.*, claims administration and adjudication). *Mertes v. Milardo Photography, Inc.*, No. PJRCV030101233S, 2003 WL 22205981, at *5 (Conn. Super. Ct. Sept. 10, 2003) (holding that exemption applied because plaintiff "did not devote more than twenty percent of her hours worked to" activities that were "non-related" to her "field of artistic endeavor"). Thus, MetLife is entitled to summary judgment on Plaintiff McKinney's claim under Connecticut law.

## IV.    **CONCLUSION**

For the reasons set forth above, MetLife's Motion for Summary Judgment should be granted, and the FLSA claims of Plaintiffs McKinney, Wolber, Dubois, Leveille, Hensel, Patel, Cornelius and Hrobowski, and Plaintiff McKinney's claim under Connecticut law, should be dismissed with prejudice.

Dated:  October 23, 2020                        MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Christopher A. Parlo*
                    Christopher A. Parlo
                    Melissa C. Rodriguez
                    101 Park Avenue
                    New York, New York 10178

                    *Attorneys for Defendant*