# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**DEBRA JULIAN, STEPHANIE MCKINNEY AND KIMBERLY HARRIS**, *on behalf of themselves and others similarly situated,*

                *Plaintiffs,*

**v.**

**METROPOLITAN LIFE INSURANCE COMPANY**,

                *Defendant.*

**Case No.: 1:17-cv-00957-AJN**

*Electronically Filed*

*Oral Argument Requested*

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' <u>MOTION FOR CLASS CERTIFICATION</u>

**MORGAN, LEWIS & BOCKIUS LLP**
Christopher A. Parlo
Melissa C. Rodriguez
Ashley J. Hale

101 Park Avenue
New York, New York 10178
212.309.6000

*Attorneys for Defendant Metropolitan Life Insurance Company*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................ 1

II.  APPLICABLE LEGAL STANDARDS:  PLAINTIFFS HAVE THE BURDEN
TO SATISFY EVERY STRINGENT REQUIREMENT OF RULE 23. ......................... 3

III.  RELEVANT FACTUAL BACKGROUND ............................................... 4

    A.  Plaintiffs Seek to Avoid Their Own Testimony About Differences. ..................... 4

    B.  The Putative Class Members Do Not Agree On Their Primary Duty. ................. 5

    C.  The Putative Class Members Do Not Agree on the Scope of Their
Discretion and Independent Judgment. .................................................. 8

    D.  Other "Facts" Alleged by Plaintiffs  Are Unsupported or Simply Untrue. ......... 13

IV.  ARGUMENT .................................................................................... 14

    A.  Plaintiffs Have Failed to Prove Commonality, Let Alone Predominance. .......... 14

        1.  Determining any LTDCS's Duties and How They Were Performed
Cannot be Answered by How Any LTDCS Was, or All LTDCSs
Were, Classified. .......................................................................... 16

        2.  There Is No Commonality Because Whether Each LTDCS Is
Covered By The Administrative Exemption Cannot Be Answered
On A Classwide Basis. ................................................................... 17

            a.  Whether Each LTDCSs Was Primarily Engaged In Exempt
Work Varies. ......................................................................... 17

            b.  Plaintiffs' Insistence That The Court Must Examine Each
LTDCSs' Intent In Describing Their Job Duties Forecloses
A Finding Of Commonality. ..................................................... 19

            c.  There are no Policies, Documents or other Materials that
Answer Whether All LTDCSs Were Primarily Engaged In
Exempt Work. ....................................................................... 19

            d.  Plaintiffs' Inapposite Cases Do Not Call For A Different
Result ................................................................................. 25

        3.  Plaintiffs Also Fail To Establish That Common Issues
Predominate. .............................................................................. 28

            a.  Whether Plaintiffs' Performed Exempt Job Duties Is The
Dominant Issue In This Case And Requires Individualized
Inquiries. ............................................................................. 29

            b.  Plaintiffs' Administrative Production Dichotomy Argument
is a Red Herring .................................................................... 30

# TABLE OF CONTENTS
(continued)

                                                                                           **Page**

          c.        Damages Also Must Be Determined On An Individual Basis. ........................................................................ 32

  B.      Plaintiffs Fail To Establish Typicality. ................................................. 34

  C.      Class Adjudication Is Not Superior. ................................................... 35

V.      CONCLUSION ............................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. Morgan Stanley*,
  656 F. App'x 555 (2d Cir. 2016) ........................................................................34

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)..................................................................................1, 3

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ....................................................................................28

*Argudo v. Parea Grp. LLC*,
  No. 18-0678, 2019 WL 4640058 (S.D.N.Y. Sept. 24, 2019) ...................................34

*Bonaventura v. Gear Fitness One NY Plaza LLC.*,
  No. 17-2168, 2018 WL 1605078 (S.D.N.Y. Mar. 29, 2018)........................15, 18, 24

*Callari v. Blackman Plumbing Supply, Inc.*,
  307 F.R.D. 67 (E.D.N.Y. 2015)....................................................19, 27, 29

*Campbell v. PricewaterhouseCoopers, LLP*,
  287 F.R.D. 615 (E.D. Cal. 2012) ........................................................................30

*Comcast Corp. v. Behrend*,
  564 U.S. 27 (2013)................................................................................ *passim*

*Cruz v. Dollar Tree Stores, Inc.*,
  No. 07-2050, 2011 WL 2682967 (N.D. Cal. July 8, 2011) ...................................24

*Cuevas v. Citizens Fin. Grp., Inc.*,
  526 F. App'x 19 (2d Cir. 2013) ........................................................................3, 16

*Damassia v. Duane Reade, Inc.*,
  250 F.R.D. 152 (S.D.N.Y. 2008) .........................................................5, 26, 27, 28

*Dauphin v. Chestnut Ridge Transp.*,
  No. 06-2730, 2009 WL 2596636 (S.D.N.Y. Aug. 20, 2009)...................................32

*Diaz v. Elecs. Boutique of Am., Inc.*,
  No. 04-0840, 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ...................................27

*Edwards v. Publishers Circulation Fulfillment, Inc.*,
  268 F.R.D. 181 (S.D.N.Y. 2010) ........................................................................29

*Enea v. Bloomberg L.P.*,
  No. 12-4656, 2014 WL 1044027 (S.D.N.Y. Mar. 17, 2014)...........................27, 33

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)..................................................................................................14

*Glatt v. Fox Searchlight Pictures, Inc.*,
    811 F.3d 528 ............................................................................................................29

*Grenawalt v. AT & T Mobility, LLC*,
    No. 11-2664, 2014 WL 4832318 (S.D.N.Y. Sept. 29, 2014) .................................28

*Griffith v. Fordham Fin. Mgmt., Inc.*,
    No. 12-1117, 2015 WL 1097327 (S.D.N.Y. Mar. 12, 2015)..................................33

*Han v. Sterling Nat'l Mortg. Co.*,
    No. 09-5589, 2011 WL 4344235 (E.D.N.Y. Sept. 14, 2011) .................................27

*Holick v. Cellular Sales of N.Y., LLC*,
    No. 12-0584, 2019 WL 1877176 (N.D.N.Y. Apr. 26, 2019)............................11, 28

*Jackson v. Bloomberg, L.P.*,
    298 F.R.D. 152 (S.D.N.Y. 2014) ...........................................................................27

*Jacob v. Duane Reade, Inc.*,
    289 F.R.D. 408 (S.D.N.Y. 2013) .................................................................26, 27, 28

*Kassman v. KPMG LLP*,
    416 F. Supp. 3d 252 (S.D.N.Y. 2018).....................................................................34

*Kopera v. Home Depot U.S.A., Inc.*,
    No. 09-8337, 2011 WL 135016 (S.D.N.Y. Jan. 11, 2011) ....................................24

*Krupinski v. Laborers E. Region Org. Fund*,
    No. 15-0982, 2016 WL 5800473 (S.D.N.Y. Oct. 2, 2016)......................................7

*Lindsey v. Tire Discounters, Inc.*,
    No. 15-3065, 2017 WL 5972104 (S.D. Ohio Dec. 1, 2017)...................................27

*Marlo v. United Parcel Serv., Inc.*,
    639 F.3d 942 (9th Cir. 2011) ..................................................................................30

*McDermott v. Fed. Sav. Bank*,
    No. 14-6657, 2020 WL 6295058 (E.D.N.Y. Aug. 12, 2020) .................................18

*Mike v. Safeco Ins. Co. of Am.*,
    274 F. Supp. 2d 216 (D. Conn. 2003) .....................................................................21

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010).............................................................................. *passim*

*Orellana v. One If By Land Rest. LLC*,
    No. 18-7865, 2020 WL 5768433 (S.D.N.Y. Sept. 27, 2020) .................................34

*Ouedraogo v. A-1 Int'l Courier Serv., Inc.*,
No. 12-5651, 2014 WL 4652549 (S.D.N.Y. Sept. 18, 2014) ......................................... *passim*

*Pedroza v. PetSmart, Inc.*,
No. 11-0298, 2013 WL 1490667 (C.D. Cal. Jan. 28, 2013) ............................................24, 27

*Perez v. Allstate Ins. Co.*,
No. 11-1812, 2014 WL 4635745 (E.D.N.Y. Sept. 16, 2014) ....................................26, 27, 28

*Quiles v. Wal-Mart Stores, Inc.*,
No. 16-9479, 2020 WL 1969940 (D.N.J. Apr. 24, 2020) ..................................................27

*Roe-Midgett v. CC Servs., Inc.*,
512 F.3d 865 (7th Cir. 2008) ..................................................................................15

*Romero v. H.B. Auto. Grp., Inc.*,
No. 11-0386, 2012 WL 1514810 (S.D.N.Y. May 1, 2012) ..............................................18, 19

*Roseman v. Bloomberg L.P.*,
No. 14-2657, 2017 WL 4217150 (S.D.N.Y. Sept. 21, 2017) ..............................................27

*Ruggles v. WellPoint, Inc.*,
272 F.R.D. 320 (N.D.N.Y. 2011) ........................................................................ *passim*

*Scott v. Chipotle Mexican Grill, Inc.*,
954 F.3d 502 (2d Cir. 2020)............................................................................... *passim*

*Torres v. Gristede's Operating Corp.*,
No. 04-3316, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) ..............................................30

*Trawinski v. KPMG LLP*,
No. 11-2978, 2012 WL 6758059 (S.D.N.Y. Dec. 21, 2012) ..............................................34

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)...............................................................................................28, 30

*Vargas v. Howard*,
324 F.R.D. 319 (S.D.N.Y. 2018) .................................................................................34

*Velasquez v. Digital Page, Inc.*,
303 F.R.D. 435 (E.D.N.Y. 2014) ...............................................................................29

*Vinole v. Countrywide Home Loans, Inc.*,
571 F.3d 935 (9th Cir. 2009) .....................................................................................30

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)...................................................................................... *passim*

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
571 F.3d 953 (9th Cir. 2009) .....................................................................................30

*Youngblood v. Family Dollar Stores, Inc.*,
   No. 09-3176, 2011 WL 4597555 (S.D.N.Y. Oct. 4, 2011).................................................26, 28

**Statutes**

Fair Labor Standards Act .................................................................................................................15

**Rules**

29 C.F.R. §541.200(a)....................................................................................................................15

29 C.F.R. §541.201(a)....................................................................................................................30

29 C.F.R. §541.202(c).............................................................................................................. *passim*

29 C.F.R. §541.203(a)...............................................................................................................10, 15

Fed. R. Civ. P. 23(a) ...................................................................................................................3, 34

Fed. R. Civ. P. 23(b)(3)....................................................................................................3, 4, 16, 28

Fed. R. Civ. P. 23(c)(4)..................................................................................................................34

## I.   **INTRODUCTION**

Plaintiffs seek to certify three classes totaling 350 Long Term Disability Claim Specialists ("LTDCS"); who worked over a six-plus year period; in three states; for different managers; handling different long-term disability ("LTD") claims; for thousands of different claimants and customers.  Critically, they testified to have done so in strikingly different ways.  Plaintiffs, therefore, cannot meet the "stringent requirements for certification," which "in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).  Their suggestion that myriad individualized issues regarding the exemption status of each class member can simply be ignored is NOT the law, as it would deprive MetLife of its right to "litigate its statutory defense[]" at the heart of each individual claim.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011).

This case, and Plaintiffs' motion, is about the administrative exemption.  Plaintiffs must prove that 350 LTDCSs performed the same exempt job duties in the same way, such that they *all* are or are not exempt.  Plaintiffs know that the disparate, actual record precludes doing so through common proof.  ***So they ignore it and seek to create new facts.***  Although not referred to as such in any job description, evaluation, or even the guide they cite, Plaintiffs now call the work of LTDCSs "claims-processing"—a term newly invented for this litigation.  If, they argue, all LTDCSS only "process" claims, they are all exempt.  Their problem, however, is that this self-serving, condescending description bears no resemblance to the record of what any LTDCS did and does each day (much less all of them).[1]

The blanket characterization of "processing claims" ignores the testimony of numerous LTDCSs (including a named plaintiff) that *they* made or recommended the decisions on LTD claims.  It ignores that this primary duty was NOT processing claims, and involves the exercise of

---

[1] Not one of the approximately **179,000** pages of material produced by Defendants and Plaintiffs describes the numerous, critically important decisions made by LTDCSs as merely "processing" claims.

discretion and independent judgment.  It ignores that LTDCSs do not agree that any piece of paper or individual dictates their decisions and recommendations about whether to approve or deny each claim.  It ignores that LTDCSs have sworn that MetLife's job description, training and written resources are **not** reliable indicators of their **actual** job duties, and that if, when, and how LTDCSs used these resources, if at all, differed among LTDSCs and from claim to claim.  So there is no common proof that the only (or primary) thing that ALL LTDCSs do is "process" claims.

Plaintiffs seek to overcome this deficiency with an argument the Second Circuit has repeatedly rejected: that classifying all putative members as exempt, without more, warrants class certification.  That approach fails because "the fact of common exemption does not establish whether all plaintiffs were *actually* entitled to overtime pay or whether they were covered by the applicable administrative regulations defining [the] FLSA's exemptions."  *Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010) (citing *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958-59 (9th Cir. 2009) (*reversing* certification based on uniform exemption because it "disregards the existence of other potential individual issues that may make class treatment difficult if not impossible")).  Instead, "[P]laintiffs must demonstrate not only that the proposed employees were classified pursuant to a common policy, ***but also that the proposed class had similar job duties***."  Dkt 65 (the "Order"), at 9 (emphasis added).  Plaintiffs cannot do so.

"[D]etermining whether all LTDCSs exercised a similar amount of discretion—and whether the exercise of that discretion rendered LTDCSs exempt from [overtime]—***is a fact-intensive question***" that must be done on a case-by-case basis.  *Id.* (emphasis added).  The Plaintiffs have admitted this in arguing that issues of fact about their job duties preclude summary judgment.  Dkt 291 ("SJ Opp."), 6-7, 9 (conceding that applicability of exemption is a "fact-intensive inquiry," that requires the Court "to conduct a meaningful assessment as to what the employees' primary duties *actually were*") (emphasis added).  Accordingly, this Court cannot resolve "the validity of each class members' claim to [non-exempt] status 'in one stroke,'" as is

required to establish Rule 23(a) commonality, and Plaintiffs' motion should be denied.  *Ouedraogo v. A-1 Int'l Courier Serv., Inc.*, No. 12-5651, 2014 WL 4652549, at *6 (S.D.N.Y. Sept. 18, 2014) (Nathan, J.) (denying certification); *Cuevas v. Citizens Fin. Grp., Inc.,* 526 F. App'x 19, 22 (2d Cir. 2013) (denying certification because, *inter alia,* it could not be proven that class members "actually share primary duties such that common issues predominate over individual ones").[2]

## II.   APPLICABLE LEGAL STANDARDS:  PLAINTIFFS HAVE THE BURDEN TO SATISFY EVERY STRINGENT REQUIREMENT OF RULE 23.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only[.]" *Ouedraogo*, 2014 WL 4652549, at *2 (citing *Comcast Corp. v. Behrend,* 564 U.S. 27, 33 (2013) (internal quote and alteration omitted)); *Italian Colors,* 570 U.S. at 234.  Moreover, Rule 23 "does not set forth a mere pleading standard." *Ouedraogo*, 2014 WL 4652549, at *3.  To certify a class, the trial court must conduct a "rigorous analysis" to determine whether the party seeking certification has met the prerequisites of Rule 23. *Dukes,* 564 U.S. at 351; *Ouedraogo*, 2014 WL 4652549, *3 (Plaintiffs must meet each Rule 23 requirement in light of "*all* of the relevant evidence" in the record).  This means *Plaintiffs* must *prove* that there are "'common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Comcast,* 569 U.S. at 33 (quoting *Dukes,* 564 U.S. at 350).  Plaintiffs must also meet Rule 23(b)(3) with proof that "questions of law or fact common to class members predominate over any questions affecting only individual members,"

---

[2] This brief refers throughout to the Declarations of Laura Smith (Smith Decl), Emily Page (Page Decl), Michelle Cesario (Cesario Decl), Erica Miscione (Miscione Decl), Lisa Bellot (Bellot Decl), Nina Ayotte (Ayotte Decl), Marijoy Hall (Hall Decl), Deanna Lambert (Lambert Decl), Kelly Dieppa (Dieppa Decl), Emily Thibado-Conley (Thibado-Conley Decl), Jessica Johnston (Johnston Decl), Derek Wilcox (Wilcox Decl), Jason Sulley (Sulley Decl), and Christopher A. Parlo (Parlo Decl).  *See also* Parlo Decl Ex A (Julian Tr), Ex B (Hensel Tr), Ex C (McKinney Tr), Ex D (Patel Tr), Ex E (Mocny Tr), Ex F (Roberts Tr), Ex G (Wolber Tr), Ex H (Dubois Tr), Ex I (DeForge Tr), Ex J (Gill Tr), Ex K (T. Harris Tr), Ex L (K. Harris Tr), Ex M (Jones Tr), Ex N (Hrobowski Tr), Ex O (Cornelius Tr), Ex P (Leveille Tr), Ex Q (Stephenson Tr), Ex R (Wicklund Tr), Ex S (Coffin Tr), Ex T (Day Tr), Ex U (Dygert Tr), Ex V (Starowicz Tr), Ex W (Smith Tr), Ex X (Maneen Tr), Ex Y (Kolupa Sur), Ex Z (Crego Sur), Ex AA (Carlo Sur), Ex BB (Arroyo Sur), Ex CC (Stephen Sur), Ex DD (Randolph Sur), Ex EE (DeForge Sur), Ex FF (Wolber Sur).

and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy. *Id.*

Crucially, "[w]hat matters to class certification is not the raising of common questions-even in droves-but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes,* 564 U.S. at 350 (internal alterations and cites omitted) (emphasis added). The Supreme Court has further recognized that district courts cannot shy away from addressing merits issues relevant to the Rule 23 analysis. *Id.* at 351 (determining whether Rule 23 is satisfied "frequently . . . entail[s] some overlap with the merits of the plaintiff's underlying claim"). Instead, because Plaintiffs have the burden of presenting common proof that can generate common *answers* as to "the validity of *each* class members' claim," the Court's analysis must "resolve[ ] factual disputes relevant to each Rule 23 requirement-notwithstanding an issue's overlap with [Plaintiffs'] case on the merits." *Ouedraogo,* 2014 WL 4652549, *3, 6 (internal quote and cites omitted) (emphasis added). Plaintiffs have failed to meet this burden.

## III.    RELEVANT FACTUAL BACKGROUND[3]

### A.    Plaintiffs Seek to Avoid Their Own Testimony About Differences.

In this opposition and its motion to decertify the collective, MetLife has established material differences in what LTDCSs claim they did, including through over ***800 pages*** of LTDCS deposition testimony. Plaintiffs' Rule 23 motion virtually ignores this testimony and LTDCSs' actual duties. The reason is clear. Plaintiffs do not want the Court to focus on what they actually do, and especially on whether they make decisions. Instead, Plaintiffs devote their brief to generic documents and ancillary issues—for example, the unremarkable fact that, as with nearly every

---

[3] MetLife's Motion to Decertify Plaintiffs' Conditional Collective (Dkt 229, 1-21) details additional LTDCS disagreements about: (1) their job duties; (2) whether and how they used guidelines or other resources; and (3) their exercise of discretion and independent judgment. MetLife incorporates those facts by reference here.

employee in every industry, Plaintiffs received performance evaluations and training, used computers, or used a Claims Management Guide ("CMG").  None of those issues or documents, however, answers for the Court *what* job duties (and primary duty) any LTDCS actually performed or *how* (and *how often*) they performed them – the dispositive issue in a case centered on whether discretion and independent judgment were exercised.  Indeed, *Plaintiffs* admit those answers *must come from the LTDCSs themselves*.  *See* Julian Tr 291 (to know what other LTDCSs did on a day-to-day basis, "you would have to call" the individual LTDCS); Hensel Tr 65-66 (as to how other LTDCSs performed their jobs "of course you would have to ask them"); *see also* McKinney Tr 94-95; Patel Tr 85.

Further seeking to evade their own testimony, Plaintiffs argue "that whether LTDCSs ever used words like 'making decisions' (or 'recommendations') dodges the real issue."  Mot 20.  But in a case about whether decisions were made (i.e. "making decisions"), and whether those decisions involved discretion and judgment, such testimony is material and dispositive.  To state the obvious, their "deposition testimony [is] more reliable than [] prepared written statements [by their counsel], because it is in the witnesses' own words …."  *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 160 (S.D.N.Y. 2008).  Almost as baffling, they also claim the "fact that some LTDCSs may use different words to describe their experiences applying MetLife's manuals and protocols is not material."  Dkt 283, 16-17.  But that argument ignores that Plaintiffs must prove that some policy or practice so constrained ALL LTDCSs that, on a common basis, discretion and independent judgment was not possible.  That multiple LTDCSs gave materially different answers about their actual work experiences and primary duty does not "dodge the issue."  *It is <u>the</u> issue*. *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 513 (2d Cir. 2020) (affirming denial of certification where "testimony of the named plaintiffs regarding their primary duty" was "internally inconsistent and distinguishable from one another.").

## B.    <u>The Putative Class Members Do Not Agree On Their Primary Duty.</u>

The LTDCS job description reflects that LTDCSs are exempt.  Parlo Decl Ex. GG. However, several LTDCSs testified that the job description is *not* accurate *and **cannot** be relied upon* to determine their job duties.  *See* Mocny Tr 76-78; Roberts Tr 19-20.  Some LTDCSs swear they performed the exempt job they were hired and expected to do.  Others now deny (for the first time) performing their work as expected by MetLife.  That disagreement as to the LTDCSs' primary duty precludes certification.  *Scott*, 954 F.3d at 513 ("the *primary duty* performed by class plaintiffs — the dispositive question of the exemption inquiry — was not adequately similar").

LTDCSs are expected to decide (and some admit they did), whether to approve or deny LTD benefits to employee customers (the "claimants") and, later, whether to terminate or modify that payment.  Wolber Tr 50-51, 94-95.  Multiple LTDCSs confirmed this.  *E.g.*, Dubois Tr 134-35; DeForge Tr 47; Patel Tr 68-69, 131-32; Gill Tr 246-47; Gill Dep. Ex. 4; T. Harris Tr 165-66. However, Plaintiffs Julian and K. Harris, and Opt-in Mocny, testified to holding a very different job.  And these are not mere differences of "words" or degree.  Julian's alleged primary duty is unrecognizable from the one she was hired to perform.  Julian testified she was a "trained monkey," a "peon," and a "gofer," whose sole job was to collect information at the direction of her supervisor ("Unit Leader" or "UL"), that she would hand over to nurses, doctors, and vocational consultants at MetLife.  Julian Tr 58-59, 61-62, 68, 71-72, 227-29.  She claims that such individuals, and not her, would then decide whether to approve or deny the claim.  *Id.*  Julian testified that she did not make a single decision or recommendation, or offer any opinion, throughout the entire claim cycle. *Id*. 168-71, 175, 286.  K. Harris, Jones and Mocny also testified that claim decisions are made by *others* involved in managing claims, and that they used, in K. Harris's words, "no thought" during the course of their claims.  K. Harris Tr 153-54, 160, 266-80; Mocny Tr 109, 141-44, 152, 310-13; Jones Tr 80-84, 125-28.

Julian, K. Harris, and Mocny's alleged primary duty—the mindless retrieval of information without any analysis or thought—is nothing like the job other LTDCSs performed.  Dubois,

Hrobowski, Patel, Wolber, Leveille, Hensel, Cornelius and DeForge testified that *they* decided whether someone was disabled and whether to approve or deny a claim, and *they* regularly exercised discretion in doing so.  *E.g.*, Dubois Tr 58-59, 83-84, 135; Patel Tr 68-69, 131-32, 173-82; Gill Tr 122, 125-28, 129-31, 145-49, 152-54, 222-23; Wolber Tr 48-51, 66, 107; T. Harris Tr 257-61; Hensel Tr 104-05, 113-29; Hrobowski Tr 128, 173-74, 312-13; DeForge Tr 47-48; Cornelius Tr 148-51; Leveille Tr 208.  For example, Dubois unequivocally stated: "***I had to make an approval or denial on every claim***."  Dubois Tr 134-35.  Gill also admitted that her "primary" and "very important" responsibility was to recommend approving, denying or terminating LTD claims based upon her analysis of all information relevant to the claim.  Gill Tr 127-28, 291-92; Gill Dep. Ex. 4.  Wolber evaluated and decided whether to approve, deny, and terminate hundreds of claims.  Wolber Tr 49-51, 66-68, 86.

Named Plaintiff McKinney rejected the position taken by Julian and K. Harris, but added her own spin.  While McKinney refused to say that she "approved" claims, she testified that *she "made the decision to recommend"* approval and her recommendations were rarely not accepted.  McKinney Tr 175-83, 239-40, 247-51.  As a matter of law, the distinction McKinney tried to draw is irrelevant: "approving" and "recommending" are both exempt functions. 29 C.F.R. §541.202(c); *Krupinski v. Laborers E. Region Org. Fund*, No. 15-0982, 2016 WL 5800473, *9 (S.D.N.Y. Oct. 2, 2016) (applying administrative exemption to employee who made "recommendations to supervisors").  But, dispositive as to this motion, her explanation of her job puts her squarely at odds with her peers, and precludes certification.  McKinney Tr 178-79, 183; Dkt 48, 6-8.

Further negating commonality on the central question of *whether* individual LTDCSs decide if a claim should be approved, Julian, Roberts and others who deny making those decisions cannot even agree on who does.  Roberts testified that *nurses* make the decision.  Roberts Tr 19-20, 120-25.  Leveille testified that *ULs* make the decision.  Leveille Tr 312-13.  Julian testified that *ULs, nurses, and medical specialists* make the decisions.  Julian Tr 61-62.  Other LTDCSs,

however, testified that ULs, nurses and other resources do *not* and *cannot* make those decisions. Hensel Tr 102-04, 206-08 (testifying that nurses, doctors and vocational consultants cannot make claim decision); Stephenson Tr 69; Hrobowski Tr 311-13 (nurses, vocs and other resources never make claims decisions); Patel Tr 140-41; Smith Decl ¶12; Page Decl ¶5; *see also* Cesario Decl ¶¶4, 10 (vocational rehabilitation consultants do not render decisions as that decision lies "solely" with the LTDCSs); Miscione Decl ¶4 (as a Nurse Clinician I do not approve or deny claims); Bellot Decl ¶¶4-5 ("In my role as a Clinical Unit Leader, I do not render decisions on claims for LTD benefits"); Ayotte Decl ¶¶4-5 ("Nurse clinicians do not decide whether a claim for LTD benefits is approved or denied."); Hall Decl ¶¶4, 6 (as a Nurse Clinician I do not render decisions on claims).  If Plaintiffs cannot agree on *who* makes the decisions, there can be no common answer about what their primary duty was.

### C.   The Putative Class Members Do Not Agree on the Scope of Their Discretion and Independent Judgment.

In addition to there being no common answer on whether LTDCSs approve or deny claims, LTDCSs also disagree about whether and how they performed other exempt duties that bear on whether they exercised discretion and independent judgment.  In fact, LTDCSs gave the *opposite* answer to the *same* question about their duties/decisions.  As Julian, Hrobowski and other LTDCSs confirmed, the only way to determine what job duties each performed, as well as how and how often, ***is to ask each of them***.  Julian Tr 291; Mocny Tr 57-59, 250-51; Hensel Tr 64-66; McKinney Tr 94-95; Hrobowski Tr 78-79, 319.  But when asked about those duties, the LTDCSs gave very different, and conflicting (*i.e.* NOT common) answers.

***LTDCSs' had different authority levels and differed in how and how often they exercised that authority***.  LTDCSs claim different experiences on how much authority and discretion they had to approve claims while free from immediate direction or supervision (plainly exempt duties). *See* 29 CFR §541.202(c).  Plaintiffs have argued that "such variations don't matter" and "[n]o

claim specialist exercised 'complete discretion.'" Dkt 283, 22-23. But that is legally irrelevant and factually wrong. It is legally irrelevant because making recommendations as to a course of conduct, rather than the final decision, is equally an exercise of discretion and independent judgment. 29 C.F.R. §541.202(c). Factually, Wolber admitted approving claims with an annual value of up to $90,000, which make up the majority of her portfolio. Wolber Tr 66-68. Laura Smith has authority up to $7,500 per claim, per month, an amount that represents about 90% of her claims. Smith Decl ¶12; *see also* Lambert Decl ¶8 (authority of up to $10,000, per claim, per month). Dubois testified that UL Ta-Nisha Rose reviewed her recommendations for the first 3-6 months. Dubois Tr 91-92. After that, Dubois had the discretion to herself approve claims up to $36,000-which represented over half of her portfolio. *Id.* 92. These differences were not tied to any MetLife policy or practice, "[j]ust manager discretion." *Id.* 91. Thus, contrary to the claim that no LTDCS had "complete" discretion, Wolber, Smith and at times Dubois had *complete discretion* to approve the majority of their claims without any UL involvement. Smith Decl ¶12; Wolber Tr 66-68; *Scott*, 954 F.3d at 513 (noting District Court conclusion that "that the putative class members' testimony also 'rang dissonantly from the record.'").

Precluding certification, despite also working with ULs Rose and Hartline, McKinney testified to a totally different experience. McKinney Tr 59, 127. Unlike Smith, Wolber, and Dubois, McKinney claims she did *not* have discretion to approve claims up to a certain amount. Instead, McKinney could only *recommend* the amount to be paid. McKinney Tr 178-79, 183, 247-50. Similarly, while Gill testified that she approved claims with an annual value up to $30,000, this was *infrequent* because her claimants made more than $30,000/year. Gill Tr 239-40.

**LTDCSs differ in how they choose to evaluate their claims.** Plaintiffs claim that all LTDCSs used the same information for every claim, and gathered that information the same way. Mot 8-11. The record tells a different story. To determine whether to approve or deny a claim, some (but not all) LTDCSs may review, among other things, the claimant's medical records,

information provided by the claimant and their medical providers, the claimant's medical condition and related restrictions, and the claimant's occupation and work environment.  Dubois Tr 58-59, 71-75, 156; Stephenson Tr 37-39; Gill Tr 36-38; Parlo Decl Ex. HH.  If a claim is approved, some (but not all) LTDCSs continue to reassess new information about the claimant's medical condition, treatment plan, possible accommodations, potential fraud and other factors, to decide whether to continue, terminate, or modify benefits.  Leveille Tr 270-71; Wolber Tr 106-07; Dubois Tr 158; Smith Decl ¶¶14, 16.  As Dubois testified: "[Y]ou couldn't make a decision if you didn't have all the information you needed."  Dubois Tr 102.  However, while numerous LTDCS confirmed they decide what to review and consider, *others deny doing so*.  *Compare,* Hensel Tr 101-02; Dubois Tr 58; Leveille Tr 108-17, *with* Mocny Tr 72, 104-07; Roberts Tr 19-20.

Highlighting significant differences, some LTDCSs confirmed that they exercised their judgment by: *interpreting* the provisions of the different LTD plans of different employers; *analyzing* claimants' medical records; *evaluating* claimant's pre-existing conditions; and *assessing* the claimant's functionality to determine whether s/he can return to work and what, if any, accommodations may facilitate the employee's return.  *E.g.,* Hrobowski Tr 297-98*;* Patel Tr 145-47*,* 176-77, 179-80; Kolupa Sur, Crego Sur, Carlo Sur (Questions #2, 18, 30, 31); Smith Decl ¶7.[4] These are all exempt functions.  *See* 29 C.F.R. §541.203(a).  Other LTDCSs denied making any evaluative decisions and claimed they relied solely on other employees to perform these exact same duties. Julian Tr 52-53, 264-68, 287-88; K. Harris Tr 288-93.

There is also no uniform LTDCS experience on interviewing claimants, employers, and healthcare providers (another exempt duty).  29 C.F.R. §541.203(a).  Whereas Julian and Gill claim that they were *required* to interview the claimant *in every case*, McKinney and other

---

[4] *See also* Julian Tr 293; Leveille Tr 112, 165, 178-79, 183, 255; Dubois Tr 106-09, 116, 127, 221-25; Gill Tr 67-69, 71, 121-24, 257; McKinney Tr 324, 327, 331; Wolber Tr 135-37, Ex. 4; Roberts Tr 108, 113-15, 135-36; Hensel Tr 87-89, 137-41, 153-57; Hrobowski Tr 249-52, 295-97, 299-300, 331-32; T. Harris Tr 188-89; 192-219; K. Harris Tr 193-95; Mocny Tr 96; Patel Tr 107-08*; DeForge Sur, Arroyo Sur, Carlo Sur, Crego Sur, Stephen Sur, Wolber Sur, Randolph Sur Questions #4, 5, 8, 11, 12, 13, 14, 19, 21, 22, 23, 24, 29, 30, 31.

LTDCSs had the *discretion* to, and did, make decisions (or for McKinney "recommendations") *without* interviewing the claimant. *Compare* Julian Tr 276-77; Gill Tr 40-41, *with* McKinney Tr 317; Arroyo Sur, Stephen Sur, Randolph Sur, Carlo Cr., Crego Sur (Question #8). Julian claims she **never** conducted a follow-up interview with any claimant, and that MetLife clinicians conducted these interviews instead. Julian Tr 243-44. Others, however, regularly conducted follow-up interviews to determine any changes to a claimant's medical condition, and whether the claimant was adhering to back-to-work plans. Dubois Tr 72-73, 87-88; Wolber Tr 106-07; Hrobowski Tr 328-30.[5]

The LTDCSs' also differ on *who* they interviewed. Some personally interviewed the claimant's healthcare providers; others say they relied on other resources for medical information. *Compare* Wolber Tr 79-80; McKinney Tr 89-91 ("I spoke with doctors obviously."); Hrobowski Tr 318, *with* Dubois Tr 110-11 ("I would never talk to doctors."); K. Harris Tr 265. Whereas some LTDCSs *did* interview employers—ranging from "occasionally" to "all the time"—others bizarrely testified that *they were not allowed to*. *Compare* Julian Tr 34, 64-65; K. Harris Tr 264-65; Patel Tr 58, 98-102; Leveille Tr 125-27; Roberts Tr 60-63, 87-90 ("A. Did I ever reach out to claimant's employers? All the time."), *with* McKinney Tr 90 ("Q. Did you interview employers to determine pertinent claim information? A. That was not allowed, no.").[6]

**LTDCSs' practices differed on determining the extent and length of liability.** Decisions to approve, deny, continue or terminate claims, as well as deciding when payment on claims stops and starts, have a substantial impact on the businesses of both MetLife and its customers. T. Harris

---

[5] The LTDCSs also cannot agree on *how* they conducted interviews (*i.e.*, whether they used discretion). Some testified *they tailored* their questions to the specific claim and the claimant's responses. Roberts Tr 67-69; Hensel Tr 151-53. Others remarkably testified that they followed the same template, without deviation, for every interview, and did not ask any follow-up questions. K. Harris Tr 248-52; Mocny Tr 186-96.

[6] Plaintiffs may say the discrepancies in their job duties are not self-serving denials, but rather the result of overbearing managers, or LTDCSs who simply were not good at their job and needed extra assistance. Even so, that is yet another reason why this case cannot be certified. *See, Holick v. Cellular Sales of N.Y., LLC*, No. 12-0584, 2019 WL 1877176, at *7 (N.D.N.Y. Apr. 26, 2019) (decertifying collective after stating "evidence showing notable differences among Plaintiffs with regard to . . . the level of supervision and discipline exerted by [Defendant] over Plaintiffs . . . is highly relevant" to the decertification analysis), *appeal filed*, No. 20-2037 (2d Cir. Jun 29, 2020).

Tr 182-86; Patel Tr 135-36; DeForge Tr 100-02.  Yet, the LTDCSs cannot agree on how or if they determined liability and the value of claims.  Most LTDCSs acknowledge that because no two claimants have precisely the same medical condition or restrictions, and because each condition may affect a claimant's ability to work in different ways, *there is no formulaic method to decide whether to terminate or modify claims for LTD benefits*.  Leveille Tr 172, 240-47, 250-52, 259-61, 265-66; Wolber Tr 94-95; Gill Tr 138-42, 159-61; Dubois Tr 90-93; McKinney Tr 209-12, 309-10; Patel Tr 124-26.  They say numerous factors must be considered.  *Id.*

LTDCSs also claim different experiences assessing whether a claim is fraudulent.  Some testified they evaluated investigation materials from SIU, an anti-fraud unit, made *decisions* or *recommendations* to have SIU conduct social media research or surveillance to investigate potential fraud, or conducted social media and other searches on their own (all clearly exempt duties, *see* Dkt 229, 13, 18).  Leveille Tr 240-46; Patel Tr 83-86, 138-39; T. Harris Tr 323 (asked for social media searches); Hrobowski Tr 328, 330; Wolber Tr 71-74; Smith Decl ¶10 (had "the authority to request enhanced investigation techniques."); K. Harris Tr 212-13, 220-21 (refers claims to SIU); Dubois Tr 119-24, 140 (same); McKinney Tr 167-80, 231-33 (same); K. Harris Dep. Ex. 6; Gill Tr 61, 156-60 (requests "Direct observation"); Wicklund Tr 323-25 (confirming that LTDCS can do searches); Hensel Tr 155-56 (LTDCSs review reports from SIU).  Others, however, said they did not or could not ask for or perform *those exact same tasks*.  Roberts Tr 82 (never referred a claimant's file to a special investigations unit; "A. Not me."), 135 (never asked for social media search); Julian Tr 185-87, 295 (did not review reports from SIU); Mocny Tr 203-04 (if saw a "red flag" all could  only tell her UL), 262-65; Arroyo Sur (Question #28, "No"); Randolph Sur (Question #25, "**No**").  Some LTDCSs' then decided or recommended whether to terminate claims based on the information uncovered in those investigations; others claim they did not.  *Compare* McKinney Tr 170-80; Dubois Tr 119-24, *with* Julian Tr 185-87, 301-02.

As to the value of LTD claims, some LTDCSs admitted that *they* determined the date when

benefits would start; others claim that a "system" did. *Compare* Dubois Tr 227-28 (LTDCSs relied on her to calculate benefit start dates), *with* Gill Tr 344-45 ("The system will calculate the start date."). While some LTDCSs testified that *they decided* benefit duration, others claimed that only medical staff did so. *Compare* Julian Tr 68, *with* Dubois Tr 60-61; T. Harris Tr 182-86.[7]

**There is no "typical" claim for LTD benefits.**  Seeking to avoid all of these differences, Plaintiffs' counsel assert that all plans are the same.  Mot 9. That is not what the Plaintiffs testified. Julian testified "every plan would be different." Julian Tr 265-68.  Numerous others testified that each employer has its own LTD plan (and sometimes multiple plans).  Dubois Tr 61-62, 106-07, 227-28; Leveille Tr 100-01; K. Harris Tr 167; Hrobowski Tr 68-70, 81-82; Patel Tr 62-64, 117-19, 151-52; Hensel Tr 109-11; Mocny Tr 62-64.  Each plan could have a different definition of "disability" and different exclusions from coverage, that must be analyzed based on the medical, occupational and other facts of e*ach* claimant.  Hrobowski Tr 68-70; 81-82.  Moreover, determining whether a claimant meets those definitions or is excluded under each employer's plan is just one piece of the claim puzzle.  Dubois Tr 106-07; Leveille Tr 100-01; Wolber Tr 63-65, 95-96; Gill Tr 26-28; K. Harris Tr 239-41.  Every claim is also different.  As Opt-in Hensel testified "not one claim is the same, so every time you get a disability claim something is different[.]"  Tr 218-23.  These vast differences in LTDCS claims handling preclude certification.

D.    **Other "Facts" Alleged by Plaintiffs  Are Unsupported or Simply Untrue.**

It is unfortunately necessary to also address a number of Plaintiffs' statements for which they cite no admissible evidence, or which the record directly contradicts.   These misrepresentations and distortions of the record are not limited to, but include:

---

[7] Depending on the particular plan, the value of a claim—and the financial obligation to pay it—could also decrease dramatically based on the availability of "offsets,"  such as social security benefits.  McKinney Tr 149-51.  Many LTDCSs admit that they routinely identified and applied offsets, which had a significant financial impact on MetLife and its clients.  McKinney Tr 150-51; Gill Tr 195-97; Leveille Tr 225-30; Roberts Tr 114-15; Hensel Tr 205-06; Hrobowski Tr 85-86, 152-53, 189, 330-31; Arroyo Sur, Carlo Sur, Crego Sur, Randolph Sur (Question #12).  In direct contrast, Julian claims she did not determine what offsets might apply.  Julian Tr 328-29.

| Plaintiffs' Representation | The Actual Record |
|---|---|
| "On the other hand, if a supervisor approves the denial of a clam. . ." Mot 11. | LTDCSs are the ones responsible for approving or *denying* a claimant's LTD claim. Ayotte Decl ¶2; Bellot Decl ¶¶3-4; Dieppa Decl ¶¶16-17. ULs and CSSs do not make the decisions to approve or deny claims.  Hrobowski 326-328; Hensel 105 ("if I had a claim that was under me, the CSS would not make that – that decision"). |
| "Accordingly, the DPA system ensures that all claims are being processed and documented in the same way. . ." Mot 12 (no record citation). | Mr. Coffin explained that DPA is merely a "diary system," where LTDCSs "document the actions they are taking and the rationale." Coffin Tr 158-59.  There is no evidence even to suggest that DPA "ensures that all claims are being processed . . . in the same way." |
| "For example, clinical resources . . .[guide LTDCSs] through various supervisory interactions. . ." Mot 14 (citing portion of CMG). | There is no evidence that clinical resources provide any "supervisory interactions" to LTDCSs.  The cited portion of the CMG (and the entire record) confirm that LTDCSs are "accountable for assessing the functional capacity of each claimant" and only engage with clinical resources when they choose to do so. *See* Dkt 270-5. |

The record testimony above makes clear that no representative or common proof can establish whether all LTDCSs are exempt.

## IV.   ARGUMENT

### A.   Plaintiffs Have Failed to Prove Commonality, Let Alone Predominance.

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of [Plaintiffs'] underlying cause[s] of action" and MetLife's defenses. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quote omitted). Here, it must be determined whether each putative class member was misclassified under New York, Illinois, and Connecticut law, or whether an exemption applies.  Neither point can be answered on a common basis.

This fact-intensive inquiry requires determining what each LTDCS's "primary duty" is and then whether that primary duty: (1) "is the performance of office or non-manual work directly

related to the management or general business operations of [MetLife] or [its] customers;" and (2) "includes the exercise of discretion and independent judgment … ." 29 C.F.R. §541.200(a). Embedded within these questions are additional issues with no common answer.[8]  For example, in assessing discretion and independence, administratively exempt employees may have "their decisions and recommendations . . . reviewed at a higher level," so long as they generally retain authority to make choices "free from immediate direction or supervision." *Id.* §541.202(c).  This means Plaintiffs must show that common answers exist not only as to (i) whether all LTDCSs made *decisions* about LTD claims, but also as to (ii) whether some or all LTDCSs instead made *recommendations* about those claims, *and* (iii) whether or not those decisions *or* recommendations were free from immediate direction or supervision. *Id.*  Plaintiffs have not shown that any of these questions can be answered on a common basis on any point material to the case.

Complicating the analysis, the DOL regulations provide that claims adjusters (like Plaintiffs) satisfy *both* of the duties requirements for the administrative exemption if their "duties include activities such" as: (1) "evaluating and making recommendations regarding coverage of claims;" (2) "interviewing insureds, witnesses and physicians;" and (3) "determining liability and total value of a claim." 29 C.F.R. §541.203(a).  Therefore, Plaintiffs must also prove that common answers exist as to *each* of these duties, for every *class* member.  They cannot do so.  Instead, as detailed above and below, this court would have to perform "a case-by-case assessment to determine whether [a given adjuster's] duties meet the requirement for exemption" under §541.203(a). 69 Fed. Reg. 22122, at 22144 (Apr. 23, 2004); *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 874 (7th Cir. 2008) (holding claims adjusters exempt after recognizing need for case-by-case analysis); *Bonaventura v. Gear Fitness One NY Plaza LLC.,* No. 17-2168, 2018 WL

---

[8] The question whether employees are entitled to overtime under the FLSA is "a complex, disputed issue, and its resolution turns on exemption, which in turn will require the district court to decide a number of subsidiary questions involving whether plaintiffs fall within the Labor Department's criteria for 'employees employed in a bona fide executive [or administrative] capacity.'" *Myers,* 624 F.3d at 548 (quoting 29 U.S.C. § 213(a)(1)).

1605078, at \*6 (S.D.N.Y. Mar. 29, 2018); *see also* SJ Opp. 6-7, 9 (noting the analysis is "a highly fact intensive inquiry that must be made on a case-by-case basis[.]"); Order at 9.

Because Plaintiffs have failed to show that these issues at the core of the exemption analysis are capable of classwide resolution, they have failed to establish commonality or meet Rule 23(b)(3)'s "even more demanding" predominance requirement. *Comcast*, 569 U.S. at 34.

### 1. *Determining any LTDCS's Duties and How They Were Performed Cannot be Answered by How Any LTDCS Was, or All LTDCSs Were, Classified.*

Under *Dukes,* it is not sufficient for parties seeking certification (as Plaintiffs have done here) merely to list allegedly "common questions," which virtually "[a]ny competently crafted class complaint" can do. 564 U.S. at 349-50. Instead, Plaintiffs must affirmatively demonstrate the existence of a common question "of such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. In other words, there must be a question that can be answered ***and resolve the case*** on a classwide basis.

Plaintiffs' list of allegedly common questions (Mot 22-23) boils down to two: what is each LTDCS's primary duty and does each LTDCS exercise sufficient discretion. *Id.*[9] Plaintiffs have not established, however, that either question is susceptible to common proof (they're not). They instead argue that, contrary to settled Second Circuit precedent, certification is warranted because MetLife has a uniform "policy" of classifying employees as exempt. Mot 21-25. That is "a gross [and incorrect] overstatement of the law." *Ruggles v. WellPoint, Inc.,* 272 F.R.D. 320, 339 (N.D.N.Y. 2011). Indeed, a district court *abuses its discretion* by relying, without more, on a uniform exemption policy to grant certification. *Cuevas,* 526 F. App'x at 22 (reversing certification

---

[9] The relevance, if any, of the other questions posed by Plaintiffs (Mot 22-23) -- "what are MetLife's policies and practices regarding the payment of compensation" and whether class members regularly worked more than 40 hours per week -- are irrelevant unless all class members are found to be non-exempt. If a class member is exempt, it does not matter how many hours they worked, or that they did not receive overtime. And, even *if* there was common proof of the hours worked by each member (and there is not, *see infra* at 33), that would not resolve "the validity of each class members' claim to [non-exempt] status 'in one stroke.'" *Ouedraogo*, 2014 WL 4652549, \*6.

where district court failed to undertake a "rigorous analysis" of plaintiffs' duties and erred by relying on employer's "blanket" exemptions). This is because a "blanket application of exemption status, whether right or wrong, is not [ ] a rule capable of facilitat[ing] common proof on otherwise individualized issues . . . [as] courts must still ask where the individual employees actually spent their time." *Ruggles,* 272 F.R.D. at 341. This Court must still ask: what did each LTDCS actually do—particularly as the LTDCSs cannot agree on the answer to that very question.

This Court's reasoning in *Ouedraogo* is instructive. The Court recognized that "proof of commonality necessarily overlap[ped] with Plaintiffs' merits-stage claim that Defendants misclassified the putative class of employees as independent contractors." 2014 WL 4652549, at *3. The Court then rejected the very argument Plaintiffs raise here: "***It is not disputed that Defendants had a blanket policy of classifying all drivers as independent contractors. Rather, it is the drivers' common status as employees entitled to overtime wages that must be proven***." *Id.* (emphasis added). Because the plaintiffs "failed to prove" that each class member's classification was "sufficiently capable of classwide proof"—particularly because that answer "varied from individual to individual"—the Court denied certification. *Id.,* at *5. The same principles in *Ouedraogo* apply here, and Plaintiffs' motion should be denied for the same reasons.

### 2. There Is No Commonality Because Whether Each LTDCS Is Covered By The Administrative Exemption Cannot Be Answered On A Classwide Basis.

The evidence, first and foremost the testimony of the LTDCSs, shows that the fact-intensive inquiry into each LTDCS's *actual* job duties cannot be answered by common proof. *See supra*.

#### a. Whether Each LTDCSs Was Primarily Engaged In Exempt Work Varies.

Plaintiffs concede that, at a minimum, any classwide trial would need to resolve for each LTDCS (1) their primary duty and (2) whether and how often they regularly exercised discretion and independent judgment in performing that duty. Mot at 22-23. But the testimony of the LTDCSs on the most critical question—who decides (or recommends) whether to approve LTD

17

claims—shows that there is no common answer to this question.  Some say they decide.  Some say they only recommend.  Some say others decide.  Some say it depends claim by claim.

| LTDCS Decides | LTDCS Recommends | Others Decide | Depends On Claim |
|---|---|---|---|
| "My goal was to make the decision – approve – you know, the claim decision." Patel Tr 68.<br>Q: So that was your decision to approve or deny? A: Pretty much, yeah." Dubois Tr 59.<br>Q: "Do nurses make initial claim decisions? A: I – I don't think they can make the decision to approve a claim. They make their recommendation and then we make the decision. Q: When you say 'we,' the LTD claims specialist? A: Yes, the LTD claims specialist." Stephenson Tr 69. | Q: "You would make some type of suggestion or recommendation to someone? A: Yes. Q: To whom? A: The unit leader or CSS." Gill Tr 116.<br>Q: "What are the different things you can recommend to your unit leader . . .approve the claim? A: Yes. . . Q: There were occasions where you suggested or recommended a claim be denied, correct? A: Correct." McKinney Tr 178-79.<br>Q: My question was did you make denial recommendations to your manager?  A: Yes. Cornelius Tr 226 | "Nurses, psych specialists and unit leaders made decisions. We were not allowed to make a decision." Julian Tr 61. | "You would draw from those resources and either work on the decision yourself or present that decision to your unit leader and come up with a decision." Hensel Tr 101-02.<br>Q: "So, what happens when there is no CDM who makes the decision? A: In that case, I do make the decision. Q: So, when there is not a CDM, you agree that the claim specialist is responsible for making the claimed [sic] decision? A: Yes." Hrobowski Tr 217. |

Given this disagreement about their primary duty, and whether they exercised discretion and independent judgment in performing that duty (*compare* Julian Tr 61 *with* Patel Tr 68) it is impossible to reach *one* conclusion as to *all* class members regarding the administrative exemption through generalized proof.  *Romero v. H.B. Auto. Grp., Inc.,* No. 11-0386, 2012 WL 1514810, at *18 (S.D.N.Y. May 1, 2012) (denying certification where resolution of "central question" of classification "require[d] individualized examinations of each plaintiffs daily responsibilities and duties while on the job"); *McDermott v. Fed. Sav. Bank,* No. 14-6657, 2020 WL 6295058, at *6-7 (E.D.N.Y. Aug. 12, 2020) (denying certification where "[t]he key factual circumstances on

which the [exemption] turn[ed] appear[ed] to differ from class member to class member"); *Scott*, 954 F. 3d at 513 (affirming denial of certification; "although the *range* of tasks were largely the same across class plaintiffs, the *primary duty* performed by class plaintiffs—the dispositive question of the exemption inquiry—was not adequately similar").

> b.  *Plaintiffs' Insistence That The Court Must Examine Each LTDCSs' <u>Intent</u> In Describing Their Job Duties Forecloses A Finding Of Commonality.*

In seeking to avoid the LTDCSs' testimony, Plaintiffs' counsel argue that the Court cannot rely on the actual words used by the LTDCS to describe their job duties.  Dkt 283, 16-22.  They argue that even a "yes" or "no" answer to a deposition or survey question does not, in fact, mean "yes" or "no" (Dkt 281, at 16), and, instead, the factfinder needs to inquire into what each LTDCS was thinking when they used basic words like "decision," "recommendation," "determine" or "yes."  *E.g.*, Dkt 283 n. 51 (arguing that although Opt-in Hrobowski testified "yes" when asked if "she evaluated medical records to see if they indicate that the disabling condition existed," her testimony is not evidence she performed that duty); *see also* Dkt 281, at 18 ("The survey also uses many subjective terms open to interpretation ('resume' words such as Analyzing, Determining, Interpreting, Evaluating, Reviewing, etc.) . . . .").  However, if the Court cannot know what any LTDCS meant by "decide," "recommend," "determine" or "evaluate" without them testifying about what they actually meant, it is impossible to unpack their job duties based on purportedly representative testimony or documents.  *Callari v. Blackman Plumbing Supply, Inc.,* 307 F.R.D. 67, 82 (E.D.N.Y. 2015) (denying certification: "individual determinations are precisely the kind of determinations that render certification inappropriate."); *Romero*, 2012 WL 1514810, *16 (denying certification where "a determination of exempt status requires an . . . individualized inquiry into the specifics of each allegedly misclassified employee").

> c.  *There are no Policies, Documents or other Materials that Answer Whether All LTDCSs Were Primarily Engaged In Exempt Work.*

Unable to rely on the LTDCSs' testimony, Plaintiffs' counsel argue that commonality can

be shown through job descriptions, the CMG, training and evaluations, and the availability of "resources." Mot 6-12.  However, none of these things, alone or together, answers the question of whether any class member is exempt, much less all of them.

      *First*, in attempting to negate job descriptions and other documents that describe *exempt* positions, Plaintiffs testified that these documents are ***not*** reliable indicators of their job duties:

> Q. As to the job description, looking at that, without asking you yourself personally what of these things did you do or not do, ***I can't know whether that job description is accurate, right? A. Correct***. McKinney Tr 89-95.

*See also* Mocny Tr 104-09, 114-17; K. Harris Tr 263-64; Hensel Tr 223-26; Julian Tr 177 (testifying that information in MetLife's written resources was "false").  Specifically referencing the CMG, several LTDCS testified that they do *not* believe the CMG is accurate or accurately reflects their job duties.  K. Harris Tr 263-64 ("Q: The CMG says, and I quote, No script or template will ensure that each individual conversation with a claimant is effective, since each claimant and situation is unique, end quote. [Objection] A: I disagree"); Mocny Tr 107-09, 116-17; Hrobowski Tr 206-07, 211-12.  Accordingly, *Plaintiffs* have conceded that there are "sharp factual disputes about LTDCSs' reliance on" the "CMG and other guidelines."  SJ Opp., n.21.

      Plaintiffs' claim that the CMG is the "bible" is not even supported by an LTDCS who used that phrase.  While Sandi Day in one moment claimed the CMG was the "bible," she *excepted* all portions of the CMG confirming the *exempt* duties of LTDCSs, such as the statement *that LTDCSs are responsible for making the claim decision*.  Day Tr 108, 143-52.  Moreover, conveniently absent from Plaintiffs' "bible-based" string cite (Mot n.17) is Day's own subsequent backtracking testimony: **"[m]aybe I misspoke about [the CMG] for me being the bible, all right.  I probably should have said a resource for me.**"  Day Tr 151-52 (conceding that sometimes she followed the CMG and sometimes she did not, and that sometimes the CMG was accurate and sometimes it was not).  And some LTDCS used the CMG rarely or never at all.  *See* p. 22, *infra*.

      In any case, "[w]hether an employee is exempt is determined by the employees actual work

activities, not by the employer's characterization of those activities through a job title or job description." *Ruggles*, 272 F.R.D. at 339.  In *this* case, that principle applies with even greater force.  Plaintiffs cannot, to avoid summary judgment, *reject* under oath the accuracy of policies that demonstrate exempt duties, then turn around and claim (for Rule 23 purposes) that those same policies uniformly determine their duties.  *See, e.g., Mike v. Safeco Ins. Co. of Am.,* 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (denying certification where plaintiff "expressly disavow[ed] [his] job description"); *see also* SJ Opp., n.6 ("Because the exemption centers on what employees actually do, resumes and job descriptions are non-dispositive[.]").

    *Second*, LTDCS testimony establishes that they do not agree that any single training, manual, or other piece of paper dictates their duties or answers any or all claims questions.[10] Dubois, for example, confirmed that her colleagues could not rely on the CMG or any resource, other than *her*, to calculate benefit start dates for one Company's employees:

> Even after I left, [other Claims Specialists] would reach out to me to ask me how to get the benefit start dates.  ***And there wasn't one other person there, including my unit manager, who knew how to do the Campbell's account[.]  I was the only person.***

Dubois Tr 227 (emphasis added).

    Plaintiffs' suggestion that their job consisted of a series of rote tasks reduced to a single document (Mot at 6-12, 23-25) also cannot be reconciled with their testimony that the only way to determine what job duties each LTDCS performed, as well as how (and how often) they performed those duties, ***is to ask each of them***.  Julian Tr 291; Mocny Tr 57-59, 250-51; Hensel Tr 64-66; McKinney Tr 94-95; Hrobowski Tr 78-79, 98, 126-27, 199, 285, 319; Patel Tr 85.

    Plaintiffs' argument is also refuted by their testimony that MetLife did *not* require LTDCS to follow any training or resource made available to them.  Julian, Dygert, and Harris testified that,

---

[10]*E.g.*, Leveille Tr 172, 240-47, 250-51, 259-61, 265-66; Wolber Tr 94; T. Harris Tr 323-25; Gill Tr 138-41, 159-61; Dubois Tr 90-91; McKinney Tr 197-200, 209-10, 219-20, 309-10; K. Harris Tr 103-12, 149-51, 156-57; Hensel Tr 145-48; Smith Decl ¶14 ("The process always varies based upon the nature of the impairment and particular facts of the claim."); Patel Tr 124; Hrobowski Tr 80-81, 316 (every claim is different and claims management differs from claim to claim).

contrary to all training and written materials, nurses and vocational consultants made the claims decisions, and Mocny testified that decisions were made by a consensus of "the clinicians, the UL, [and] the CSS." Julian Tr 75; Mocny Tr 232-233; Dygert Tr 173-174. That testimony is directly at odds with: (1) the LTDCS job description; (2) training materials and the CMG; and (3) directives given to nurses and vocational consultants that they can*not* make those decisions. Parlo Decl Exs. GG, II; Miscione Decl ¶4; Thibado-Conley Decl ¶¶5-6; Ayotte Decl ¶¶4-5. Plaintiffs' new position about written materials simply does not match their sworn testimony.

*Third*, the record shows that LTDCSs did not *actually use* the CMG or other resources in a common way. *Ruggles,* 272 F.R.D. at 339-41 (certification denied where record showed "variation" as to "what guidelines or tools [each class member] employs, how often she consults them, and in what manner she does so"). While some LTDCSs reviewed the CMG regularly, others testified that they did not use it at all, and others could not even recall how often they reviewed it. Patel Tr 168-69 (days and weeks when she did not refer to the CMG at all); Starowicz Tr 237-242 (testified that she looked at the CMG daily, but when pressed could not recall if she had used it the prior week); Cornelius Tr 109-112, DeForge Tr 179, 181 (did not know how often they or any of their colleagues look at the CMG); Jones Tr 191-92 (looked at the CMG daily); Roberts Tr 109 (referred to CMG on a weekly, but not daily, basis); Mocny Tr 98-103 (initially looked at the CMG regularly, but over time looked at it infrequently).

As to the use of resources, there is likewise no similarity. The only common point is that LTDCSs have "resources" they *can choose to use* to help them make their best claims decision, including ULs or Claim Support Specialists ("CSSs"), nurses, doctors and vocational consultants. K. Harris Tr 104-05; Hensel Tr 80-82, 101-02; Dubois Tr 76; Wolber Tr 75-77; Miscione Decl ¶¶ 2, 6-7; Cesario Decl ¶¶5-7; Johnston Decl ¶¶9-10; Wilcox Decl ¶¶19-20. They can also convene a Claim Discussion Meeting ("CDM") with those resources to get additional input. *See, e.g.*, Miscione Decl ¶¶6-7; Cesario Decl ¶6; Sulley Decl ¶¶14-15. However, the LTDCSs do not agree

on whether or how these resources were used, or the degree of direction or supervision (if any) those resources provided. McKinney and several other LTDCSs testified that they had the discretion and authority to determine, depending on the claim, whether to conduct a CDM. McKinney Tr 220-23; Gill Tr 76-79; Hensel Tr 84-85, 100, 187-95; Roberts Tr 23-24 (entirely up to the LTDCS); Stephenson Tr 19-20 (same); Hrobowski Tr 132, 199, 304-05; K Harris Tr 283; Wolber Tr 92; Hensel Tr 100 ("I would not set up a CDM if I thought we didn't need a CDM. If I'm doing a CDM it's because I think we need it."), 187-92; DeForge, Carlo, Crego, Stephenson Surs. (Question #29). In exercising this discretion, McKinney testified that she chose to hold CDMs on only 10% of her claims. McKinney Tr 220-23. In contrast, Julian and Mocny testified they were *required* to hold CDMs, and to consult with the same resources, for *every single claim* (100%!). Julian Tr 38-39, 190-91, 255, 281-83, 289-90; Mocny Tr 176, 181-82, 219-21; *cf.* Hrobowski Tr 98, 199 (there was no such policy); Patel Tr 110 (no such rule). Leveille testified that for *most* claims *she determined* whether to conduct CDMs, but in limited circumstances she was *required* to hold one. Leveille Tr 198-200.

These were not the only variants. Whether Hensel used particular resources (like nurses or vocational resources), or conducted a CDM, ***changed depending on his UL at the time***. Hensel Tr 82-84, 187-92. Others decided whether to engage resources depending on the particular facts of the claimant's condition and employment. Stephenson Tr 40; K. Harris Tr 108-11; Wolber Tr 62-64. As Hrobowski admitted, "it really depends on each situation as to if I take it to a CDM or not," (Hrobowski Tr 285), and to find out what other LTDCSs did you would have to ask each one. *Id*. 98, 199, 285. Plaintiffs also differed in *how* they engaged these different resources. Leveille stated she would reach out to a nurse *only* if she did not understand the information in the claimant's medical file. Leveille Tr 113. Hrobowski testified she would go to a resource only if she had a question, and that she would specifically formulate her question and purpose for the CDM in advance. Hrobowski Tr 204, 218, 220-21, 313-14. *See also* Smith Decl ¶ 15 ("If I submit

a request to a nurse, for example, he or she will review the request and submit what is called a Clinical Response ('Response').").  Mocny, however, claimed she was limited to reciting the facts regarding a claim, and that a UL or other resource ran the entire CDM.  Mocny Tr 154-55, 236-39, 261-62.  Mocny testified that her UL, CSS, a nurse and a voc *all* had to attend every single CDM.  Mocny Tr 257-62.  Others testified that *they* determined who would attend and attendance differed from claim to claim.  Hrobowski Tr 106-07; Patel Tr 113-14, 137-38; DeForge Tr 65-67.  Simply, there were no common practices. *Scott*, 954 F.3d at 514 (despite a common job description, classification and expectations, the "disparate accounts from Apprentices prove[d] fatal to the predominance inquiry.").

*Fourth*, even assuming LTDCSs participated in the same evaluations and training, and had access to the same written resources, that "does not tell us how [LTDCSs] allocated their time between exempt and nonexempt time as a class." *Pedroza v. PetSmart, Inc*., No. 11-0298, 2013 WL 1490667, at *9 (C.D. Cal. Jan. 28, 2013) (denying certification); *Kopera v. Home Depot U.S.A., Inc.,* No. 09-8337, 2011 WL 135016, at *4 (S.D.N.Y. Jan. 11, 2011) (denying certification where, as here, there were sharply contested disputes as to whether a 266-page "Training Guide" provided common proof of "actual duties"); *Cruz v. Dollar Tree Stores, Inc.,* No. 07-2050, 2011 WL 2682967, at *8 (N.D. Cal. July 8, 2011) (denying certification because evidence of "uniform training and training-related materials," "same on-the-job tools," and "daily planners that require[d] [employees] to perform certain tasks" did *not* provide common proof of employees' actual duties).

Indeed, the LTDCSs' testimony refutes Plaintiffs' counsel's suggestion that the Court could somehow find common, classwide job duties through the evaluation process.  Mot 15-16, 23-24.  While Plaintiffs mislead the Court that a "squadron" of Quality Assurance ("QA") reviewers comb through every claim (Mot 15), the evidence is that QA reviews are conducted for only a small fraction of randomly selected claims.  Smith Tr 60-61 (as of 2018, on average, *one*

24

quality review per associate per month, selected at random); Maneen Tr 99-100 (between 2013 – 2016, on average, 3-4 audits per associate, *per year*, selected at random); Wicklund Tr 267 (had *no* QA audits in 2013 and could not recall any audits in 2014).   Of greatest significance, and directly precluding any finding of common impact, multiple LTDCSs testified that the QA process had __no__ impact on their claims decisions or how they were made.   *E.g.*, Day Tr 76-77 (QA process never resulted in her being instructed to handle claims differently); DeForge Tr 113-14 (never instructed by QA regarding whether her handling of claims was right or wrong); Leveille Tr 208 ("Q: Has there ever been a situation where in a QA you were told you made the wrong decision? A: No.").   Not one LTDCS testified that any review or evaluation dictated ANY claim decision. So, while Plaintiffs' misleadingly characterize QA reviewers as effectively peering over the shoulder of some LTDCSs, that misrepresentation (even if true) only creates yet another critical distinction in how each LTDCS did his/her job, and further negates any common proof.   *See* 29 C.F.R. §541.202(c) (courts must determine degree of direction and supervision to determine whether administrative exemption applies).

Plaintiffs get no further by raising the unremarkable fact that LTDCSs receive performance reviews, as does nearly every employee in America.   Mot 15.   They offer no evidence that such reviews changed how any particular LTDCS, or all LTDCSs, did or did not make claims decisions. In fact, the content of the reviews confirms that LTDCS were *not* expected to blindly follow the abstract "process" described in Plaintiffs' motion.   *See, e.g.*, Parlo Decl Ex. JJ ("I accomplished the goal of being an independent worker by taking ownership and accountability of my caseload"; "I worked to develop strategies and solutions with limited involvement of others"); *id.* Ex. KK (receiving positive feedback for focusing on what made sense "for each particular situation").

In sum, Plaintiffs have failed to prove that the existence of any policy or document answers "in one stroke" whether all class members are exempt.   *Dukes,* 564 U.S. at 350.

### d.  Plaintiffs' Inapposite Cases Do Not Call For A Different Result

Plaintiffs' arguments rely primarily on decisions involving retail chain store workers who uniformly admitted performing the same narrow, manual, required tasks in cookie-cutter settings. Mot 23-27.  None of those cases support a finding of commonality under the facts here.

In *Damassia*, a pre-*Dukes* case involving assistant managers, the plaintiffs ***uniformly*** testified they "regularly spen[t] significant parts of their shifts performing manual labor activities like sweeping and mopping the store." *Damassia,* 250 F.R.D. at 160.  When deposed a few years later, the same group of assistant managers, in *Jacob,* likewise ***all*** testified to performing the same *manual* job duties, including "working the cash register" and "stocking shelves." *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 419 (S.D.N.Y. 2013).  Rounding out Plaintiffs' trifecta of chain store cases, the assistant managers in *Youngblood v. Family Dollar Stores, Inc., **all*** agreed to performing the same *manual* tasks set forth in 'minute detail" in corporate policies, such as "[r]otating stock," arranging shelves and "transfer[ring] merchandise from stockroom to store." No. 09-3176, 2011 WL 4597555, at *2-3 (S.D.N.Y. Oct. 4, 2011).  Similarly, in *Perez v. Allstate Ins. Co.,* No. 11-1812, 2014 WL 4635745 (E.D.N.Y. Sept. 16, 2014), the plaintiffs' testimony was "largely consistent" as to their "primary duty," and they "operate[d] pursuant to a uniform job description." There was no disagreement, as here, regarding what duties were performed or how.

Despite some Plaintiffs' efforts to downplay their job duties, ***none of them*** have asserted that they regularly performed the same narrow list of *required*, *manual* tasks that established commonality in *Damassia*, *Jacob*, *Perez* and *Youngblood*.  Just the opposite: the record shows that LTDCSs performed a wide range of duties and did so very differently from claim to claim.  *See supra*.  The LTDCSs do *not* agree that they *in fact* performed the same job duties or even the same primary duty (*id.*), and they do *not* agree that MetLife's job description or other documents

uniformly dictated their job duties.[11]   Instead, they have disavowed the accuracy and relevance of

those same documents.  *See supra* at 21-23.  As such, *Damassia*, *Jacob*, *Perez* and *Youngblood*

are inapplicable.  *See Callari,* 307 F.R.D. at 80 (distinguishing *Jacob* and *Perez,* and denying

certification, where testimony established, as here, that putative class members' actual duties were

*not* determined "by the document setting forth their job description"); *see also Ruggles,* 272 F.R.D.

at 339; *Diaz v. Elecs. Boutique of Am., Inc.,* No. 04-0840, 2005 WL 2654270, at *4 (W.D.N.Y.

Oct. 17, 2005) (denying certification where "[a]lthough [the putative class] share the same job

description, their responsibilities, in fact, may differ and thus a highly fact-specific and detailed

analysis of each [class member's] duties is required, making class treatment inappropriate");

*Lindsey v. Tire Discounters, Inc.,* No. 15-3065, 2017 WL 5972104, at *7 (S.D. Ohio Dec. 1, 2017)

(denying certification where, *inter alia,* "[p]laintiffs gloss over the deposition and declaration

testimony establishing that in many cases, [the putative class's] job duties (and the [plaintiffs']

understanding of their job duties) did not match up with the official job description").[12]

       Moreover, several of the cases Plaintiffs cite are further distinguishable because they rely

on the theory, *rejected* by the Second Circuit in *Myers,* that an employer's blanket classification

of plaintiffs is a strong factor in favor of certification.  *Compare Myers,* 624 F.3d at 550 (holding

that the "the question of entitlement to overtime pay is answered by examining the employee's

---

[11] Plaintiffs' other cases also make clear that, irrespective of any blanket exemption policy or common job description, certification is only appropriate in an exemption case where, unlike here, plaintiffs can *affirmatively demonstrate that the putative class all performed the same primary duty(ies)*. *Cf. Roseman v. Bloomberg L.P.,* No. 14-2657, 2017 WL 4217150, at *7 (S.D.N.Y. Sept. 21, 2017) ("testimony from [] employees" demonstrated that primary duty could be answered on a classwide basis); *Jackson v. Bloomberg, L.P.,* 298 F.R.D. 152, 166 (S.D.N.Y. 2014) ("[t]he *parties agree* that [putative class members] have the same primary responsibility"); *Enea v. Bloomberg L.P.,* No. 12-4656, 2014 WL 1044027, at *2 (S.D.N.Y. Mar. 17, 2014) (*employer conceded that all class members performed the same duties*); *Han v. Sterling Nat'l Mortg. Co.,* No. 09-5589, 2011 WL 4344235, at *10 (E.D.N.Y. Sept. 14, 2011) (all testimony showed class members' "*primary responsibilities were largely identical*") (emphasis added throughout).
[12] *See also Pedroza,* 2013 WL 1490667, at *13, (denying certification in exemption case because the plaintiffs' "testimony show[ed] that even if the [employer's] manuals and policies impose[d] certain restrictions on the [on work duties], their application, in practice, left room for the [class members] to exercise their discretion on matters of consequence"; and expressly distinguishing *Damassia*); *Quiles v. Wal-Mart Stores, Inc.,* No. 16-9479, 2020 WL 1969940, at *7 (D.N.J. Apr. 24, 2020) (denying certification in exemption case because the "declarations and deposition testimony proffered by both parties demonstrate[d] significant differences in the [class members'] primary duties" and rejecting plaintiffs' attempt to rely on *Damassia*).  *This case is similar to Pedroza and Quiles, but nothing like Damassia.*

*actual duties,*" and affirming that "*Hertz's common [exemption] policy demonstrated little* regarding whether the constituent issues that bear on Hertz's ultimate liability are provable in common") (emphasis added), *with Damassia*, 250 F.R.D. at 159 (concluding that exemption policy was "evidence" that any *actual* differences in job duties were "not material"); *Youngblood*, 2011 WL 4597555, at *2 (same, citing *Damassia*); *Jacob*, 289 F.R.D. at 415 (relying on *Damassia* and another subsequently vacated decision to find commonality based substantially on uniform classification policy); *Perez,* 2014 WL 4635745, at *16 (citing *Jacob* and *Damassia* in holding that uniform exemption weighed in favor of classification).[13]

Plaintiffs' failure to establish that LTDCSs' duties were *in fact* similar in ways material to the duties prongs of the administrative exemption is fatal to their motion.[14]

### 3. Plaintiffs Also Fail To Establish That Common Issues Predominate.

Plaintiffs have also failed to satisfy the "more demanding" Rule 23(b)(3) predominance inquiry. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623-24 (1997). Common questions for purposes of predominance are limited to those "where the *same* evidence will suffice for *each* member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (emphasis added). Thus, not just any question will meet the "predominance" prong. Plaintiffs must show that the "more 'substantial' aspects of this litigation will be susceptible to generalized proof for all class members than any individualized issues." *Myers,* 624 F.3d at 551. Here, because Plaintiffs' "claims

---

[13] Plaintiffs wrongly assert that "[i]n wage cases, the commonality requirement is usually satisfied where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices." Mot n. 67. **But none of the cases Plaintiffs cite involved alleged misclassification.** Instead, the cases involved the question of whether a common, undisputed, non-exempt pay practice (such as whether proper tip credits were used) was legal. *See* Mot, n.67. Unlike the misclassification claims here, the alleged pay policies in those cases were *facially unlawful*.

[14] Plaintiffs also rely on pre-*Dukes* cases that found commonality based on issues that would not pass muster under the Supreme Court's more rigorous standard requiring common *answers*. Mot 30 (citing *Han*, 2011 WL 4344235, at *9; *Noble v. 93 Univ. Place Corp.,* 224 F.R.D. 330, 343 (S.D.N.Y. 2004)). Although *Grenawalt v. AT & T Mobility, LLC* was decided after *Dukes*, that decision does not mention nor address, *Dukes*' heightened commonality requirement. *See* No. 11-2664, 2014 WL 4832318 (S.D.N.Y. Sept. 29, 2014). Moreover, unlike here, the parties in *Grenawalt* did not dispute the guards' duties, or that "there was *no difference in the duties* of the guards … ." *Id.*

mandate an individualized inquiry and determination, there is no point in proceeding as a class action." *Velasquez v. Digital Page, Inc.,* 303 F.R.D. 435, 444 (E.D.N.Y. 2014) (no commonality or predominance where plaintiff failed to show the putative class had similar job duties).

> a. *Whether Plaintiffs' Performed Exempt Job Duties Is The Dominant Issue In This Case And Requires Individualized Inquiries.*

Plaintiffs concede their claims rise and fall on whether they can show, on a classwide basis, that the primary duty(ies) actually performed by LTDCSs are not exempt.   Mot 17-34.   That dispute is the most "substantial aspect[] of this litigation." *Myers,* 624 F.3d at 551.   Yet, as established above, determining those job duties is not "susceptible to generalized proof ***for all class members*.**" *Id*. (emphasis added).   Even assuming some of the secondary issues raised by Plaintiffs (training, evaluations, etc.) "may be answered with generalized proof, they are not more substantial than the questions" about LTDCS' actual job duties at the heart of this case, and that require individualized proof.  *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 539 (2d Cir. 2015 (no predominance where "the most important question in th[e] litigation cannot be answered with generalized proof"); *Ruggles*, 272 F.R.D. at 340 ("the role of commonly applicable procedures and tools, such as [] [g]uidelines, on [employees'] discretion," did not "predominate over individual concerns" where, as here, "evidence shows that [class members] employ[ed] different tools in different combinations and consult[ed] them with varying frequency depending upon the work each perform[ed]").  For this reason, Plaintiffs' motion should be denied.  *Myers,* 624 F.3d 537 (no predominance where exemption applicability must be determined based on individualized proof); *Callari,* 307 F.R.D. at 82 (where plaintiffs fail to show commonality because exemption status would require case-by-case inquiry, "it follows that the proposed class also fails to meet the more demanding requirements" of predominance); *Edwards v. Publishers Circulation Fulfillment, Inc.,* 268 F.R.D. 181, 188-89 (S.D.N.Y. 2010) (individual issues predominate because misclassification claims required an "individual assessment" of each

employee's duties).

The cases Plaintiffs cite to establish commonality also fail to establish predominance, and for the same reasons. They involve facially unlawful pay practices (Mot 37-38 (citing *Spencer* and *Shahriar*)), or the facts are materially distinguishable from those here. Mot at 24 (citing *Damassia*, *Jacob*, *Youngblood*, and *Perez*)); *see also supra* n.11. Plaintiffs' reliance on *Torres v. Gristede's Operating Corp.*, No. 04-3316, 2006 WL 2819730, at *15-16 (S.D.N.Y. Sept. 29, 2006), is even more misplaced. In *Torres*, none of the employees was paid on a "salary basis." Therefore, the question of liability could be readily decided on a classwide basis having *nothing* to do with any duties that were or were not performed. *Id.*[15]

> ### b. Plaintiffs' Administrative Production Dichotomy Argument is a Red Herring

Plaintiffs' administrative/production dichotomy argument cannot manufacture common or predominant issues where none exist. Regulations, DOL opinion letters, and binding precedent are clear that LTDCSs are exempt if they perform their primary duty for MetLife **_OR_** for MetLife's customers. 29 C.F.R. §541.201(a). While Plaintiffs expound on how LTDCSs "process" claims, which they assert (incorrectly) is the product *of MetLife* (Mot 27), that issue (and any questions or answers about that) is irrelevant. It is undisputed that LTDCSs perform claims handling services *for MetLife's customers*, and Plaintiffs cite no evidence those customers are ALL claims handling companies. Instead, the record is replete with evidence that LTDCSs *were the only ones* managing the claims of the employees (or to use Plaintiffs' term "processing" claims) *of the customers*. Cornelius Tr 67-68; Patel Tr 57-58, 65-68; Hensel Tr 112-113; K. Harris Tr 162-171. Not only

---

[15] Plaintiffs also rely on two cases from the Ninth Circuit that pre-date *Dukes*, *Comcast*, and *Tyson*: *Wells Fargo*, 571 F.3d 953, and *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009). Mot, n.70. Those cases do not help Plaintiffs, as both "rejected" the "idea that the class proponents can rely on the employer's 'policies and procedures' to establish sufficient evidence of predominance." *Campbell v. PricewaterhouseCoopers, LLP*, 287 F.R.D. 615, 626 (E.D. Cal. 2012) (citing *Wells*, *Vinole*, and *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 945, 948 (9th Cir. 2011) (rejecting plaintiffs' argument that "UPS's policies and procedures establish sufficient evidence of predominance" because the "fact that UPS expect[ed] [class members] to follow certain procedures or perform certain tasks d[id] not establish whether they actually are 'primarily engaged' in exempt activities" or whether they "customarily and regularly exercise[ ] discretion and independent judgment").

does that make Plaintiffs' argument irrelevant for purposes of this motion, it warrants summary judgment on that point for MetLife.  Dkt 251, at 8-14.

   In addition, even if MetLife had no customers for whom LTDCSs provided services, Plaintiffs' argument would fail.  As shown in MetLife's summary judgment motion, LTDCS are nothing like "work[ers] on a manufacturing production line," or workers "selling a product in a retail or service establishment."  *Id.* at 8 (quoting 29 C.F.R. §541.201(a)).  LTDCSs do not produce or sell insurance products offered by MetLife.  *Id.*  Rather, they perform the ancillary service of deciding claims under the insurance products MetLife sells.  *Id.* at 10.  As such, they clearly fall on the "administrative" side of the dichotomy, even as to MetLife.

   To try to avoid these facts, Plaintiffs allege that MetLife's main "product" is "processing insurance claims" for its customers.  Mot 27.  But they provide no evidence to support that claim, or to show that MetLife's "main product" is not the insurance products it creates.  Moreover, as noted above, claims adjusting (or "processing insurance claims" as Plaintiffs' counsel now likes to call it) ***is an administrative function regardless of whether it is for the employer or its customers***.  Dkt 251, at 12.  Thus, for whomever LTDCSs "process" insurance claims it is exempt work.  If Plaintiffs had evidence or legal support that the administrative/production dichotomy is dispositive of the claims of every class member (Mot at 27), they would have moved for summary judgment long ago.  Their silence speaks volumes.

   Even if Plaintiffs are permitted to ignore this black letter law, whether LTDCSs fall on the production or the administrative side of the dichotomy still cannot be decided for every class member based on common proof.  As Plaintiffs concede, this requires an "inquiry" into the "nature of the job" and "whether it constitutes the management or running of a business."  Mot at 27.  So for *each* claim handled by *each* LTDCS (for MetLife's *thousands* of different employer-customers), the Court would need to assess, *inter alia,* if:

• MetLife and/or the LTDCSs functioned as the insurance operation of the employer/

customer or does the employer/customer have its own insurance or claims personnel who handle and/or decide any LTD claims;

- LTDCSs liaised with the employee/customers about benefits issues or whether the employer/customer does so;
- LTDCSs handled return-to-work issues for the employee/customers or whether the employer/customer internally manages that function.

Of course, answers to these questions will be customer by customer and cannot be obtained through common proof. Thus, none of the questions "materially advances the litigation for all class members." Mot at 27. In addition, even if the administrative/production dichotomy could be resolved on other than an individual basis, it would still not demonstrate that class issues *predominate* over individual ones. Specifically, the predominance requirement is not met where a disparity in duties nonetheless raises "a strong possibility . . . that the [] exemption will apply to some-but not all" of the putative class. *Dauphin v. Chestnut Ridge Transp.,* No. 06-2730, 2009 WL 2596636, at *3-4 (S.D.N.Y. Aug. 20, 2009) (denying certification notwithstanding that "method of proving . . . exemption applies would likely involve some amount of generalized proof"). This is true even where one question may be dispositive of some or all of the class members' claims, because "[i]f a class were certified, the trial of this action could easily devolve into an examination of the [duties] of each class member." *Id.* at *4. Here, while some LTDCSs may have performed the same duties that the customer existed to provide (which MetLife denies), others clearly were functioning as the insurance departments for customers whose business had nothing to do with claims handling. Dkt 251, pp. 8-14.

### c.   *Damages Also Must Be Determined On An Individual Basis.*

To satisfy the predominance requirement, Plaintiffs must also prove that the "damages resulting from [their] injury [are] measurable 'on a classwide basis' through use of a 'common methodology.'" *Comcast,* 569 U.S. at 30. As the Supreme Court explained in *Comcast,* class issues do not predominate over individual issues where plaintiffs fail to demonstrate that the question of damages can by proven on a classwide basis using a "just and reasonable" methodology, rather

than one which is merely "speculative." *Comcast,* 569 U.S. at 35-36.

Plaintiffs have not offered any reliable methodology to determine whether any class member worked more than 40 hours per week and, if so, what those hours were.  To the contrary, as explained in MetLife's motion for decertification, there is no common evidence as to class members' alleged damages (*i.e.*, their alleged hours worked over 40 in a week), and no way to efficiently try the issue of damages in one proceeding.  Dkt 229, 31-32.  No LTDCS kept and submitted records of their hours worked.  DeForge Tr 157-60; Patel Tr 187-88, 196-98, 210-11; Hrobowski Tr 32-34.  Plaintiffs offer no evidence that the LTDCSs have uniform hours, or that the same discrete event, such as waiting in a security line, or working a shift, can establish the hours for which they are seeking alleged damages.  Significantly complicating the inquiry, many class members worked all or a portion of the time at home.  Day Tr 12 (full-time remote worker); Leveille Tr 23 (spent time working 100% remote); Wolber Tr 15 (remote work 2-3 days per week), 153-154 (listing other remote LTDCS).  Though Plaintiffs make passing reference in a single footnote to "representative evidence and sampling to determine damages" (Mot n.72), that method would be neither just nor reasonable.  The lone decision cited by Plaintiffs, *Enea v. Bloomberg L.P.,* No. 12-4656, 2014 WL 1044027, at *2 (S.D.N.Y. Mar. 17, 2014), demonstrates precisely what is lacking from this case.  In *Enea*, the plaintiffs' damages model included "three types of common proof: (1) Bloomberg's badge data; (2) Bloomberg's electronic time stamp data; and (3) representative testimony." *Id.*  Here, Plaintiffs are missing the first two categories and do not even attempt to claim otherwise.  This leaves Plaintiffs with *only* the possibility of representative testimony, which is the most unreliable form of proof.  *Griffith v. Fordham Fin. Mgmt., Inc.,* No. 12-1117, 2015 WL 1097327, at *5 (S.D.N.Y. Mar. 12, 2015) (finding no predominance where proposed representative testimony would "overcompensate some class members and undercompensate others, without a basis for the number of hours class members actually worked").  Plaintiffs, moreover, have failed to explain how representative testimony would be possible given

33

no evidence that class members worked any uniform schedule, shift or hours.  As Plaintiffs have failed to meet their burden to establish that class-wide questions predominate over individualized questions, certification should be denied.[16]

**B.**  **Plaintiffs Fail To Establish Typicality.**

The "commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Dukes,* 564 U.S. at 349 n.5.  Plaintiffs cannot establish typicality.  Because they testified to performing disparate job duties, it cannot be said that any Plaintiff has claims that are "typical" of the rest of the class.  *Myers,* 624 F.3d at 545 (affirming lack of typicality because the "main issue to be decided in the case, whether each potential plaintiff was properly classified as 'exempt' . . . [required] a 'fact-intensive inquiry into each potential plaintiff's employment status'"); *Trawinski v. KPMG LLP*, No. 11-2978, 2012 WL 6758059, at *7 (S.D.N.Y. Dec. 21, 2012) (no commonality or typicality where "proof of liability will not turn on what [the employer] did or did not do vis-a-vis the entire class, but rather what each member of the class does on a daily basis").  As with their arguments on commonality, nothing in the cases Plaintiffs cite compels, or even supports, that typicality is met in an exemption case where the plaintiffs fail to establish that the actual duties they performed can be determined on a class-wide basis.  Mot 28 (citing *Jacob* and *Meyer*).[17]

---

[16] Plaintiffs argue in a single sentence that, in the alternative, the Court should certify the class under Rule 23(c)(4) and "identify common issues for class-wide adjudication."  Mot 33-34. For the same reasons above, there would be little utility in that approach.  The most critical question-whether each Plaintiff was properly classified as exempt from overtime-cannot be decided on a class-wide basis.  Plaintiffs' failure to identify what they believe is the "common issue" that could discretely be decided concedes this point.  *Adkins v. Morgan Stanley,* 656 F. App'x 555, 557 (2d Cir. 2016) (court is "not obligated to implement Rule 23(c)(4) on its own initiative"); *Kassman v. KPMG LLP,* 416 F. Supp. 3d 252, 285 (S.D.N.Y. 2018) (denying certification under Rule 23(c)(4) where "Plaintiffs ha[d] not identified a common question warranting certification").

[17] Again, Plaintiffs rely on inapposite cases outside the exemption context, where liability did not turn on differences in the putative class members' job duties.  *Orellana v. One If By Land Rest. LLC,* No. 18-7865, 2020 WL 5768433 (S.D.N.Y. Sept. 27, 2020) (tip credit case); *Argudo v. Parea Grp. LLC,* No. 18-0678, 2019 WL 4640058  (S.D.N.Y. Sept. 24, 2019) (same); *Vargas v. Howard,* 324 F.R.D. 319, 324 (S.D.N.Y. 2018) (time shaving case).

## C.  Class Adjudication Is Not Superior.

Plaintiffs contend that a class action would be a "superior" method of resolving their claims chiefly because (1) their claims are unlikely to present intractable manageability issues; and (2) the class members "lack the resources and incentive to proceed with their claims."  Mot 32-33. Neither argument is correct.  As to manageability, where "individualized proof is required to determine the correctness of Defendant's categorizing putative class members as exempt, a class action is not a superior mechanism for adjudicating their claims." *Ruggles,* 272 F.R.D. at 341. Because the issues of liability and damages can only be decided through individualized proof, this action would inevitably devolve into a series of individual trials for each class member.

As to the putative class's resources and incentive, Plaintiffs seem to rest their argument on a presumption that each individual Plaintiff's damages are *de minimis.*  Mot 33.  Although MetLife disputes that Plaintiffs are entitled to any damages, or that they worked the hours they allege, Plaintiffs earned annual salaries of up to $78,600 and allege to have worked up to 20 hours of overtime per week.  Leveille Tr 294 (expected to work 10-20 hours over 40), 306:9-15 ("at least 45 to 50 hours a week."); Roberts Tr 250–51 (some have worked "60 hours a week"); Patel Tr 20203 (10 hours over 40 each week); Stephenson Tr 237 ("on average 45 [hours worked per week]."  If true, that would result in much more than *de minimis* damages.  In any event, nearly four years into the case, Plaintiffs still have not produced any damages calculation for any Plaintiff (another reason to doubt Plaintiffs can prove their damages on a representative basis), and provide absolutely no evidence to support the proposition that they lack the resources to pursue their claims individually.  *Ouedraogo*, 2014 WL 4652549, *3 (the "party seeking certification must be prepared to prove that its prerequisites are met by a preponderance of the evidence").

## V.    CONCLUSION

For the reasons set forth above, Plaintiffs' Motion should be denied in its entirety.

Dated:  January 22, 2021                                MORGAN, LEWIS & BOCKIUS LLP

By: /s/ *Christopher A. Parlo*
       Christopher A. Parlo
       Melissa C. Rodriguez
       101 Park Avenue
       New York, New York 10178

       *Attorneys for Defendant*