USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/31/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Julian, *et al.*,

                    Plaintiffs,

          —v—

MetLife, Inc., *et al.*,

                    Defendants.

---

17-cv-957 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

Current and former long-term disability claim specialists bring claims against Metlife, Inc. for failure to pay overtime wages under the Fair Labor Standards Act and state labor laws. After the Court conditionally certified a collective action for the FLSA claims, the parties engaged in lengthy discovery. Metlife now moves to decertify the collective and for summary judgment as to certain Plaintiffs. Plaintiffs oppose both motions and have filed for class certification under Federal Rule of Civil Procedure 23 for Plaintiffs' state labor law claims. Plaintiffs also move to strike Metlife's Reply to Plaintiffs' Opposition to Metlife's Rule 56.1 Statements and to strike, or for the Court to disregard, survey responses from Metlife employees cited in support of Metlife's motion for decertification. Metlife filed an unopposed motion to maintain under seal certain documents submitted by Plaintiffs in support of their motions.

For the reasons that follow, Plaintiffs' motion to strike the survey responses is DENIED, Metlife's motion for decertification is GRANTED, Plaintiffs' motion for certification is DENIED, Plaintiff's motion to strike Metlife's Reply is GRANTED, Metlife's motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Metlife's motion to seal certain documents submitted in support of Plaintiffs' motions is GRANTED.

## I.      BACKGROUND

Plaintiffs Debra Julian, Tonya Gill, Stephanie McKinney, and Kimberly Harris sued

Defendant Metlife, Inc. on behalf of themselves and other current and former employees who

worked as Long-Term Disability Claim Specialists.  Dkt. Nos. 1, 6, 17, 120.  Plaintiffs allege

that Metlife improperly classified them as exempt employees under the Fair Labor Standards Act

and state labor laws and improperly denied them due overtime.  *Id.*

Plaintiffs moved for conditional certification of a collective action under 29 U.S.C. §

216(b) and for court-approved distribution of notice.  Dkt. No. 34.  The Court granted Plaintiffs'

motion in a Memorandum Opinion & Order after determining that Plaintiffs had met their burden

of showing that they are similarly situated to the proposed class of "all people employed by

Metlife as Claim Specialists and Senior Claim Specialists who worked on long term disability

insurance claims . . . at any time since February 8, 2014."  Dkt. No. 65.  A court-approved notice

was sent to 470 Metlife Claim Specialists across the United States.  To date there are 78

members in the collective in addition to the named Plaintiffs.

Following lengthy discovery, Metlife filed a motion to decertify the FLSA collective.

Dkt. No. 228.  Metlife also filed a motion for summary judgment as to eight Plaintiffs, including

named Plaintiff Stephanie McKinney, for whom Metlife argues there is no genuine dispute of

material fact that these Plaintiffs are exempt from overtime under the FLSA's administrative

exemption (and, for Plaintiff McKinney, the administrative exemption of the Connecticut

Minimum Wage Act).  Dkt. No. 248.  After the summary judgment motion was fully briefed,

Plaintiffs filed a motion to strike Metlife's reply to Plaintiffs' opposition to Metlife's Rule 56.1

statement filed in support of the motion for summary judgment.  Dkt. No. 338.  Plaintiffs also

filed a motion for class certification under Federal Rule of Civil Procedure 23 for Plaintiffs'

overtime claims under New York, Connecticut, and Illinois labor laws.  Dkt. No. 265.  All

motions are fully briefed.[1]

## II.   MOTION TO STRIKE OR FOR THE COURT TO DISREGARD METLIFE'S EMPLOYEES' SURVEY RESPONSES

After this lawsuit commenced, Metlife provided a voluntary survey to employees asking

them about their job duties.  In support of their motion for decertification, Metlife cited some of

these surveys, in addition to other evidence, to demonstrate the disparate nature of Plaintiffs'

experiences.  Plaintiffs move to strike these survey responses from the record on the grounds that

they are inappropriate communications with potential class members.

Courts have the power under Rule 23 to restrict counsels' communication with potential

class members, but that power is limited to situations where there have been specific findings of

serious abuses, and any potential remedy must be weighed against the parties' rights to free

speech.  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99-101 (1981).  There is nothing inherently

abusive about Metlife exercising its right to "obtain information relevant to this litigation by

interviewing their employees."  *Zamboni v. Pepe W. 48th St. LLC*, No. 12 CIV. 3157 AJN JCF,

2013 WL 978935, at *3 (S.D.N.Y. Mar. 12, 2013).   Plaintiffs must instead demonstrate that

Metlife did so in a way that was "coercive or misleading," for example by misleading employees

about their rights in this litigation.  *Id* at *3-4 (holding that it was coercive for the employer to

require employees to sign a statement saying that they do not have any claims under the FLSA).

In support of their motion, Plaintiffs submit the testimony of three Plaintiffs who took the

survey.  Dkt. No. 282-2, Tr. 61; Dkt. No. 282-3, Tr. 164-165; Dkt. No. 282-6, Tr. 320-21.  Those

---

[1] On March 31, 2021, the Court granted in part and denied in part a motion for judgment on the pleadings submitted by Defendants as to certain Plaintiffs who had filed for bankruptcy and failed to disclose their overtime claims during the bankruptcy proceedings.  Dkt. No. 347.  The Court held that those Plaintiffs were barred by the doctrine of judicial estoppel from asserting claims for any unpaid wages prior the filings of their bankruptcy petitions.  *Id.*

Plaintiffs attest that, although Metlife did not expressly require them to take the survey, they subjectively felt that they had to take the survey and experienced anxiety regarding the event. *Id.*

That is insufficient to demonstrate that Metlife engaged in any serious abuses. There is no evidence that Metlife misled any employee with respect to the survey, forced or manipulated any employee into taking it, used the survey to pressure employees not to join the action, or any kind other kind of misleading or coercive behavior. Plaintiffs' motion is therefore denied.

## III.    MOTION TO DECERTIFY THE COLLECTIVE ACTION

Metlife moves for decertification of Plaintiffs' FLSA collective. The Court conditionally certified Plaintiffs' FLSA collective action in a Memorandum Opinion & Order on March 22, 2018 pursuant to 29 U.S.C. § 216(b). Dkt. No. 65. In that decision, the Court explained that Plaintiffs had met their low burden of making a modest factual showing that they are similarly situated to the proposed class because they presented some evidence demonstrating that they had similar job duties and were subject to the same policy reclassifying them as exempt in November 2013. *Id.* at 6. The Court noted that Metlife's evidence submitted in opposition to the motion showed that Metlife disputed not what kind of duties Claim Specialists perform, but rather how much discretion they used in performing those duties. *Id.* at 8. The Court explained that how much discretion Claim Specialists used is a "fact intensive question" that was not appropriate at that stage. *Id.* at 9.

Conditional certification is only a preliminary step in the process of maintaining a collective action under FLSA. Following the completion of discovery, the Court "will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010). The Second Circuit has explained that

4

"plaintiffs are similarly situated to the extent they share a similar issue of law or fact material to the disposition of their FLSA claim," and that a few dissimilarities should not defeat certification so long as there are material similarities.  *Scott v. Chipotle Mexican Grill, Inc.,* 954 F.3d 502, 516 (2d Cir. 2020).

Here, the disposition of Plaintiffs' FLSA claims depends on whether they are exempt from overtime pay under the "administrative employee" exemption of the FLSA.  *See* 29 U.S.C. § 213(a)(1).  One of the key requirements of that exemption is whether the employee "exercises discretion and independent judgment" in performing their primary duty.  *Id.*  And because this case turns on the applicability of the administrative exemption, collective treatment is only appropriate under § 216(b) if the named and opt-in Plaintiffs are similar in ways that are material to the issue of whether that exemption applies, including whether they exercised discretion and independent judgment.

In opposing decertification, Plaintiffs assert that they are "similarly situated" with respect to the administrative exemption and that the Court can decide whether the exemption applies for the collective based on common proof – in particular "Metlife's corporate policies, manuals, job descriptions, and other records and documents, testimony of corporate witnesses and representatives," along with representative testimony from Plaintiffs in the collective.  Dkt. No. 283 at 15.  Plaintiffs claim this "common proof" will demonstrate that the Claim Specialist position was not one for which employees exercised discretion and used independent judgment. *Id*.

As the Court will explain in section V of this opinion, discovery has proved that the opposite is true.  In granting summary judgment for Metlife as to Plaintiff McKinney, the Court holds that the Claim Specialist position generally requires that employees exercise significant

amounts of discretion and independent judgment, and that Plaintiff McKinney did in fact

exercise discretion and independent and judgment in performing her duties.  *See infra*

V(D)(2)(a).  That determination is based on the facts in the record, which are not genuinely

disputed, regarding Metlife's policies, procedures, and training of Claim Specialists, as well as

Plaintiff McKinney's testimony.  *Id.*

However, while the Claim Specialist position at Metlife generally involved the exercise

of discretion and independent judgment, there is evidence in the record which tends to

demonstrate that some other Plaintiffs might have had varied experiences.  Unlike the various

Plaintiffs involved in the summary judgment motion, other Plaintiffs have testified that they were

managed or supervised in a way that absolved them of all decision-making.  Def. Mot. At 3 n.3.

For example, despite the fact that Metlife's policies and training required otherwise, *see infra*

V(D)(2)(a), named Plaintiff Julian testified that "my job was not making a decision on a claim"

but instead that "my job was gathering the information to bring it to the claims discussion

meeting with everyone and they would make the determination[.]"  Dkt. No. 230-1 at 72.

As such, the disposition of each Plaintiffs' FLSA claims will depend on evidence that is

not common to the collective, i.e., Plaintiffs' testimony and other evidence regarding their

individual circumstances and how they completed their day-to-day tasks at Metlife.  That inquiry

will also require credibility assessments of Plaintiff's testimony.  As a result, a factfinder would

be unable to determine that all plaintiffs in the collective are either exempt or non-exempt in one

swoop.  *Vecchio v. Quest Diagnostics Inc.,* No. 16 CIV. 5165 (ER), 2020 WL 5604080, at *12

(S.D.N.Y. Sept. 18, 2020).  *Accord Mike v. Safeco Ins. Co. of Am.,* 274 F. Supp. 2d 216, 220 (D.

Conn. 2003) (declining to allow a FLSA collective action to proceed for insurance claim

adjusters because the "merits of [their] claim will turn upon evidence relating to [their] day-to-

day tasks, and not upon any [] company policy or decision."). Therefore, while Plaintiffs may still share various factual similarities, those facts are not "material to the disposition of their FLSA claims" in this case and they therefore are not "similarly situated" for the purposes of § 216(b) of the FSLA. *Scott*, 954 F.3d at 516.

Metlife's motion for decertification is granted and the opt-in Plaintiffs claims are dismissed without prejudice to filing their own FLSA actions.

## IV.    MOTION FOR RULE 23 CERTIFICATION

In addition to opposing Metlife's motion for decertification of the FLSA collective, Plaintiffs move to certify a class action under Federal Rules of Civil Procedure 23 for Plaintiffs' state law claims. Under Rule 23, any proposed class action class action must (1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of those of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class. Fed. R. Civ. P. 23(a). Further, a party attempting to certify a class must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class litigation is superior to other available methods for fairly and efficiently adjudicating the controversy" (or satisfy one of the other two criteria of Fed. R. Civ. P. 23(b), which Plaintiffs do not raise here). Fed. R. Civ. P. 23(b)(3).

For the commonality requirement of Rule 23(a), Supreme Court has explained that "commonality" means not that the Plaintiffs claims raise common questions (as Plaintiffs do here), but that those questions are "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). For an

issue like the administrative exemption, Plaintiffs do not need to accomplish the "impossible task of showing that all class members have identical responsibilities" at Metlife, but the Court must be able to find that "the individual employees' deposition testimony relating to their specific job duties is *generalizable* to others in the proposed class." *White v. W. Beef Properties, Inc.,* No. 07 CV 2345 RJD JMA, 2011 WL 6140512, at *3 (E.D.N.Y. Dec. 9, 2011) (cleaned up) (citing *Myers*, 624 F.3d at 549).

Plaintiffs' motion for class certification fails for the same reason that the FLSA collective must be decertified, i.e., that "[a] determination of exempt status requires an inquiry into the specifics of Plaintiffs job and a similarly individualized inquiry into the specifics of each allegedly misclassified employee whom Plaintiff is seeking to join." *Romero v. H.B. Auto. Grp., Inc.,* No. 11 CIV. 386 CM, 2012 WL 1514810, at *16 (S.D.N.Y. May 1, 2012). *Accord Diaz v. Elecs. Boutique of Am., Inc.,* No. 04-CV-0840E(SR), 2005 WL 2654270, at *6 (W.D.N.Y. Oct. 17, 2005). As discussed above, evidence regarding Metlife's policies, procedures, and training of Claim Specialists cannot serve as common proof of a lack of discretion or independent judgment on behalf of Claim Specialists. Whether or not each Claim Specialist can successfully bring a claim depends on if that particular Claim Specialist was managed or supervised in a way so as to prevent them from exercising discretion and using independent judgment. Therefore, Plaintiffs' motion to certify is denied.

## V.    MOTION FOR SUMMARY JUDGMENT

Metlife moves for summary judgment as to named Plaintiff Stephanie McKinney, and opt-in Plaintiffs Pamela Wolber, Jennifer Dubois, Claudette Leveille, Michael Hensel, Mia Cornelius, Krystal Hrobowski and Sandhya Patel's ("Plaintiffs") overtime claims under the FLSA and as to Plaintiff McKinney's overtime claims under the Connecticut Minimum Wage

Act.  Metlife argues that their claims are barred under the "administrative exemptions" of both statutes.

As discussed above, all opt-in Plaintiffs' claims in this action are dismissed without prejudice because they are not "similarly situated" for the purposes of § 216(b).  Therefore, only Plaintiff McKinney's claims remain for the purposes of this summary judgment motion.  For the reasons that follow, summary judgment is granted as to Plaintiff McKinney's FLSA claims but not as to her CMWA claims.

### A.  Legal Standard

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the Court must view all facts in the light most favorable to the non-moving party.  *See Eastman Kodak Co. v. Image Techn. Servs., Inc*., 504 U.S. 451, 456 (1992); *Gemmink v. Jay Peak Inc*., 807 F.3d. 46, 48 (2d Cir. 2015).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." *Ridinger v. Dow Jones & Co. Inc*., 651 F.3d 309, 317 (2d Cir. 2011).  The same is true for "mere speculation or conjecture as to the true nature of the facts." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).  If

"opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" for purposes of evaluating a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Only disputes over material facts will preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 1986). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party*." Cross Commerce Media, Inc. v. Collective, Inc*., 841 F.3d 155, 162 (2d Cir. 2016). "On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).

### B. The Parties' Rule 56.1 Statements and Plaintiffs' Motion to Strike Metlife's Reply

In conjunction with their motion for summary judgment, Metlife filed a Rule 56.1 Statement and Plaintiffs filed a Rule 56.1 counterstatement. Both parties filed responses, and then Metlife filed a reply to Plaintiff's response to its Rule 56.1 Statement. Plaintiffs filed a motion to strike Metlife's reply to Plaintiffs' response to its Rule 56.1 Statement on the grounds that it is procedurally improper.

Local Civil Rule 56.1 requires that, upon motion for summary judgment, the party shall submit a "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." U.S. Dist. Ct. Rules S. & E.D.N.Y., Civ. Rule 56.1. The opposing party is then to "respond[] to each numbered paragraph in the statement of the moving party" and each statement will be deemed admitted "unless specifically controverted." *Id.*

Courts are to disregard statements in a Rule 56.1 statement or response when unsupported by citations or otherwise improper.  "[A]llegations of uncontested fact cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement."  *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001).  Moreover, it is not appropriate for a Rule 56.1 statement, response, or counterstatement to include legal argument or legal conclusions.  *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019).

Here, Defendant filed a reply in support of their Rule 56.1 Statement without first seeking leave.  Rule 56.1 "does not provide for a reply" but also "does not prohibit such replies." *Cap. Recs., LLC v. Vimeo, LLC,* No. 09-CV-10101 (RA), 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 7, 2018).  Because the Plaintiff did not have an opportunity to file a sur-reply, the Court will decline to consider Defendant's reply to alleviate any potential unfairness.  *Id.*  Plaintiffs' motion to strike this document from the record is GRANTED.  *Am. Gen. Life Ins. Co. v. Diana Spira 2005 Irrevocable Life Ins. Tr.,* No. 08-CV-06843 NSR, 2014 WL 6694502, at *1-2 (S.D.N.Y. Nov. 25, 2014).

The Court will of course apply the longstanding principles described above in determining whether facts are meaningfully disputed as it considers both parties' Rule 56.1 statements and responses.  The Court will "disregard" any assertions that are not supported by the record, responses that are unresponsive to the asserted fact, and any improper argumentation. *See Holt,* 258 F.3d at 73; *Weider Health & Fitness v. AusTex Oil Ltd.,* No. 17CV2089RMBOTW, 2018 WL 8579820, at *2 (S.D.N.Y. Dec. 19, 2018), *report and*

*recommendation adopted,* No. 17CIV2089RMBOTW, 2019 WL 1324049 (S.D.N.Y. Mar. 25, 2019).

### C. Undisputed Material Facts

The following facts are drawn from Metlife's Rule 56.1 Statement and Plaintiffs' Rule 56.1 Counterstatement.[2]  While the parties *nominally* dispute virtually all of each other's factual assertions, the majority of the parties' disagreements go to the phrasing, weight, or impact of a fact instead of "actually disputing the fact itself."  *Lee v. City of Troy*, No. 1:19-CV-473, 2021 WL 567240, at *2 (N.D.N.Y. Feb. 16, 2021).  The Court determines that the following material facts are not genuinely disputed.

Metlife offers long-term disability insurance to individual customers and employers. Dkt. No. 295 ¶¶ 1-4.  Metlife Claim Specialists handle long-term disability claims.  *Id.* ¶ 9-10. Each Claim Specialist handles about 90 to 100 claims at a time and Metlife refers to Claim Specialists as the "owner" of those claims.  Dkt. No. 295 ¶ 44, 48.  Claim Specialists are trained to handle LTD benefits claims in accordance with Metlife's policies and procedures.  This generally involves following the "claim pathway," which includes six basic steps: Intake, Eligibility Review, Information Gathering, Information Assessment, Initial claim Pathway, Ongoing Claim Pathway.  Dkt. No. 332 ¶ 10-11, Dkt. No. 294-47 (Pl. Ex. 45).  At the end of this process, the Claim Specialists are trained to make a decision or recommendation in accordance with their training of whether, under Metlife's policies, the claimant's LTD benefits claim should be approved or denied.  295 ¶ 15.

---

[2] Although the Court has dismissed the opt-in Plaintiffs' claims, the testimonies of these former plaintiffs are still a part of the record in this case and are cited throughout the parties Rule 56.1 Statements and Oppositions.  The Court will consider that evidence where relevant in determining whether there is a genuine dispute of material fact.

There are a variety resources that Claim Specialists are trained to follow or utilize while handling claims.  One of the main resources is the "Claims Management Guide," which is a central repository for a wide array of guidelines for handling different aspects of the claims process.  Dkt. No. 332 ¶ 16; Dkt. No. 295 ¶ 33.  Claim Specialists are also trained to consult experts such as clinicians and vocational rehabilitation specialists in certain circumstances for various steps related to the claims process.  Dkt. No. 295 ¶ 25.  Additionally, Claim Specialists are provided other internal resources as well, such as MDGuidelines, which is an online resource that contains comprehensive information about medical conditions.  Dkt. No. 332 ¶ 19.

While Claim Specialists are trained to follow Metlife's general policies and procedures and utilize the resources provided to them, the case management duties and needs of claimants will differ depending on the facts of each claim.  Dkt. No. 295 ¶ 39.  Claim Specialists generally will not use every resource for every claim and instead are trained to use a clinical, non-clinical, or other internal resource depending on the facts of each case.  Dkt. No. 295 ¶ 30, 32, 65.  *See, e.g.,* Dkt. No. 250-8, Leveille Tr. 124:9-14 (Q: "you make the decision" of whether "I'm going to use a nurse, voc, doctor, or no one, right?" A: "Correct.").  For example, one of the Claims Management Guide guidelines instructs that each Claim Specialist is "accountable for assessing the functional capacity of each claimant and is expected to initiate that assessment independently with the use of MDGuidelines[,]" and is "expected to have a good overall understanding of common medical conditions and to utilize a clinical resource (CR) in situations in which the claimant's recovery is not consistent with MDGuidelines or complex in other ways."  Dkt. No. 297-30 at 3 (Pl. Ex. 28).

Moreover, while the Claims Management Guide provides guidelines such as this for handling claims, it does not specifically address every possible claim scenario and does not tell a

Claim Specialist how to handle a specific individual's claim.  Dkt. No. 295 ¶¶ 35-36.  At various

points, the Claims Management Guide instructs Claim Specialists to make decisions based on the

unique facts of each case and the resources available to them.  *See, e.g.,* Dkt. No. 294-30 at 3 (Pl.

Ex. 28), Dkt. No. 297-47 at 3 (Pl. Ex. 35), Dkt. No. 297-38 at 6,7 (Pl. Ex. 36).  Moreover, Claim

Specialists are not required to review the Claims Management Guide for every claim.  Dkt. No.

295 ¶ 41-43.

The Claim Specialists use their training and Metlife's resources to make a number of

assessments or determinations in handling a claim from start to finish.  The Claim Specialist

must first determine, in accordance with Metlife's policies and procedures, whether that claimant

qualifies as disabled under their plan based on the specific facts of their case.  Dkt. No. 295 ¶ 50-

51, 52.  Each plan will have a definition of disability and the Claim Specialist will need to

confirm that the individual's claimed diagnosis satisfies that definition.  *Id.* ¶ 54-55.  *See, e.g.,*

Dkt. No. 250-6, Dubois Tr. 51 ("I get medical records from doctors on claimants who are

disabled or claiming they're disabled, and I would review the medical records to determine if

they were disabled, with the nurses and the resources.  And I would use, you know, the policies

and procedures that Metlife provided to us through the [Claims Management Guide] and through

the training to determine if they were disabled or not disabled and I would make a decision.").

Based on their training, the Claim Specialist would also determine what information was needed

for proof of that disability.  Dkt. No. 295 ¶ 76.

Claim Specialists are also responsible for gathering information about the claim.  They

must obtain information relative to the asserted disability, such as medical records from the

claimant's doctors and job descriptions from the claimant's employer, Dkt. No. 332 ¶ 25, and in

certain circumstances will discuss the claim with healthcare providers and employers.  Dkt. No.

295 ¶ 62.  Claim Specialists will also conduct initial and subsequent interviews with claimants.
*Id.*  In the interviews, Claim Specialists have an interview guideline that they follow but are able
to ask follow-up questions on the spot based on the claimant's answers.  *Id.* ¶ 64.   Claim
Specialists do not visit claimants in their homes or at work.  Dkt. No. 332 ¶ 29.

When handling claims, Claim Specialists were also trained to assess the information they
received for issues.  The Claim Specialists were to look for any "discrepancies" in the
information that the claimant provided, such as discrepancies in the claimant's medical records
or discrepancies between the claimant's medical records and the claimant's subjective
perceptions of their disability.  Dkt. No. 295 ¶ 68.  Claim Specialists were also to look for any
"red flags," for example where a claimant claims to have a debilitating injury preventing them
from working but report going to the gym or playing sports multiple times a week.  *Id.* ¶¶ 72-73.
Claim Specialists would then raise the red flags with Metlife's "Special Investigation Unit,"
which is a separate unit tasked with investigating potential insurance fraud.  *Id.*  Claim
Specialists would also assess whether claimants were following the treatment plan recommended
by their health care professionals, such as filling prescriptions and participating in therapy.  *Id.* ¶
77.

If a case raises certain issues or is especially complex, Claim Specialists are trained to
request a "Claim Discussion Meeting."  Dkt. No. 295 ¶¶ 69-71.  Claim Specialists can invite
various professional resources to this meeting, such as a clinician, vocational rehabilitation
official, and / or another internal resource, to help them address the issues.  *Id.*  Claim Specialists
do not need to hold Claim Discussion Meetings for every claim, but only where they decide
based on their training that it is necessary or prudent to do so. *Id.* ¶ 69.

Finally, relying on their training, Claim Specialists will assess the facts of each individual claimant and decide whether they should receive LTD benefits according to the terms of the claimant's LTD Plan.  Dkt. No. 295 ¶¶ 15, 45.  *See, e.g.,* Dkt. No. 250-5, Hensel Tr. 128-29 ("[A]t the end of the day it's your name on the decision; you would own the decision.").  When calculating benefits, Claim Specialists are trained to identify any applicable offsets based on the LTD plan, such as social security, worker's compensation, or other income, and apply those offsets using MetLife's software.  Dkt. No. 295 ¶ 83; Dkt. No. 250-4, McKinney Tr. 151.

Moreover, the benefits decision will require oversight in certain circumstances.  If the Claim Specialist decides to deny the claimant benefits, then a supervisor will have to sign off on that decision.  Dkt. No. 332 ¶ 11; A supervisor will also have to sign off if a Claim Specialist decides to grant benefits outside the amount of which the Claim Specialist is authorized to grant independently.  Dkt. No. 292 ¶ 96.   Claim Specialists have varying authority to independently approve claims amounts, ranging from $0 a month, $3,000 a month, $7,500 a month, $10,000 a month, or higher.  *Id.*

Metlife has a Quality Assurance department that conducts regular audits of a small amount of randomly selected claim files to identify any errors or issues with the resolution of the claim. Dkt. No. 332 ¶ 12.

In addition to the benefits determination, Claim Specialists are also tasked with deciding, often relying on resources, whether an injured employee could return to work and what, if any, accommodations would be needed at the workplace to facilitate their return.  Dkt. No. 295 ¶¶ 100-103.  Claim Specialists will discuss these accommodations with employers, healthcare providers, and healthcare practitioners.  *Id.*

In November 2013, Metlife reclassified as Claim Specialists as administrative employees that were exempt from overtime.  Dkt. No. 332 ¶ 39.

Plaintiff Stephanie McKinney worked as Claim Specialist and received a fixed weekly salary of over $684 a week.  Dkt. No. 295 ¶¶ 10, 14.  As a Claim Specialist, Plaintiff McKinney was required to follow the Metlife policies and training described above.  Dkt. No. 332 ¶ 10, 18. After consulting the various resources at her disposal and gathering different sources of information, Plaintiff McKinney provided recommendations on whether to approve, deny, modify, or terminate a claim for hundreds of claims while working at Metlife.  Dkt. No. 295 ¶ 47, Dkt. No. 250-4, McKinney Tr. 174-78, 242, 246-49.

### D.  The FLSA Claims

The FLSA exempts from overtime requirements "any employee employed in a bona fide . . . administrative . . . capacity."  29 U.S.C. § 213(a)(1).  The applicable regulations define an administrative employee as one who is (i) compensated on a salary of not less than $684 per week, (ii) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers", and (iii) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).  "A claim of exemption under the FLSA is an affirmative defense, and the employer bears the burden of proof in making any such claim."  *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 91 n.7 (2d Cir. 2013).

Metlife bears the burden to demonstrate that there is no genuine issue of material fact regarding whether the administrative exception applies to Plaintiff McKinney.  Plaintiffs do not contest the first element of this definition, i.e., that Plaintiff McKinney and all Claims Specialists

received a salary of not less than $684 per week.  Plaintiffs do contest, however, that Plaintiff

McKinney and the other Claim Specialists at Metlife meet the other two requirements of the

administrative exception:  that their "primary duty is the performance of office or non-manual

work directly related to the management or general business operations of the employer or the

employer's customers" and "includes the exercise of discretion and independent judgment with

respect to matters of significance." 29 C.F.R. § 541.200(a).   As discussed below, the Court holds

that Metlife has met its burden of showing that there is no genuine dispute of material fact that

Plaintiff McKinney satisfies these other two elements of the exception and is therefore exempt as

an administrative employee.

    1.   **Section 541.200(a)(2): "primary duty is the performance of office or non-manual work directly related to management or general business operations of the employer or employer's customers"**

First, Metlife must show that there is no genuine dispute of material fact as to whether a

Plaitiff McKinney's "primary duty" as a Metlife Claim Specialist is "the performance of office

or non-manual work directly related to the management of general business operations of the

employer or employer's customers," 29 C.F.R. § 541.200(a).

The term "'primary duty' means the principal, main, major or most important duty that

the employee performs." 29 C.F.R. § 541.700(a).  Moreover, "the performance of office or non-

manual work directly related to the management of general business operations" means that the

employee must "perform work directly related to assisting with the running or servicing of the

business, as distinguished, for example, from working on a manufacturing production line or

selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).  The key

distinction for this aspect of the administrative exemption is whether the employee is "directly

producing the good or service that is the primary output of a business," in which case they are

not an administrative employee, or if they are "performing general administrative work applicable to the running of any business." *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009).

Additionally, the regulations expressly provide that "insurance" is an example of one of the "functional areas" of work that generally qualifies as administrative work instead of production-related work.  29 C.F.R. § 541.201(b).  The Department of Labor has specifically opined that where, like here, an employee working for an insurance company "provide[s] claims adjusting services" to customers "which are necessary to service the insurance policy sold by the insurance company," the "second criteria of the administrative exception test" is met because "their primary duty involves the performance of office or non-manual work directly related to the management or general business of the employer's customers."  DOL Opinion Letter, FLSA 2005-25.

There is no genuine dispute of material fact in the record that Plaintiff McKinney and all other Claim Specialists' "primary duty" is handling LTD benefits claims and that this duty is "directly related to the management of general business operations" of Metlife or its customers. Metlife sells insurance policies – the primary output of its business.  Claim Specialists have no involvement in producing or selling those policies but instead "process claims against [those] policies" submitted by Metlife's customers.  *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 872-73 (7th Cir. 2008) (holding that claim adjusters were exempt under the administrative exception). Plaintiffs attempt to argue that Claim Specialists are actually involved in production by redefining Metlife's product not as "insurance policies" but as "claims processing."   Dkt. No. 291 at 18.  But these definitional gymnastics do not overcome the clear regulatory guidance explaining that claims adjusters like Claim Specialists, who "administer[] the policies 'produced'

by the insurers," perform administrative work for the purposes of FLSA's administrative exception. *Roe-Midgett*, 512 F.3d at 872. There is no genuine issue of material fact as to the applicability of this exemption factor.

### 2. Section 541200(a)(3): "primary duty includes the exercise of discretion or independent judgment on matters of significance"

While the Metlife Claim Specialists' primary duty is to perform "office or non-manual work directly related to the management or general business operations," i.e. administrative work, that is only half of the exemption. The work must also "include[] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3).

### a. Discretion and independent judgment

Exercising discretion and independent judgment "involv[es] the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). It does not include performing "clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work." 29 C.F.R. § 541.202(e).

The regulations have provided some guidance as to when an insurance claims adjuster position requires the exercise of discretion and independent judgment. According to the regulations, insurance claims adjusters "generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company, if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations

regarding litigation." 29 C.F.R. § 541.203(a).   However, by its own terms the "insurance claim

adjuster" example provided in the regulations "does not create a 'blanket exemption for claims

adjusters.'" *Harper v. Gov't Emps. Ins. Co.*, 586 F. App'x 772, 774 (2d Cir. 2014) (quoting Dep't

of Labor, Wage & Hour Div., Op. Letter (Jan. 7, 2005) at 2).   Some kinds of claim adjusters

might have duties that do not meet the requirements of the administrative exemption, as defined

in 29 C.F.R. § 541.200(a).   Moreover, if a claims adjuster performs these kinds of tasks but does

so without significant discretion, or, in other words, they "merely us[e] a standardized format for

resolving claims," then the DOL has opined that those claim adjusters would not meet the

exception.   DOL Opinion letter, FLSA 2005-25.

Therefore, to succeed on its motion, Metlife must show that there are no "genuine

disputes of material fact regarding whether [Plaintiff McKinney] performed a sufficient number

of the tasks listed" above "with sufficient discretion and independent judgment to satisfy the

administrative exemption's duties requirements."   *Harper*, 586 F. App'x at 775.

The Court holds that that this burden has been met.   Metlife Claim Specialists perform

many of the tasks listed in the "insurance claim adjuster" example in the regulations (or similar

ones), including interviewing insureds and evaluating and making recommendations regarding

coverage of claims.   29 C.F.R. § 541.203.   Their job duties require them to gather large amounts

of information, including from initial and follow up witness interviews, medical reports,

employer data, and data from resources such as clinical experts, vocational rehabilitation experts,

and other internal resources.   They then are required to assess and evaluate that information to

make various judgments, such as whether the individual has a disability covered by their plan

and is eligible for coverage, whether there are any discrepancies or "red flags" with respect to the

claim, whether the claim for benefits should be approved or denied, what the amount of the

claimant's benefits should be according to their plan, when the individual should return to work and, if so, with what (if any) accommodations. Each of these steps requires the Claim Specialists to synthesize different sources of information and, based on the specific facts of that case and their extensive training, "mak[e] a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). And there is no genuine dispute of fact in the record that Plaintiff McKinney generally performed those kinds of tasks as a Metlife Claim Specialist.

In opposing Metlife's motion, Plaintiffs provide a number of arguments for why Metlife's Claim Specialists do not satisfy the administrative exemption, but all of them fail. First, Plaintiffs point out that the Claim Specialists do not perform a number of the tasks listed in the "insurance adjuster claim" example – in particular, they are not involved in litigation or evaluating fraud claims, and that they do not visit claimants at their homes or at work. 29 C.F.R. § 541.203. But the insurance claim adjuster example in the regulations does not state that a claim adjuster needs to engage in *all* of these activities to qualify, but merely that claim adjusters "generally" will meet the exemption "if their duties include activities *such as*" those listed. *Id.* As discussed above, Claim Specialists perform many of those duties.

Second, Plaintiffs argue that the Claim Specialists "effectively" do not make any decisions, because all outcomes are determined by Metlife's policies, procedures, and resources. As Plaintiffs point out, the "exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e). According to Plaintiffs, Claim Specialists follow standardized procedures as dictated by the Claims Management Guide and other internal resources at Metlife, which predetermine the outcome of every claim.

As an initial matter, that an employee relies on extensive training and expert resources does not necessarily mean that they are not rendering an independent judgment for the purposes of the administrative exemption.  The question is instead whether the individual's job duties require them to "evaluat[e] [] possible courses of conduct" and "mak[e] a decision after the various possibilities have been considered," 29 C.F.R. § 541.202(a).

Here, there is no genuine dispute that no resource or expert at Metlife decides whether a claimant is covered or chooses whether a claim will be approved, denied, terminated, or modified.   Nurses, the MD Guidelines, and vocational experts do not make decisions on whether a claimant's injury is covered under their Long-Term Disability Plan and what the extent of that coverage should be.  Nor does the Metlife Claims Management Guide make claims decisions either.  There is no genuine dispute that Claim Specialists are trained to use the Claims Management Guide, which is a repository of various guidelines for each step in the claims process.  But there is also no dispute that these guidelines do not tell Claim Specialists how any specific claim must be resolved, nor does a Claim Specialist have to consult the Claims Management Guide for every claim.  Most importantly, the portions of the Claims Management Guide that Plaintiffs entered into the record conclusively demonstrate that the *guidelines themselves* require Plaintiffs to exercise discretion and independent judgment.  For example:

> Guideline on medical determinations:  in discussing "medical development", one guideline explains that the Claim Specialist "***gathers medical and occupational information to <u>determine</u> whether the claimant satisfies the definition of disability*** and all other applicable plan provisions[,]" and instructs that "***[t]he unique facts of each claim should be considered when <u>determining</u> what medical information is needed*** and the CS should request only the medical information that is necessary for the claim determination or ongoing management[,]" and further that "[b]ased on the individual claim, the CS should ***<u>use good judgment in determining what information is relevant to the claim under review and may need to deviate from these general guidelines</u>***."  Dkt. No. 297-37 at 3 (Pl. Ex. 35) (emphasis added).

Guideline on return to work: in discussing the "return to work analysis", the guideline describes that the Claim Specialists should "work with the claimant, and often with a vocational rehabilitation consultant (VRC), to **determine if the claimant is able to return to his/her occupation**" and that the Claim Specialist "is **ultimately responsible for making the claim decision** and communicating the decision to the claimant **after reviewing the opinions and analyses provided by the clinical and/or vocational resources**." Dkt. No. 297-38 at 6 (Pl. Ex. 36) (emphasis added).

Guideline on assessing functional capacity: The Claim Specialist "is accountable for assessing the functional capacity of each claimant and is **expected to initiate that assessment independently** with the use of MDGuidelines" and is "expected to have a good overall understanding of common medical conditions and to utilize a clinical resource (CR) in situations in which the claimant's recovery is not consistent with MDGuidelines or complex in other ways." The Claim Specialist is expected to "understand" the various clinic intervention methods and "**employ the most appropriate method for the facts of each claim**." Dkt. No. 297-30 at 3 (Pl. Ex. 28) (emphasis added).

Guidelines on likely claim progression: The Claim Specialist "has **flexibility in applying the milestones and the processes described in this guideline to each individual claim depending on the LCP category identified for that claim.** Consideration should be given to what the LCP is saying about the anticipated outcome of the claim as it relates to own occupation or alternative occupation return to work potential during the Own Occupation period and to making the transition decision. Each LCP category lends itself to a specific type of investigation and timing, and **the [LTD]CS should take that into account in terms of reaching an appropriate and timely transition decision.** This investigation includes **determining what information needs to be requested of and/or shared with the claimant and when**." Dkt. No. 297-38 at 7 (Pl. Ex. 36) (emphasis added).

As these excerpts demonstrate, the Claims Management Guide is not a flow chart or template to which data goes in and a decision comes out, but rather it provides only generalized instruction for how to handle various steps of the claims process. Moreover, the experts and resources that Claim Specialists consult only address narrow questions related to individual steps of the process. Claim Specialists have to synthesize and evaluate all the different sources of information available as part of their overall decision-making on the claim.

Therefore, the undisputed record shows that the various resources provided by Metlife do not render claims decisions, Claims Specialists do. Instead of simply tabulating or recording data into a system, Claim Specialists have to evaluate various options for resolving a claim and

choose between them.[3]  In their papers, Plaintiffs assiduously avoid calling this process of choosing between the various options for resolving a claim as a "decision," but that is precisely what that word means in the English language.  (And as discussed below, even if some Claim Specialists' choices had to be approved by supervisors, they are still decisions).  And as to Plaintiff McKinney, there is no genuine dispute in the record that, as a Claim Specialist, she made these kind of claims decisions, i.e., based on her training and resources, chose between whether to approve, deny, modify, or terminate hundreds of claims.  Because her job involved making "a decision after the various possibilities have been considered" at various steps in the claims process, as a matter of law Plaintiff McKinney exercised discretion and independent judgment.  29 C.F.R. § 541.202(a).

Third and finally, Plaintiffs also argue that the Claim Specialists do not exercise discretion or use independent judgment because they are subject to substantial supervision. There is no dispute that Claim Specialists are subject to a certain amount of supervision.  If a Claim Specialists wants to deny a claimant benefits or approve benefits outside that which they have the independent authority to decide, they will need a supervisor's sign off.   But the regulations make clear that "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level[,]" because "the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review."  29 C.F.R. § 541.202(c).  Therefore, while some decisions are technically "recommendations for action

---

[3] Even if some aspects of these decisions are "effectively" dictated by a resource or the guidelines, it is not necessary that all of the Claim Specialists day-to-day tasks require the exercise of discretion and independent judgment.  The regulation only states that it need include "some." 29 C.F.R. § 541.200(a); *See Smith v. Gov't Emps. Ins. Co.,* 590 F.3d 886, 893 (D.C. Cir. 2010) (holding that GEICO auto insurance claim adjusters satisfied this element because their primary duty "includes" some work requiring the exercise of discretion and independent judgment.).

rather than the actual taking of action" because a supervisor has to sign off on them, as Plaintiff McKinney testified, those "decisions" are still "made as a result of the exercise of discretion and independent judgment." *Id.*

In sum, though they were not free to act with complete independence or disregard Metlife's training and policies, the Claim Specialists job was to make decisions that involved the exercise of discretion and independent judgment.  Without the Claim Specialists like Plaintiff McKinney, those critical decisions would not be made at Metlife.

### b.  Matters of significance

Lastly, to satisfy the administrative exemption, Metlife Claim Specialists must not only exercise discretion and use independent judgment, but must do so with respect to "matters of significance."  "The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202.  This can include "work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business," or situations where "the employee has authority to commit the employer in matters that have significant financial impact" or "to negotiate and bind the company on significant matters." 29 C.F.R. § 541.202(b).

Metlife is in the business of selling insurance policies, and therefore the Claim Specialists that administer claims for benefits under those policies are a critical aspect of Metlife's business model and affect business operations to a substantial degree.  Moreover, as Claim Specialists decide whether to commit Metlife to pay benefits to claimants and each Claim Specialist is handling an average of 90-100 claims at a time, their decisions result in a significant financial commitment for Metlife.  Claim Specialists therefore work on "matters of significance."

* * *

The undisputed facts in the record demonstrate that Metlife Claim Specialists' "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).  The undisputed facts also demonstrate that Plaintiff McKinney was no exception.  Metlife has therefore met its burden of demonstrating that no genuine dispute of fact as to whether Plaintiff McKinney is exempt from overtime pay under the FLSA and the Court grants summary judgment for Metlife as to her FLSA claims.

### E.  Connecticut Wage Law Claims

In addition to certain Plaintiffs' FLSA claims, Metlife moves for summary judgment on Plaintiff McKinney's Connecticut Minimum Wage Act (CMWA).  Similar to the FLSA, the CMWA exempts individuals "employed in a bona fide . . . administrative . . . capacity[,]" Conn. Gen. Stat. Ann. § 31-58(e), as defined by state regulations.  Although similar, the CMWA definition of an administrative employee has additional requirements not present in the FLSA. One additional requirement is that the employee cannot "devote more than twenty per cent . . . of his hours worked in the workweek to activities which are not directly and closely related to the performance of" administrative work.  Conn. Agencies Regs. § 31-60-15.  The Defendant likewise bears the burden of demonstrating that each element of the CMWA exemption applies. *See Hendricks v. J.P. Morgan Chase Bank*, N.A., 677 F. Supp. 2d 544, 559 (D. Conn. 2009).

Metlife has not shown that no dispute of material fact exists as to whether Plaintiff McKinney spent less than 20% of her time on tasks that were not directly related to administrative work.  Metlife argues in its brief that McKinney did not spend any time on tasks that were not directly related to administrative work, but Metlife's Rule 56.1 statement does not

address the amount of time that Plaintiff McKinney spent on particular kinds of tasks or otherwise speak to this issue. Therefore, Metlife has not met its burden of demonstrating that there is no genuine dispute of material fact as to this issue and the Court will not grant summary judgment on the CMWA claims.

## VI.    MOTION TO SEAL

Defendants move to keep certain documents submitted in support of the Plaintiffs' motions under seal. Dkt. Nos. 264, 277, 290, 298. Defendants argue that these documents contain confidential and proprietary information related to Metlife's business, including sample contracts and information about Metlife's pricing structures and business strategies. *Id.* Plaintiffs do not oppose these requests. *Id.*

While is a presumption of access to judicial documents, Courts may permit narrowly tailored requests for sealing when there are important privacy and other competing interests at stake. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "[C]ourts have long recognized the protection of trade secrets as a justification for limiting public access to judicial documents" and that "[h]arm to a litigant's competitive standing likewise constitutes a competing consideration." *Sylvania v. Ledvance LLC*, No. 20-CV-9858 (RA), 2021 WL 412241, at *2 (S.D.N.Y. Feb. 5, 2021). The Court determines that Metlife's proposed sealing requests are narrowly tailored and justified by the need to protect their proprietary or otherwise sensitive business information. Metlife's unopposed motion is therefore granted.

## VII.    CONCLUSION

For the reasons discussed in this opinion, Plaintiffs' motion to strike or for the Court to disregard Metlife's employees' survey responses is DENIED, Metlife's motion to decertify the collective is GRANTED, Plaintiffs' motion to certify a Rule 23 class is DENIED, Plaintiffs'

motion to strike Metlife's Reply to Plaintiffs' opposition to Metlife's Rule 56.1 Statement is

GRANTED, Metlife's motion for partial summary judgment is GRANTED, and Metlife's

unopposed motion to seal certain exhibits are GRANTED.  The parties' motions for oral

argument are DENIED as moot.  This resolves Dkt. Nos. 228, 244, 248, 257, 264, 265, 271, 277,

280, 290, 298, 309, and 338.


       SO ORDERED.

Dated:  August 31, 2021
       New York, New York

_____
       ALISON J. NATHAN
      United States District Judge